**GIBSON, DUNN & CRUTCHER LLP**
Orin Snyder (*pro hac vice*)
Michael A. Rosenthal (*pro hac vice*)
Brian M. Lutz (*pro hac vice*)
Christopher D. Belelieu (*pro hac vice*)
Justine M. Goeke (*pro hac vice*)
Grace Hart (*pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  OSnyder@gibsondunn.com
        MRosenthal@gibsondunn.com
        BLutz@gibsondunn.com
        CBelelieu@gibsondunn.com
        JGoeke@gibsondunn.com
        GHart@gibsondunn.com

Helgi C. Walker (*pro hac vice*)
Russell B. Balikian (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Phone:  (202) 955-8500; Fax:  (202) 530-9575
Email:  HWalker@gibsondunn.com
        RBalikian@gibsondunn.com

*Co-Counsel for SES Americom, Inc.*

**KAUFMAN & CANOLES, P.C.**
Dennis T. Lewandowski
Clark J. Belote
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Phone:  (757) 624-3252; Fax:  (888) 360-9092
Email:  dtlewand@kaufcan.com
        cjbelote@kaufcan.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| *In re* | Bankruptcy Case No. 20-32299 (KLP) |
| INTELSAT S.A., *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

## SES AMERICOM, INC.'S NOTICE OF APPEAL

Pursuant to Federal Rule of Bankruptcy Procedure 8002(a)(1) and Bankruptcy Form

417A, SES Americom, Inc. ("SES") hereby respectfully submits this Notice of Appeal to appeal

---

[1]  Due to the large number of debtors (collectively, the "<u>Debtors</u>") in these chapter 11 cases, a complete list of the Debtor entities is not provided in the caption.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/intelsat.

to the U.S. District Court for the Eastern District of Virginia for review of the September 30, 2022 decision of the U.S. Bankruptcy Court for the Eastern District of Virginia, Richmond Division, disallowing SES's Proofs of Claims against Intelsat US LLC, Intelsat License LLC, and Intelsat Jackson Holdings S.A., and all prior underlying and related adverse decisions.

## Part 1: Identify the appellant

1.   **Name of appellant:**

SES Americom, Inc.

2.   **Position of appellant in the bankruptcy case that is the subject of this appeal:**

Creditor (the party that filed the Proofs of Claim that the Court disallowed).

## Part 2: Identify the subject of this appeal

1.   **Describe the judgment, order, or decree appealed from:**

SES appeals the September 30, 2022 Order sustaining Debtors' objection to Claims 84, 85, and 103 filed by SES and disallowing these claims [Docket No. 4527]; the accompanying Memorandum Opinion entered on September 30, 2022 [Docket No. 4526]; and the Amended Memorandum Opinion entered on October 5, 2022 [Docket No. 4528], together with all rulings, findings, determinations, and other decisions adverse to SES embodied in these prior pleadings or relating to Claims 84, 85, and 103 filed by SES, including specifically the order denying SES's Motion for Summary Judgment [Docket No. 2645].

A copy of the Order [Docket No. 4527] is attached hereto as **Exhibit A**, a copy of the original Memorandum Opinion [Docket No. 4526] is attached hereto as **Exhibit B**, and a copy of the Amended Memorandum Opinion [Docket No. 4528] is attached hereto as **Exhibit C**.

2.   **State the date on which the judgments, orders, or decrees were entered:**

The Order and original Memorandum Opinion were entered on September 30, 2022.  The Amended Memorandum Opinion was entered on October 5, 2022.

**Part 3: Identify the other parties to the appeal**

**List the names of all parties to the judgments, orders, or decrees appealed from and the names, addresses and telephone numbers of their attorneys:**

**APPELLEES:**

Intelsat US LLC, Intelsat License LLC, and Intelsat Jackson Holdings S.A.

The names, addresses and telephone numbers of counsel are as follows:

Edward O. Sassower, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

John O'Quinn, P.C. (admitted *pro hac vice*)
Michael A. Glick (admitted *pro hac vice*)
Emily Merki Long (admitted *pro hac vice*)
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Michael B. Slade (admitted *pro hac vice*)
Jeffrey J. Zeiger, P.C. (admitted *pro hac vice*)
Casey McGushin (admitted *pro hac vice*)
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Michael A. Condyles (VSB No. 27807)
Peter J. Barrett (VSB No. 46179)
Jeremy S. Williams (VSB No. 77469)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, VA 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

**OTHER INTERESTED PARTIES:**

John P. Fitzgerald, III, Acting United States Trustee, Region Four

The names, addresses and telephone numbers of counsel are as follows:

B. Webb King                                    John P. Fitzgerald, III
Office of the United States Trustee             Office of the US Trustee – Region 4-R
210 First St., SW, Suite 505                    701 E. Broad Street, Suite 4304
Roanoke, VA 24011                               Richmond, VA 23219


Intelsat S.A. and its affiliated debtor entities (other than appellees), including:

        Intelsat Virginia Holdings LLC
        Intelsat Connect Finance S.A.
        Intelsat (Luxembourg) S.A.
        Intelsat Envision Holdings LLC
        Intelsat Investment Holdings S.À.R.L.
        Intelsat Holdings S.A.
        Intelsat Investments S.A.
        Intelsat UK Financial Services Ltd
        Intelsat Align S.À.R.L.
        Intelsat License Holdings LLC
        Intelsat Subsidiary (Gibraltar) Limited
        Intelsat Holdings LLC
        Intelsat Finance Bermuda Ltd.
        Intelsat Satellite LLC
        Intelsat Ventures S.À R.L.
        Intelsat Global Sales & Marketing Ltd
        Intelsat International Systems LLC
        PanAmSat International Holdings LLC
        Intelsat International Employment LLC
        PanAmSat Europe Corporation
        Intelsat Genesis GP LLC
        Intelsat Service and Equipment LLC
        Southern Satellite LLC
        Southern Satellite Licensee LLC
        PanAmSat International Sales LLC
        Intelsat Genesis Inc.
        Intelsat Alliance LP
        Intelsat US Finance LLC
        PanAmSat India LLC
        PanAmSat India Marketing L.L.C.
        Intelsat Asia Carrier Services LLC

The names, addresses and telephone numbers of counsel are as follows:

Edward O. Sassower, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VSB No. 27807)
Peter J. Barrett (VSB No. 46179)
Jeremy S. Williams (VSB No. 77469)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, VA 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

John O'Quinn, P.C. (admitted *pro hac vice*)
Michael A. Glick (admitted *pro hac vice*)
Emily Merki Long (admitted *pro hac vice*)
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Michael B. Slade (admitted *pro hac vice*)
Jeffrey J. Zeiger, P.C. (admitted *pro hac vice*)
Casey McGushin (admitted *pro hac vice*)
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain jurisdictions)**

**If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.**

N/A – There is no Bankruptcy Appellate Panel.  SES desires for the U.S. District Court for the Eastern District of Virginia to hear this appeal.

**Part 5: Sign below**


Respectfully submitted,

Dated: October 14, 2022                    /s/ *Dennis T. Lewandowski*

Orin Snyder (*pro hac vice*)                     KAUFMAN & CANOLES, P.C.
Michael A. Rosenthal (*pro hac vice*)            Dennis T. Lewandowski
Brian M. Lutz (*pro hac vice*)                   Clark J. Belote
Christopher D. Belelieu (*pro hac vice*)         150 W. Main Street, Suite 2100
Justine M. Goeke (*pro hac vice*)                Norfolk, VA 23510-1665
Grace Hart (*pro hac vice*)                      Phone:  (757) 624-3252; Fax:  (888) 360-9092
GIBSON, DUNN & CRUTCHER LLP                       Email:  dtlewand@kaufcan.com
200 Park Avenue                                           cjbelote@kaufcan.com
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  OSnyder@gibsondunn.com
Email:  MRosenthal@gibsondunn.com
Email:  BLutz@gibsondunn.com
Email:  CBelelieu@gibsondunn.com
Email:  JGoeke@gibsondunn.com
Email:  GHart@gibsondunn.com

Helgi C. Walker (*pro hac vice*)
Russell B. Balikian (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Phone:  (202) 955-8500; Fax:  (202) 530-9575
Email:  HWalker@gibsondunn.com
Email:  RBalikian@gibsondunn.com

*Co-Counsel for SES Americom, Inc.*

### CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on October 14, 2022, I caused a copy of the foregoing to be (a) electronically filed with the CM/ECF system of the United States Bankruptcy Court for the Eastern District of Virginia, which thereby caused the above to be served electronically on all registered users of the ECF system that have filed notices of appearance in this matter, and (b) served by email on the Core 2002 List, on the list attached hereto as **Exhibit D**, where an email address is indicated, and to be mailed by U.S. First Class Mail to the recipients where only a mailing address is indicated.

                By /s/ *Dennis T. Lewandowski*
                    Counsel

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| INTELSAT S.A., *et al.*, | ) | Case No. 20-32299 (KLP) |
|  | ) |  |
| Reorganized Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### ORDER

In accordance with the Memorandum Opinion issued this date,

IT IS ORDERED that the objection of Debtors to Claims 84, 85, and 103 filed

by  SES Americom, Inc. is sustained, and

IT IS ORDERED that Claims 84, 85, and 103 filed by  SES Americom, Inc.

are disallowed.[1]

Signed: September 30, 2022

/s/ Keith L. Phillips
United States Bankruptcy Judge

Copies to:

Entered on Docket:  September 30, 2022

Orin Snyder
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Michael A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue

---

[1] The Motion for summary judgment filed by Intelsat is moot in light of the Court's ruling.

New York, NY 10166-0193

Brian M. Lutz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Christopher D. Belelieu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193Justine M. Goeke

Brian M. Lutz.
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000

20 San Francisco, CA 94105
KAUFMAN & CANOLES, P.C.
Dennis T. Lewandowski
Clark J. Belote
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665

Peter J. Barrett
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Michael A. Condyles
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Jeremy S. Williams
Kutak Rock L.L.P.
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Edward O. Sassower, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Steven N. Serajeddini, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Aparna Yenamandra
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Michael B. Slade
KIRKLAND & ELLIS LLP
300 North LaSalle
 Chicago, IL 60654

Michael A. Glick
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
15 Washington, DC 20004

B. Webb King
Office of the United States Trustee
210 First St, SW, Suite 505
Roanoke, VA 24011

John P. Fitzgerald, III
Office of the US Trustee - Region 4 -R
701 E. Broad Street, Ste. 4304
Richmond, VA 23219

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| INTELSAT S.A., *et al.*, | ) | Case No. 20-32299 (KLP) |
|  | ) |  |
| Reorganized Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## MEMORANDUM OPINION

## INTRODUCTION

On May 13, 2020, the Debtors[1] filed voluntary petitions for relief under

chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.  (Docket

No. 1)  On July 14, 2020, SES Americom, Inc. ("SES"), filed proofs of claim against

each of the Debtors  (DX94), alleging that each Debtor had repudiated its

obligations under a consortium agreement, including the obligation to split evenly

any proceeds received by Intelsat and SES under that agreement.  (DX94 at 7.)

SES sought "at least $1.8 billion" against each Debtor, claiming it was entitled to

"approximately $450 million" in compensatory damages, plus punitive damages.

(DX94 at 6, 7.)

---

[1] Due to the large number of debtors (the "Debtors" or "Intelsat"), the Court does not list
them all herein.  The other related filing entities are listed at Docket No. 89, the Court's
order granting joint administration.  The instant case, *In re Intelsat, S.A.*, was designated
the lead case.

On October 19, 2020, the Debtors objected to SES's proofs of claim (the "Objection"). (Docket No. 946.) At the conclusion of discovery, the parties filed competing motions for summary judgment. (Docket Nos. 2342, 2345, 2845.) Following oral argument, the Court denied SES's motion for summary judgment, holding that there were genuine issues of material fact precluding such a ruling. (Docket No. 2845, 8/19/21 Tr. at 121:5-10.) The Court took Intelsat's motion for summary judgment (the "Motion") under advisement "to consider whether or not it should grant partial summary judgment, summary judgment in full, or to apply relief under Rule 56(g)." (*Id.* at 121:25-122:4.) The Court deferred ruling on the Motion until after the scheduled trial. (Docket No. 4171, 2/2/22 Tr. at 4:5-25.)

The Court confirmed the Debtors' plan of reorganization (the "Plan") on December 17, 2021. (DX528 (Docket No. 3894.)) In resolving SES's objections to confirmation of the Plan (Docket 3468), the parties narrowed some of the issues raised by the Objection. (Docket No. 3719.) On the February 23, 2022, effective date of the Plan (*see* Docket No. 4279), SES waived and released its Proofs of Claim against all Intelsat entities except Intelsat US LLC (Proof of Claim 85), Intelsat Jackson Holdings S.A. (Proof of Claim 103), and Intelsat License LLC (Proof of Claim 84), and it released all its punitive damage claims. (*See* Docket No. 3719 § 1.2.2.) In addition, in the order confirming the Plan, the Court found that Intelsat License LLC was the Intelsat entity entitled to receive any earned accelerated relocation payments provided by the FCC's Final Order (*see infra* p.6) (DX528 ¶¶ 91-96.)

In ruling on the Objection and the Motion, the Court has considered the parties' Joint Stipulated Facts (Docket No. 4143) and the evidence presented during a lengthy trial. At trial, SES called six witnesses, and the Court admitted nearly 900 exhibits, either by stipulation of the parties (Docket Nos. 4176, 4200, 4385) or during trial. The Court also received and considered deposition designations from an additional 18 witnesses.

For the reasons stated herein, the Court will sustain the Debtors' objections to the proofs of claim at issue.

## BACKGROUND

The now-reorganized Debtors and SES (jointly "the Parties") are two of the world's largest and most sophisticated satellite operators. The Debtors and SES combined provide more than 90% of incumbent satellite services in the C-Band spectrum in the United States. (Docket No. 4143, ¶ 6.) In 2018, they entered into an agreement to collaborate on a specific project (the "Project"), in which they, along with other smaller satellite operators, would collectively negotiate to sell access to C-Band spectrum to mobile carriers, share in the costs of clearing that spectrum, and then split any remaining proceeds. (DX1; *see also* DX61-62, 78-79.)[2] Under the Parties' proposal, the profits would depend on how the market valued their shared spectrum, as well as their ability to collectively minimize clearing costs. (DX1 § 6.04.) However, the Federal Communications Commission ("FCC") rejected their proposal (DX136 ¶ 37.) and instead ordered that Intelsat and SES each clear their

---

[2] This was part of an effort to transition their operations from a band of electromagnetic spectrum in what is called the "C-Band" to clear the spectrum for 5G wireless use.

own transmissions from 300 MHz of the spectrum (the "Final Order"). Neither would share in each other's risks or clearing costs, nor would they share in or otherwise receive market-based proceeds. Under the Final Order, each of them may individually receive fixed compensation, in an amount set by the FCC, if they successfully complete their own individual required clearing work. (*Id.* ¶¶ 227-34; *see also id.* ¶¶ 171, 174, 287, 295.)

Under the Final Order, if it completes its clearing tasks, SES should receive $4 billion and have certain of its own clearing costs reimbursed. (*Id.* ¶ 232.) However, SES asserts it is entitled to half of all "proceeds" from the venture the Parties had proposed to the FCC and had memorialized in the Agreement. SES alleges that this would leave it with a shortfall of $420,824,626.

The relationship between the Parties began in 2017, when Intelsat and SES began discussions. On September 27, 2018, they entered into a 120-page Consortium Agreement (the "Agreement" or the "Consortium Agreement"), memorializing those discussions. (DX1.) The Agreement and its exhibits define the "Project" that the Parties agreed to pursue, and it also identifies alternatives they sought to avoid through this collaboration. Through the Project, the Parties would cooperate and jointly negotiate agreements to voluntarily clear portions of the C-Band to give mobile carriers access. (DX101.) The actual consortium created by the Agreement is commonly referred to as the "C-Band Alliance" or "CBA" (the "CBA" or the "Consortium").

Because the Parties both had the right to use the C-Band spectrum the Project could only succeed if they collectively negotiated with new users and voluntarily and collectively cleared the use of the shared spectrum by all incumbent users. The Consortium would negotiate access and manage the clearing, with compensation determined by the market's valuation of that spectrum. The Parties agreed to share in the Project, both in their up-front costs (involving the replacement of billions of dollars of investment in satellites and equipment) and in potential profits from transfer of their spectrum rights.

The Agreement was negotiated as the Parties were simultaneously urging the FCC to adopt their market-based approach. (DX106-08; DX310; DX172.) That proposal advocated a privately-run, market-based solution in which incumbent satellite operators would collectively negotiate with new "secondary" users over what spectrum to offer, how and by when to effectuate the clearing, and what the price would be for vacating the spectrum. The Agreement, in turn, expressly incorporated key aspects from the FCC's July 13, 2018, Notice of Proposed Rulemaking ("NPRM")—released during the midst of the Parties' contract negotiations—including the specific concept of a satellite operator-controlled "transition facilitator" that would have specific powers and authority to act on behalf of all incumbent operators in the clearing process. (*See* DX114 ¶¶ 66-97; DX1 at SES0210335-36.)

The FCC did not adopt the Parties' proposal. (DX136 ¶¶ 213-14.) In the March 3, 2020, Final Order, it rejected the market-based approach and instead

mandated that the satellite operators clear certain spectrum by 2025. (*Id.* ¶¶ 37, 155.) The FCC did not appoint a private "transition facilitator" to control the clearing process, determine the spectrum to be cleared, or negotiate compensation. Instead, the FCC determined how much spectrum must be cleared, imposing the threat of penalties on each operator individually if it did not clear as ordered. (*Id.* ¶¶ 175-77.) At the same time, the FCC provided that the new users must reimburse each satellite operator individually for certain transition costs. (*Id.* ¶¶ 178, 199.) Unlike the Project, such costs—and the risks associated with clearing—are not shared under the FCC's approach. Instead, the FCC offered "accelerated relocation payments" on an individualized basis for each satellite operator—based on the operator's own relative market share and clearing burdens—to encourage it individually to clear its own use earlier than mandated. (*Id.* ¶¶ 232-33, 289, 295.) Again, unlike the Project, the risks of another operator failing to clear its own transmissions are also not shared among satellite operators: Each satellite operator is paid if it succeeds in clearing early, regardless of whether any other operator also succeeds. (*Id.*) The FCC's accelerated relocation payments have no relationship to the value of the spectrum itself or to the public auction— they were set by regulatory fiat. (*Id.* ¶ 191.) Nothing about what the satellite operators are eligible to receive in either cost reimbursement or accelerated relocation payments appears to be determined by the market.

Although the FCC rejected the Parties' proposal, SES asserts the $9.7 billion in accelerated relocation payments that SES and Intelsat would secure if they

fulfilled their individual clearing obligations are subject to the Agreement's 50/50
split.  Under SES's theory, those payments are subsumed within the "Project" that
the Parties defined in the Agreement.  SES's breach-of-contract theory turns on the
meaning of "Project" under the Agreement.  Alternatively, they proffer theories of
unjust enrichment and breach of fiduciary duty.

The Debtors urge that the testimony and evidence from the seven-day bench
trial confirm what the plain text of the Agreement says and that the Consortium
Agreement was not written to encompass any and every eventuality that the FCC
might adopt.  They argue that the Agreement spells out a market-based solution in
detail both in directly defining the "Project"—specifying that the Consortium is to
"serve as the transition facilitator referred to in the NPRM"—and in exhibits such
as a model "Secondary Market Agreement," which could only be altered with both
Parties' consent.  (DX1 at SES0210335; *see also id.* §§ 2.01, 2.02, Ex. A.)  The
Debtors point to the fact that, in contrast, the Consortium Agreement does not
address how the Parties would operate under, or share costs or benefits from, any
other approach to clearing the C-Band spectrum, including the FCC's eventual
decision to order the clearing of the spectrum on its own terms.

Further, they argue that the negotiation history, the incorporation of the
FCC's NPRM into the Agreement, the Parties' contemporaneous representations to
the FCC, and their course of conduct all provide the relevant industry context and
confirm the "Project" exclusively entailed the Parties' proposed market-based
approach, in which the market—not the FCC—would determine how much

spectrum the Parties would offer in exchange for compensation based on the value of that spectrum.  They argue that all presentations and documents confirm that the voluntary market-based approach depended on the Consortium's negotiating market-based transactions with entities interested in specific parts of the C-Band and defining the methodology for clearing the spectrum.

SES argues that its conduct over the period between  (i) November 2019, when the FCC Chairman, via tweet, announced his intent to pursue a public auction and (2) the FCC's February 2020 issuance of a draft final order (the "Draft Order"), showed that the Consortium Agreement must have encompassed more than the market-based proposal.  The Debtors argue that rather, that conduct shows the Parties were simultaneously doing two things: (i) working to salvage aspects of their Project, at least in part—and with it, market-based compensation— in the construct of a public auction, and (ii) considering whether to amend the Consortium Agreement to encompass whatever the FCC might ultimately adopt.

Even after the FCC Chairman's November 2019 tweet, the Parties continued to advocate for the transition facilitator role as defined in the NPRM and continued to seek a share of the proceeds from the FCC's eventual auction as compensation based on the market's valuation of the spectrum.  That advocacy for market-based compensation continued even into the final two weeks prior to the FCC's issuing the Draft Order.  The Parties continued to advocate for market-based compensation until the very end when they jointly sought to increase the FCC's fixed payments.

At the same time, SES sought to amend the Consortium Agreement. To that end, SES proposed a complete re-write, redefining the key terms "Project" and "Project Gross Proceeds" and deleting "Secondary Market Agreements" altogether. (DX127.) When that proposal failed, SES sought to add language to a "short-form" amendment that would have provided for a 50/50 split between the Parties regardless of the FCC's approach. (DX42.) At the time, SES's chief strategist and chief legal officer both described SES's need for amendment as "urgent" and "critical." (DX167; DX170.)

Intelsat posits that the reason SES had an urgent need to amend was because its executives were concerned that the approach the FCC appeared likely to adopt—and ultimately did adopt—was not covered by the Consortium Agreement. It cites SES contemporaneous internal communications that (i) an FCC-directed distribution mechanism would "unravel the project" (DX411, DX470), (ii) an FCC-created proceeds split would be "very bad" for SES (DX239), and (iii) the FCC's approach would "void our 50/50 with Intelsat" (DX78) and the "50/50 with Intelsat would be gone" (DX79.) Attempts by SES's executives to explain away those contemporaneous statements at trial were not credible. At the same time, the instructions from the highest levels within SES were to "find a way to preserve the structure of the consortium agreement" (DX239), and to seek an "upfront agreement with Intelsat" (DX411.) SES failed to obtain such an amendment, and Intelsat argues that once the contours of the Final Order became clear, it would have made no sense for Intelsat to give away hundreds of millions of dollars at the expense of

its creditors when, unlike the proposed Project, SES's cooperation was neither necessary nor relevant to what the FCC had mandated.

SES did amend other agreements to account for the FCC's rejection of the market-based approach.  The Parties rewrote their agreement with one vendor[3] to remove all references to "secondary market agreements" and "project-based proceeds"—terms defined by the Consortium Agreement—because neither appeared to be in the cards.  (SES244.)  Intelsat's CFO stated that the economics for a second vendor[4] should change because the deal the Parties were working on was "clearly outside the old docs."  (DX477.)  And with respect to a third vendor,[5] SES concluded it neither needed to amend nor terminate its contract because, given the FCC's change in approach, it simply "doesn't apply to the situation," as it "was not covered."  (DX460; DX461.)

The timetable of the Parties' negotiations with the FCC is as follows:

January 17, 2020 - The FCC informally proposes $5 billion in total payments to the satellite operators, with $2.55 billion allocated to Intelsat and $1.3 billion allocated to SES.

February 3, 2020 – The FCC revises its offer to change the distribution between the Debtors and SES.  The distribution proposed was $2.89 billion allocated to Intelsat and $1.35 billion allocated to SES.

---

[3] Evercore.
[4] 5GEIA.
[5] Auctionomics.

10

February 4, 2020 – The FCC proposes $8.8 billion in total payments to the satellite operators, with $5.08 billion allocated to Intelsat and $2.4 billion allocated to SES.

February 5, 2020 – The FCC informally proposes $9.7 billion in total payments to the satellite operators, with $4.85 billion allocated to Intelsat and $3.99 billion allocated to SES.

February 7, 2020 – The FCC issues the Draft Order, reflecting the numbers proposed on February 5.

March 3, 2020 – The FCC issues the Final Order, reflecting the numbers set out in the Draft Order and officially abandoning the market-based approach for clearing the C-Band Spectrum.

Despite the Parties' collective efforts to try to salvage aspects of the Project, the FCC's decision to conduct a public auction was a significantly different from the Parties' Agreement.  It was in this atmosphere that the Debtors filed their chapter 11 petitions on May 13, 2020.

## DISCUSSION

**Jurisdiction**  The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  The Objection constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B).

**Burden of Proof**.  "The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim.  The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim.  The burden then shifts to the debtor to object to the claim.  The debtor must introduce evidence to rebut the claim's presumptive validity.  If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence."  *Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 640 (4th Cir. 2004) (internal citations omitted).  The Court finds that the Debtors, in introducing substantial credible evidence, as referenced above, have successfully shifted the burden to SES to prove, by a preponderance of the evidence, the validity and amount of the claims it has asserted.

**Conclusions of Law**.[6]  At its essence, this is a case about a contract, the Consortium Agreement, and what effect the Final Order had on it.  The answer will determine whether Intelsat is obligated to share accelerated relocation payments equally with SES, as SES claims.

***Breach of Contract.***  The Consortium Agreement's plain language contemplates a private market-based approach fundamentally at odds with the FCC's Order.  The Agreement considers the "Project" to be a private, market-based approach.  Such an approach is fundamentally at odds with the FCC's Draft and Final Orders.

---

[6] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

SES initially took the position in responses to Intelsat's Requests for
Admission that the terms "Project," "Project Purposes," "Project Gross Proceeds,"
"Project Structure," as well as §§ 10.02 (Termination Clause) and 11.04
(Amendment Clause) of the Consortium Agreement were all ambiguous.  (2/9/22 Tr.
118:18-120:9 (Purvis) (discussing (DX249); *see also* DX249 at 8-11, 14-15, 18, 22, 25-
26, 30.)  But at trial, SES's counsel stated that "we think the contract language is
clear."  (2/7/22 Tr. 16:6-13 (SES Opening).)  Regardless of this statement, the Court
will address whether the Agreement is unambiguous as to the private, market-
based approach contemplated as the "Project."

The Agreement is governed by New York law (*see* DX1 § 11.02), and New
York courts apply a high bar respecting ambiguity.  Ambiguity does not arise simply
"because two interpretations are technically possible; both interpretations must also
be reasonable." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d
293, 304 (S.D.N.Y. 2010).  Likewise, where "the meaning of an agreement among
sophisticated parties is unambiguous on its face, the agreement does not become
ambiguous simply because one of the parties later asserts that it intended a
different interpretation." *Rahl v. Bande*, 328 B.R. 387, 401 (Bankr. S.D.N.Y. 2005)
(citation omitted).  "A written agreement that is complete, clear, and unambiguous
on its face must be enforced to give effect to the meaning of its terms and the
reasonable expectations of the parties, and the court should determine the intent of
the parties from within the four corners of the contract without looking to extrinsic
evidence to create ambiguities." *Hoeg Corp. v. Peebles Corp.*, 60 N.Y.S. 3d 259, 261

(N.Y. App. Div. 2017); *see also Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)

("[a]mbiguity is determined by looking within the four corners of the document, not

to outside sources"). Rather, a contract is ambiguous only where a relevant term

within the agreement is "reasonably subject to differing interpretations."

*Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001).

The plain and unambiguous language of the Agreement makes clear that the

"Project," "Project Purposes," "Project Scope," "Project Structure," and "Project

Gross Proceeds" apply only to a private, market-based approach to clearing the C-

Band spectrum. Thus, consideration of extrinsic evidence is unnecessary and

improper.

"Project." From the opening page of the Agreement, the Parties plainly

contemplated the Project to be the market-based solution they discussed among

themselves and repeatedly presented to the FCC, and which the FCC described in

detail in the July 2018 NPRM. The Agreement states that the members "desire to

enter into … a consortium . . . to act as the transition facilitator referred to in the

NPRM, for the purpose of implementing the Project." (DX1 at SES0210335.) The

Agreement then immediately states that the Project "will entail a market-based

solution . . . as described in more detail herein and in the NPRM." (*Id.*) The

Agreement is also clear that the term "will" has the same meaning as "shall," which

SES concedes is mandatory. (DX1 § 1.03(d)(viii); 2/9/22 Tr. 103:17-21 (Purvis).) The

"Project" is therefore the market-based solution described in the Consortium

Agreement and in the NPRM that the FCC explicitly rejected in its eventual Order.

"Project Purposes." The Project Purposes confirm that the Project refers only to the "market-based approach" contemplated by the NPRM. The first reason the Parties indicated they wished to "develop and implement the Project" was to "act as transition facilitator"—a role exclusively associated in the NPRM with the market-based approach—"and ensure expedited transition of the [C-Band] Spectrum." (DX1 at SES0210335.) The Project lacks any mention of any other method for clearing the spectrum that may have been under consideration by the FCC, other than to state expressly—and as a further "Project Purpose"— that the Agreement was designed to "avoid certain complications associated with other potential options for clearing a portion or portions of the C-Band." (*Id.*) It would make little sense that an approach to clearing the C-Band that the Parties were expressly developing their Project to "avoid"—an FCC-run auction over which the Parties lacked control—would nonetheless fall *within* that Project, as SES insists.

"Project Scope." The structure of the Project definition in the Agreement confirms it remained singularly focused on the private market-based approach. The description of the Project Scope in § 2.01 provides a list of nine tasks that the Parties "shall undertake" "[i]n furtherance of the Project Purposes." The list of tasks is conjunctive, with each undertaking separated by "and," rather than a disjunctive list from which the Parties could pick and choose. The private market-based approach is the only method under which all nine undertakings would be applicable, and many of the undertakings could only be applicable to a privately-run, market-based auction where proceeds flowed directly to satellite operators (not

15

to the government).  As an example, the Project Scope required the Consortium to "negotiate and enter into" secondary market agreements that were unique to the private market-based approach.  (DX1 § 2.01(c).)  In negotiating such agreements with 5G providers, the Project also required the Parties to "determine amounts of C-band spectrum to be offered," (DX1 § 2.01(a)), petition the FCC to transfer the spectrum licenses to the mobile operators with whom the Consortium had entered into Secondary Market Agreements, (§ 2.01(b)), "create . . . a master plan setting forth the authorized Spectrum Clearing activities" for all Protected Incumbent Users (§ 2.01(d)), and establish procedures to compensate and reimburse members for Eligible Spectrum Clearing Costs from Project Gross Proceeds (§§ 2.01(e), (f))— all facets of a market-based solution and not a public auction approach, none of which are compatible with the FCC's Orders.  (DX1 §§ 2.01(a)-(h); *see also* 2/15/22 Tr. 31:11-16, 31:25-32:5 (Bryan).)

    After identifying eight specific tasks that the Parties "shall undertake" as part of the private market-based approach, the ninth and final conjunctive charge is that the Parties would "otherwise serve as the transition facilitator referred to in the NPRM." (DX1 § 2.01(i).)  The use of the word "otherwise," an adverb meaning "in all *other* respects," demonstrates that the preceding eight undertakings listed in the Project Scope are simply some of the tasks the Parties understood would be associated with serving as the Transition Facilitator, a function only relevant under the private auction, market-based approach.  *See Otherwise*, Merriam-Webster (11th ed. 2003); *see also 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.*, 815

16

N.Y.S.2d 507, 510 (N.Y. App. Div. 2006) ("The meaning of a word in a series of words is determined by the company it keeps.").

The "Transition Facilitator" role is unique; the FCC defined that role in the NPRM, and it existed solely under the proposed market-based approach. The NPRM contemplated that the "Transition Facilitator" would serve several important functions that would be relevant only within a market-based private auction. These included "negotiat[ing] with any interested terrestrial operators and incumbent users, [and] clear[ing] the negotiated-for spectrum, making it available for flexible use while protecting incumbent earth stations through a variety of potential means." (DX114 ¶ 72.) SES's Chief Legal Officer suggested they "tie in" the Agreement with the NPRM. (DX110 at SES00091323.) That is reflected in the final Agreement: almost every time the term "Transition Facilitator" is used in the Agreement, the NPRM itself is explicitly referenced. (DX1.)

The Court finds that the Project undertakings were rejected in the FCC's Final Order. Under the FCC's Order, the Consortium does not pick blocks of spectrum to auction; the FCC does. Under the FCC's Order, neither the CBA nor any satellite firm has any role in the auction; the FCC runs it exclusively. Under the FCC's Order, the FCC, not a Transition Facilitator, manages the clearing; thus, there is no need for a master plan. Under the FCC's Order, the satellite companies play no role in processing reimbursements or allocating compensation (which the FCC itself determined).

SES's argument that the optional amendment provision in § 2.01 of the Agreement establishes the Parties' intent to include more than just the market-based approach fails under New York law. SES argues the fact that the Parties "acknowledged and understood that various details of the Project shall be subject to change" means that the Parties were required to amend the Agreement to encompass a public auction. But if that were the case, the Parties could have used mandatory language—"shall"—for amendments, as they did in other parts of the agreement, rather than note the Agreement "may be amended." (2/9/22 Tr. 100:9-15, 123:20-125:5 (Purvis); Campbell 4/26/21 Dep. Tr. 223:20-224:6;[7] *see* 2/15/22 Tr. 10:17-11:22 (Bryan).)

There is nothing in the four corners of the Agreement to suggest such an interpretation, and it is not a reasonable one. Rather, it is more a case of SES, in retrospect, trying to do exactly what the New York courts cautioned against in *Rahl* – that where "the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation." 328 B.R. at 401.

---

[7] SES objects to part of this testimony, claiming that the questions were leading. (*See* Docket No. 4112, SES Depo. Objs., Appx. p. 5.) The Court overrules this objection. The designated testimony does not include leading questions. The first question is plainly open-ended and asks "what" the witness understands the term "may" to mean. The second question seeks clarity of the witness's answer, by slightly restating the witness's answer and asking "does" that properly restate the answer. The Court does not find either of these questions to be leading. And even if the cited portion contained any leading questions, that objection would be overruled for the reasons discussed in Footnote 2.

Further, SES's argument ignores "the common (and commonsensical) rule" that specific contractual language governs over more general language. *Cap. Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 272 (2d Cir. 2011); *see also Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001); *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.,* 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general.").  Here, SES cannot identify any language in the Agreement explicitly referring to any of the alternative approaches (other than the agreed-to, private market-based "Transition Facilitator" role) outlined in the NPRM.  When read as a whole, the Agreement clearly establishes that the Consortium members intended only to collaborate on and, if successful, share the proceeds from, the Parties' proposed market-based approach. *CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 874 N.Y.S.2d 174, 177 (N.Y. App. Div. 2009) (a "contract should be read as a whole, with every part interpreted with reference to the whole; if possible, the contract will be interpreted as to give effect to its general purpose.")  Even if the language in the optional amendment paragraph did somehow require the Parties to amend the Agreement "to reflect the final rules promulgated by the FCC, SES identifies nothing in the Agreement to indicate that, under a mandatory amendment that would require rewriting the majority of the contract, the Parties would nevertheless be obligated to maintain the same proceed splits to which they agreed for the market-based proposal.  (*See* 2/15/22 Tr. 69:5-12 (Bryan) ("[A]ll of the terms would have been contemplated [to be on the table in a potential amendment], but most importantly is, if [the FCC Order] was the result,

19

and we were going to have to amend to have [the Agreement] apply, is how the proceeds would be split.").)

"Project Structure." The Consortium Agreement also provided that the Project "shall" be implemented through other agreements that would be necessary only under the CBA's proposed market-based approach. (DX1 § 2.02.) These include secondary market agreements, an escrow agreement, and an operating manager services agreement. (DX1 § 2.02 and Exhibits A-C.) The forms of these agreements attached to the Consortium Agreement all reaffirm the nature and intent of the Agreement, and they are not compatible with the Final Order.

"Project Gross Proceeds." The Agreement also defines "Project Gross Proceeds" as "all proceeds received by or for the benefit of the Consortium Members in respect of the Project." (DX1 at SES0210338.) SES's Chief Legal Officer admitted that the "[p]roject gross proceeds definition is tied to the definition of the defined term capital P Project." (2/9/22 Tr. 126:1-4 (Purvis).) It is those Project Gross Proceeds and no other monies, that are, after the deduction of various fees and expenses, subject to the revenue sharing agreement in the Agreement. For all the reasons set forth above, the accelerated relocation payments for which Intelsat is eligible under the FCC's Order are not "in respect of the Project": they are not "in respect of" the market-based process described in detail in the NPRM and the Consortium Agreement (inclusive of its Exhibits and Schedules). Thus, under the FCC's approach, there are no Project Gross Proceeds and, consequently, none subject to the sharing agreement, even if were to apply."

SES's argument that the Parties intended revenues to be shared no matter what approach the FCC adopted for clearing the C-Band is found nowhere in the Agreement.  Given the sophistication of the Parties, if SES really wanted "Project Gross Proceeds" to encompass any proceeds that could possibly be generated from the NPRM's proposed provisions, SES should have included that in the Agreement. It cannot now rely on the Court to read it into the Agreement through a convoluted process that requires supposition and a tortured reading of the provisions of the Agreement.  *See Kreiss v. McCown De Leeuw & Co.*, 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) (noting that "New York law gives full effect to integration … clauses.").  SES's proffered amendment in February 2020 included proposing such a broad term as "C-Band Proceeds", demonstrates that such an agreement might have been possible but was never adopted.  Instead, from beginning to end, the Agreement's plain language reflects that it only applies under the CBA's private, market-based approach, characterized by voluntary cooperation between private parties and driven by market demand and private incentives.

If a contract is unambiguous, the Court looks to the plain language of the contract rather than to extrinsic evidence of the Parties' alleged wishes.  *See World Ambulette Transp., Inc. v. Lee*, 78 N.Y.S.3d 137 (N.Y. App. Div. 2018) (reversing district court ruling that relied on extrinsic evidence to override contract's plain language ); *Modern Art Servs., LLC v. Fin. Guar. Ins. Co.*, 79 N.Y.S.3d 4 (N.Y. App. Div. 2018).  In other words, "[w]here a contract is unambiguous, it is unnecessary for the court to resort to extrinsic evidence such as business practice to interpret it."

21

*In re Aerovias Nacionales de Colombia, S.A. Avianca*, 323 B.R. 879, 890 (Bankr. S.D.N.Y. 2005). Since there is no relevant ambiguity here, the Court must not consider extrinsic evidence.

Even if it were proper for the Court to consider extrinsic evidence, however, the evidence here confirms Intelsat's contention that the Consortium Agreement was intended to apply only in the context of the Parties' proposed market-based approach to C-Band Spectrum clearing that the FCC rejected in its entirety. In reaching that conclusion, the Court considers "(1) the acts and circumstances surrounding execution of the ambiguous term, (2) conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written agreement, and (3) the parties' course of conduct throughout the life of the contract." *Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*, 2021 WL 602989, at *1 (S.D.N.Y. Feb. 16, 2021).

During the period in which the Parties were negotiating the Consortium Agreement, their goal was to persuade the FCC to allow them to clear the C-Band through a market-based approach and to follow through on that approach once that approval was granted. For example, in June 2018, after months of term sheet negotiations and as they were beginning to negotiate the Consortium Agreement itself, the Parties' CEOs signed a letter agreement titled "Understanding reached for C-Band Secondary Market Proposal." (*See* DX69; DX70; *see also* DX61-62.) That letter explained that the Parties would develop the Project through the creation of a consortium to clear portions of the C-Band "in each case as

22

contemplated by the [C-Band Secondary Market] Proposal." (DX69 at
SES0001488.)  And, while drafting the Consortium Agreement itself, SES suggested
that the Parties tie the definition of "Project" in the Consortium Agreement to what
the FCC had described as the market-based approach in the NPRM.  (2/9/22 Tr.
100:25-103:2 (Purvis) (discussing DX110 at INT00091323).)  Along similar lines,
SES described the Consortium Agreement to its Board as the "Transition Facilitator
(Consortium) Agreement," using the same term as the FCC had in the NPRM to
describe the entity that would control the C-Band clearing process in the context of
the market-based approach.  (2/11/22 Tr. 213:20-214:2 (De Hauwer); DX75 at
SES0436866-67.)  Moreover, in the months preceding the Consortium Agreement's
execution, Intelsat and SES told the FCC repeatedly they were working together to
develop the "market-based proposal" that would "create a Consortium of C-Band
satellite operators" to clear the spectrum through "secondary market agreements."
(DX106 at SES0178670; DX107 at SES178666-67; DX108 at SES0006564.)

Second, after the Parties executed the Consortium Agreement and formed the
CBA, they described its purpose to the FCC, the public at-large, and each other.
For example, the CBA's October 1, 2018, press release, which it also filed with the
FCC, confirms the Consortium Agreement reflected the transition facilitator in the
NPRM and designed the CBA to be that transition facilitator.  (DX115 at
SES0077303; 2/10/22 Tr. 55:17-55:5 (VanBeber).)  Related documents state that the
CBA was formed to effectuate the satellite operators' "breakthrough market-based
proposal to clear portions of this CBand spectrum."  (DX115 at SES0077306.)  Other

23

filings the CBA submitted to the FCC throughout the course of the C-Band proceedings also reflect that the CBA was formed and existed only to facilitate the market-based approach. (*See, e.g.*, DX26; DX117 at INT0029315; DX 119 at SES0141104; DX198; DX342; DX415.) The CBA's head of advocacy testified to Congress in 2019 that the CBA's proposal "depend[ed] on a private sale overseen by the FCC." (DX15; DX16; Pitsch 3/23/21 Dep. Tr. at 129:5-18; Pitsch 3/24/21 Dep. Tr. at 331:15-332:10.)

SES recognized that the CBA's existence depended on the market-based approach outside of these public statements as well. For example, the SES former Chief Legal Officer acknowledged "that the CBA would not continue in the face of an adverse FCC Order," meaning one other than the "Market Based Approach" (SES283 at SES0036043.), and he also observed to his colleagues at SES that if the FCC ordered a distribution different than what was in the Consortium Agreement, SES would need a new agreement with Intelsat. (DX411 at SES0233403.)

Finally, the Parties' actions after the public-auction tweet show they understood that the Consortium Agreement did not apply once the FCC rejected the market-based approach. In particular, the Court notes SES's repeated efforts to amend the Consortium Agreement to redefine the Project Scope and change how monies that might be earned would be distributed. (DX127 at INT00322395-96, INT00322410-12; see also DX42; DX169.) SES believed that it was "urgent" that before the FCC released its order, Intelsat agree to SES's proposed amendment that would provide for 50/50 sharing regardless of what the FCC decided. (DX42;

DX322; DX167.)  SES's conduct after the public auction tweet demonstrates SES's

recognition that the Consortium Agreement, as written and signed, did not align

with the FCC's anticipated order.

      The Court finds that the Agreement is not ambiguous in any reasonable way.

The Project contemplated by the Agreement will not come to pass; any monies the

Parties receive related to their individual clearing efforts are not "in respect of the

Project" and therefore not subject to the Agreement's revenue-sharing provisions.

SES's effort to "reinvent an obviously straightforward contract [] that was signed

and executed by [] sophisticated parties" is without merit.  *Am. Home Assurance Co.*

*v. Merck & Co.*, 329 F. Supp. 2d 436, 444 (S.D.N.Y. 2004).

      SES argues that § 10.02(e) of the Agreement prohibits Intelsat from

terminating the Agreement without SES's consent.  SES contends that the section

requires a determination by the Operating Subcommittee that an FCC order "would

prevent the Project from moving forward."[8]   The Debtors disagree.  The Court need

---

[8] Section 10.02 of the Agreement provides as follows:
      Termination . This Agreement may be terminated by and upon any of
      the following:
      (a) the third (3rd) anniversary of the date of this Agreement, if by such
      time no Secondary Market Agreement has been entered into;
      (b) by a Supermajority of the Members, upon their written agreement;
      (c) by Intelsat, upon a material breach of this Agreement by SES that
      remains uncured by SES sixty (60) days after notice thereof by
      Intelsat to SES;
      (d) by SES, upon a material breach of this Agreement by Intelsat that
      remains uncured by Intelsat sixty (60) days after notice thereof by
      SES to Intelsat; or
      (e) by either Intelsat or SES, upon the determination by the Operating
      Subcommittee that any final, non-appealable FCC C-Band Orders or
      order of any other Governmental Authority would prevent the Project
      from moving forward.

not address this argument, as the Agreement had already terminated prior to the receipt of any accelerated relocation payments by any party. This is the case because there were no secondary market agreements as of the third anniversary of the Agreement. (September 27, 2021). (2/8/22 Tr. 155:1-20, 240:22-24 (Collar); 2/9/22 Tr. 109:13-22 (Purvis); DX443 (citing DX1 § 10.02(a)); 2/15/22 Tr. 2:14-4:13 (Bryan); DX136 ¶ 232).) Thus, even if accelerated relocation payments could theoretically be proceeds "in respect of the Project," Intelsat US LLC unquestionably had the right to terminate before any accelerated relocation payments were received and in fact did so.[9]

SES argues the termination under § 10.02(a) should have no effect, since Intelsat allegedly breached the Agreement before termination. SES has asserted two bases for this claim: (i) Intelsat's independent contacts with the FCC in the final days preceding the FCC's February 2020 Draft Order, and (ii) Intelsat's rejection of the Consortium Agreement pursuant to 11 U.S.C. § 365 on December 7, 2020, during the course of these chapter 11 cases. (*See* 2/7/22 Tr. 48:8-11, 50:10-15, 55:23-25 (SES Opening); 2/15/22 Tr. 101:5-16 (Bryan).)

The Court finds that these actions did not constitute material breaches of the Agreement under the facts in this case, and neither alleged breach resulted in

---

[9] After the third anniversary of the Agreement passed, Intelsat sent a termination letter to all Consortium members, stating that "to the extent the Consortium Agreement had any continuing effect following the FCC's February and March 2020 Orders (and Intelsat believes it had none), it is formally terminated pursuant to Section 10.02(a)." (DX443; *see* 2/15/22 Tr. 3:12-21 (Bryan) (Intelsat sent termination letter "out of an abundance of caution" as "no secondary market agreement had occurred, so the agreement terminated on its own terms.").)

damages to SES. New York courts recognize that "inconsequential or de minimis breaches that are not so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract" will not give rise to damages. *See., e.g., Smolev v. Carole Hochman Design Grp., Inc.*, 913 N.Y.S.2d 79 (N. Y. App. Div. 2010).

Further, SES has not shown any damages as a result of either alleged breach, even if the breaches were material. *In re MS Angeln GmbH & Co. KG*, 10 F. Supp. 3d 424, 431 (S.D.N.Y. 2014) ("[I]n order to prove a breach of contract claim, a plaintiff must establish that his damages were caused by the defendant's wrongful conduct."). Because the FCC rejected the Parties' Project, there never were any Project Gross Proceeds—*i.e.*, monies earned "in respect of the Project." Further, there is no evidence that any of Intelsat's independent contacts with the FCC had the impact of reducing payments to SES. Quite the opposite. During the time SES complains about, Intelsat's individual payments were reduced while SES's payments were increased by $1.5 billion.

As to SES's second basis for its claim that Intelsat breached the Agreement by rejecting the Agreement during the progression of its case in this Court, the Court finds that the rejection of the Agreement is consistent with the Debtors' position that the Agreement had no application following the FCC's order, rendering it effectively irrelevant. The Court does not read into the rejection any admission that the Agreement was still in effect. To do so would be to infer an intent that is not supported by the evidence presented to the Court. The Debtors

urge, in their Proposed Findings of Fact and Conclusions of Law, that the

Agreement was rejected in the bankruptcy case in an abundance of caution, to the

extent it was still in force and construed to somehow impose obligations on them

despite the FCC's rejection of the market-based approach, Intelsat US LLC rejected

the Agreement because it provided no benefit to the Debtors' estates following the

FCC's Final Order.  *See* 11 U.S.C. § 365; *COR Rte. 5 Co. v. The Penn Traffic Co. (In*

*re The Penn Traffic Co.)*, 524 F.3d 373, 378 (2d Cir. 2008) (Section 365 of allows a

trustee or chapter 11 debtor-in-possession to assume or reject any executory

contract or unexpired lease of the debtor.)[10]

Intelsat's independent contacts with the FCC in the final days preceding the

FCC's February 2020 Draft Order did not damage SES.  The Debtors' rejection of

the Agreement in the bankruptcy case did not harm SES.  Because the two alleged

breaches claimed by SES did not cause damages, there can be no recovery for them.

***Unjust Enrichment.***  SES asserts a claim for unjust enrichment as an

alternative to its breach of contract claims.  The Court finds that SES's unjust

enrichment claim fails for two reasons.  *First*, the unjust enrichment claim arises

out of the same subject matter as the Consortium Agreement and is thus barred as

a matter of law.  *Second*, even putting aside this contractual bar, SES cannot

establish the elements of an unjust enrichment claim.

New York courts are clear that "where a valid and enforceable contract

governs the relevant subject matter of the parties' dispute, the contract—rather

---

[10] The rejection of a contract may give rise to damages for the contract's breach, but, as has
been established here, there were no damages incurred by SES because of the rejection.

than principles of restitution—should determine the measure of a party's recovery

for events *arising from that subject matter.*" *Chesapeake Energy Corp. v. Bank of*

*N.Y. Mellon Tr. Co., N.A.*, 837 F.3d 146, 159 (2d Cir. 2016) (per curiam) (emphasis

added).[11]  By contrast, "unjust enrichment . . . is an obligation the law creates in the

absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746

(N.Y. 2005); *Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916).  Thus, "a party may

not recover in . . . unjust enrichment where the parties have entered into a contract

that governs the subject matter" at issue in the dispute.  *Catlyn & Derzee, Inc. v.*

*Amedore Land Devs., LLC*, 87 N.Y.S.3d 661, 664 (N.Y. App. Div. 2018); *see Poplar*

*Lane Farm LLC v. Fathers of Our Lady of Mercy,* 449 F. App'x. 57, 59 (2d Cir. 2011)

("[W]hen a valid agreement governs the subject matter of a dispute between parties,

claims arising from that dispute are contractual; attempts to repackage them as

sounding in … unjust enrichment … are generally precluded.").  For this reason,

New York courts routinely dismiss unjust enrichment claims when they arise out of

alleged breaches of contract.  *E.g., Sell It Soc., LLC v. Strauss,* 2018 WL 2357261, at

*8 (S.D.N.Y. Mar. 8, 2018); *DRL Software Sols., LLC v. JourneyPure, LLC,* 2018 WL

1276856, at *2 (S.D.N.Y. Mar. 8, 2018) (dismissing unjust enrichment claim where

---

[11]  *See also MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998)
(observing that, under "well–settled principles of New York law....  the existence of a valid
and enforceable written contract governing a particular subject matter ordinarily precludes
recovery in quasi contract ... for events arising out of the same subject matter" (internal
quotation marks omitted)); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382,
389 (1987) ("It is impermissible ... to seek damages in an action sounding in quasi contract
where the suing party has fully performed on a valid written agreement, the existence of
which is undisputed, and the scope of which clearly covers the dispute between the
parties.")

"the case will center on parties' obligations under [a written] contract"); *ISS Action, Inc. v. Tutor Perini Corp.*, 95 N.Y.S.3d 298, 303 (N.Y. App. Div. 2019) (dismissing unjust enrichment claim because the disputed issue was addressed, one way or another, in the parties' agreements").

SES seeks to avoid this adverse case law by arguing that the unjust enrichment claim acts as a gap-filler to the extent that the Consortium Agreement does not apply to the FCC's decision. However, this is precisely the type of end-run around a contract that the above cases prohibit. Under New York law, an unjust enrichment claim does not arise merely because a contract does not specifically address a given situation. Such a rule would effectively always allow unjust enrichment claims if a contract were found not to govern a specific action between parties. Instead, the inquiry must focus on whether the events giving rise to the unjust enrichment claim are "events arising out of the same subject matter" as a "written contract governing a particular subject matter." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (emphasis added). If the events arise out of the same subject matter, an unjust enrichment claim may not lie—even if the contract is held not to apply to that matter. *Id.* ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")

The nature of SES's primary claim—that Intelsat has breached the Consortium Agreement—demonstrates why there can be no unjust enrichment

claim here as a matter of law.  The thrust of SES's unjust enrichment claim appears

to be that Intelsat improperly led SES to believe the Agreement's revenue-sharing

obligation was still in force even after Intelsat had determined that it was not.

Putting aside whether that is correct as a factual matter, it demonstrates that

SES's unjust enrichment claim arises out of precisely the same events and subject

matter as its contract claims.  The fact that SES's unjust enrichment claim seeks to

enforce a 50/50 split—a figure found nowhere else other than the Agreement—

confirms as much.  In such a situation, New York law is clear that an unjust

enrichment claim cannot succeed.  *Catlyn & Derzee, Inc.*, 87 N.Y.S.3d at 664.

SES cites no case to the contrary.  In its opening statement, SES argued that

unjust enrichment is a "long-recognized stand-alone theory of liability" and cited a

series of cases in which  plaintiffs successfully asserted such claims.  (*See* 2/7/22 Tr.

84:22-23 (SES Opening Statement).)  But none of those cases involved a valid,

enforceable contract governing the same subject matter as the unjust enrichment

claim.  For example, in *Thayer v. Dial Indus. Sales, Inc.*, the court noted that a

party cannot proceed in quasi contract "when there is an express contract covering

the subject matter involved."  189 F. Supp. 2d 81, 92 (S.D.N.Y. 2002) (quotations

omitted).  The court held that because the plaintiff performed services for a period

before there was a contract governing his performance, he could bring an unjust

enrichment claim to recover for those precontract services.  *Id.*  Other cases on

which SES relies did not concern a contractual relationship or breach of contract

claim.[12]  SES thus has provided no authority to show why New York's rule disallowing unjust enrichment claims on a subject matter covered by a contract does not bar its claim here.

In addition, SES has not established the elements of unjust enrichment. Even if SES could assert a claim for unjust enrichment in the face of the Consortium Agreement, the Court finds the claim would still fail because SES cannot establish any of the elements necessary to establish such a claim.

To establish unjust enrichment, a plaintiff must show that "(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Deerin v. Ocean Rich Foods, LLC*, 71 N.Y.S.3d 123, 126-27 (N.Y. App. Div. 2018) (citation omitted).  SES cannot establish any of these elements.

SES cannot show Intelsat was enriched at all, much less at SES's expense. The undisputed evidence at trial was that the work to cause the FCC to increase its accelerated relocation payment offer to a total of $9.7 billion was either joint work or, with respect to the last $900 million (from $8.8 billion to $9.7 billion), work that Intelsat drove individually.  As that work increased the "size of the pie" for both Parties, SES cannot explain how Intelsat was enriched or SES was harmed. Rather, as the amount of accelerated relocation payments grew to $9.7 billion, SES's portion of those funds grew by $1.5 billion, while Intelsat's share decreased

---

[12] In particular, SES cites *State Farm Mut. Auto. Ins. Co. v. A to Z Med. Care P.C.*, 2019 WL 2489901 (E.D.N.Y. June 7, 2019); *Gov't Emps. Ins. Co. v. Infinity Health Prod., Ltd.*, 2012 WL 1427796 (E.D.N.Y. Apr. 6, 2012).

by more than $200 million. (DX524.) Because its payments were decreased when the total relocation payments were increased to $9.7 billion, Intelsat was not unjustly enriched, and in fact was not enriched at all. On the other hand, SES received a large increase in its award thanks to Intelsat's continued negotiation efforts with the FCC.

Various SES witnesses testified that if they had known that Intelsat believed the 50/50 split would no longer apply under the anticipated Final Order mandating individualized acceleration payments, SES may have ceased working cooperatively with Intelsat earlier. But SES's witnesses also admitted that, in that scenario, the outcome was so uncertain that SES may itself have received less compensation—or even no compensation—in the market-driven clearing process set forth in the Agreement.[13] At best, what SES may have done in recognition that a 50/50 split was no longer obtainable, and what may have been the effect of its actions, is speculative. There is no proof that SES's walking away from the joint advocacy prior to the release of the Draft Order would have made SES better off. There is thus no evidence that SES was harmed by what it alleges to be the wrongful conduct.

Finally, SES cannot establish that it would be "against equity and good conscience to permit [Intelsat] to retain what is sought to be recovered." *Deerin*, 71 N.Y.S.3d at 127. The ultimate split of the accelerated relocation payments was set by the FCC. The FCC allocated those amounts based on its views of "the relative

---

[13] *See* 2/14/22 Tr. 41:25-42:7 (De Hauwer).

contribution that each eligible space station operator is likely to make towards
accelerating the transition of the [C-band spectrum]," along with each license
holder's satellite coverage and transponder usage.  (DX136 ¶ 227.)

SES has not presented any evidence that the FCC was "duped" into
establishing those splits or that the splits are fundamentally unfair using the
metrics the FCC itself independently selected.  To the contrary, SES's own data
(and own internal communications) are clear that, based on the objective metrics
that the FCC used in allocating the accelerated relocation payments amongst the
operators, Intelsat and SES's share of the proceeds would *not* be equal "under any
type of metric (revenue, supply etc.) that the FCC would mandate," such that SES
received more than it deserved from the FCC.  (DX239; DX227.)[14]  Moreover, while
SES criticizes "back-channeling" by Intelsat CFO David Tolley in the two-day
period between the FCC's "best and final offer" on February 4 and issuance of the
Draft Order on February 7, there is no evidence that anything Intelsat did resulted
in it receiving a larger allocation at SES's expense.  In fact, during that same time,
Intelsat's offer decreased while SES's increased by $1.5 billion.  (*E.g.,* DX160.)

To the extent SES thought the FCC's splits were unfair, it could have
objected to the Draft Order or refused to participate in the accelerated clearing; it
did neither.  In short, the Court does not see anything "unjust" about allowing the
split of accelerated relocation payments set by the FCC based on objective criteria to
determine the amounts available to SES and Intelsat.  For this reason and the

---

[14] SES does not dispute that Intelsat has more capacity in the C-Band (*see* DX227; 239).

reasons set forth above, the Court finds that even independent of any contractual

bar to SES's unjust enrichment claim, SES could not and did not establish the

elements of an unjust enrichment claim.

**Breach of Fiduciary Duty**.  SES has asserted Intelsat breached a fiduciary

duty to SES when it took the position that the Consortium Agreement did not apply

to the FCC's Draft and Final Orders.  Despite presenting evidence and argument for

seven days at trial, SES made little to no mention of this claim.  In any event, the

Court finds that SES's breach of fiduciary duty claim fails.

To establish a breach of fiduciary relationship under New York law, "a

plaintiff must prove the existence of a fiduciary relationship, misconduct by the

defendant, and damages that were directly caused by the defendant's conduct."

*Stein v. N. Assurance Co. of Am.*, 2012 WL 1605365, *10 (E.D.N.Y. May 7, 2012).

SES cannot establish these elements.

The first element of a fiduciary duty claim is the existence of a fiduciary

relationship between the Parties.  *Id*.  To the extent SES claims a fiduciary duty is

established by the Consortium Agreement, that claim is precluded by its plain

terms.  Section 8.04 of the Consortium Agreement states:

> <u>Section 8.04 Fiduciary Duties</u>. No Member or any of its past present, or
> future Representatives shall have any fiduciary duty to any Member,
> nor shall have any obligation, or be liable or accountable in damages or
> otherwise, to any Member for exercising any of the rights of such
> Member or such Representative under this Agreement or any Related
> Agreement to which it is or will be a party, or for losses sustained,
> liabilities incurred or benefits not derived as a result of errors in
> judgment or mistake of fact or law or any act or omissions, so long as
> such Member (or its Representatives) was not grossly negligent, did
> not engage in willful misconduct and did not act with bad faith or

deliberate dishonesty. No Member shall in any event be liable for any consequential, incidental or indirect damages, including loss of profit or goodwill. This provision shall not affect specific limitations of liability in any of the Related Agreements. (DX1 § 8.04.)

As sophisticated parties, Intelsat and SES had the option to contractually "waive legal claims based on the fiduciary duties that arise from their relationships." *Union Carbide Corp. v. Montell N.V.*, 1998 WL 293991, at *7 (S.D.N.Y. June 5, 1998); *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 523-24 (S.D.N.Y. 2014). That is precisely what they did. Section 8.04 of the Agreement precludes any claim that may be based on the existence of a fiduciary duty.

SES seeks to avoid this result by pointing to language in § 8.04 that it claims creates a carve-out to the fiduciary duty disclaimer for willful misconduct, bad faith, or deliberate dishonesty by a Consortium member. Its attempt fails for two reasons.

First, SES's reading of the disclaimer is incorrect. Under the "last antecedent doctrine," a modifier placed at the end of the series—like the one here pertaining to willful misconduct, bad faith, or deliberate dishonesty—modifies only the last item in the series. *See Duane Reade, Inc. v. Cardtronics, LP*, 863 N.Y.S.2d 14, 17 (N.Y. App. Div. 2008) (applying canon). The carve-out language that SES points to does not relate to the fiduciary duty disclaimer, but instead to the portion of § 8.04 that creates a limitation on damages recoverable for breaches of the Agreement.

This interpretation is also consistent with any reasonable understanding of the language of the provision. It is typical for a contractual term that limits a party's liability to have a carve-out for willful misconduct or bad faith; if a party has

36

engaged in such misconduct, the law generally does not permit that party to insulate itself from the harm it caused. *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC (In re Part 60 Put-Back Litig.)*, 36 N.Y.3d 342, 352 (N.Y. 2020). In contrast, it makes little sense to have the existence of a relationship (like a fiduciary duty) depend on the nature of a party's future actions. Under SES's reading, the Parties could have maintained their relationship for years without having any fiduciary duties to one another, only to have such a duty spring to life at the moment Intelsat engaged in supposedly willful or dishonest conduct. That makes no sense.[15]

*Second*, even if SES were correct that a willful misconduct carve-out applies to the fiduciary duty disclaimer, SES failed to establish that a fiduciary duty exists between the Parties. Section 8.04 merely disclaims fiduciary duties; it does not create such duties. New York law is clear that "an arms-length contract between two parties "does not by itself give rise to fiduciary duties between them, something more is required." *Hamister v. Liberty Mut. Ins. Co.*, 2008 WL 4365893, at *9 (W.D.N.Y. Sept. 22, 2008). Here, there are simply no affirmative statements in the Consortium Agreement that *establish* such a fiduciary duty.

SES cites no persuasive evidence that would establish a fiduciary relationship. It presented no evidence that "one party's superior position or superior access to confidential information is so great as virtually to require the

---

[15] Even if the disclaimer could have potentially applied to the "no fiduciary duty" clause, the facts here belie the notion that Intelsat's actions constitute "willful misconduct," "bad faith," or "deliberate dishonesty."

other party to repose trust and confidence in the first party," which may have created a fiduciary duty. *Pension Comm. v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 624 (S.D.N.Y. 2009); *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 293 (N.Y. App. Div. 1988). Nor did SES establish the type of "special circumstances" required to convert a contractual relationship into a fiduciary one, "such as control by one party of the other … or creation of an agency relationship." *L. Magarian & Co. v. Timberland Co.*, 665 N.Y.S.2d 413, 414 (N.Y. App. Div. 1997). Intelsat and SES are competitors (Docket No. 4143, Joint Stipulated Facts, ¶ 1.); Intelsat and SES are not fiduciaries.

Even if SES could establish that Intelsat owed a fiduciary duty to SES and that Intelsat breached that duty by seeking a greater portion of the accelerated relocation payments from the FCC, SES would not be able to establish damages. As with SES's unjust enrichment claim, there is no evidence that Intelsat's alleged breach caused any actual harm to SES.

As discussed above, during the period in which SES alleges Intelsat was engaged in misconduct, Intelsat's share of the relocation payments was reduced from $5.08 billion to $4.85 billion, and SES's share increased from $2.4 billion to $4 billion. As a result, even if Intelsat's engaging in advocacy before the FCC during this time could be construed as breaching some duty owed to SES, that advocacy in fact benefited SES by more than a billion dollars. And to the extent SES's fiduciary duty claim is based on alleged back-channeling undertaken by Intelsat or its agents, SES failed to prove that such advocacy improved Intelsat's own position vis-à-vis

SES. Instead, the record establishes that Intelsat's potential recovery decreased during the final days of the negotiations, whereas SES's increased. Because Intelsat's advocacy did not damage SES, its claim for breach of fiduciary duty (even if one even existed) must fail. *Parametric Capital Mgt., LLC v. Lacher*, 791 N.Y.S.2d 10, 11 (N.Y. App. Div. 2005) (breach of fiduciary duty claim dismissed because "such breach would ripen only when plaintiffs are able to allege damages").

***Constructive Trust***. In its Proofs of Claim, SES did not seek the imposition of a constructive trust. (DX94.) However, in its opening statement at trial, SES nonetheless asked the Court to impose a constructive trust on some of the accelerated relocation payments that Intelsat License will receive if it satisfies the requirements of the Final Order. The Court declines to do so.

As a threshold matter, even if SES were able to establish some elements of a constructive trust, its claim would nevertheless fail because SES disclaimed any allegation of fraud; neither did it prove fraud. (*See* DX249 at p. 45-46, Responses to Req. for Admission 56 & 57 ("SES admits that it does not allege that Intelsat committed fraud.").) It is settled law that there can be no constructive trust in the absence of fraud: "New York law is clear that a constructive trust is an equitable remedy intended to be fraud-rectifying rather than intent-enforcing." *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 216 (2d Cir. 2004) (internal quotations and citations omitted); *see also Bankers Sec. Life Ins. Soc'y v. Shakerdge*, 406 N.E.2d 440, 441 (N.Y. 1980) (noting "the constructive trust doctrine serves as a fraud-rectifying remedy rather than an intent-enforcing one")

(citation omitted). Consistent with Second Circuit and New York case law, a
district court in the Fourth Circuit denied a constructive trust claim governed by
New York law where (as here) there was "no allegation or evidence that the
transaction was false or fraudulent." *Rapoca Energy Co. v. J.L. Mining Co.*, 368 F.
Supp. 2d 541, 545 (W.D. Va. 2005). SES's constructive trust theory fails for that
reason alone.

The Court also finds that SES did not establish by a preponderance of the
evidence any of the elements necessary to a constructive trust claim. "[T]o establish
a constructive trust there must be provided: (1) a confidential or fiduciary relation,
(2) a promise, express or implied, (3) a transfer made in reliance on that promise,
and (4) unjust enrichment." *Bankers Sec. Life Ins. Soc.*, 406 N.E.2d at 440.

*First*, there was no "confidential or fiduciary relation" between the Parties.
As the Court has previously found, there was a waiver of any fiduciary duties in the
Consortium Agreement. (DX1 § 8.04 ("No Member or any of its past, present, or
future Representatives shall have any fiduciary duty to any Member …").

*Second*, there was no "transfer made" to Intelsat "in reliance on" any promise
to SES. The FCC's Order provides for acceleration payments directly and
separately to each of Intelsat and SES, depending on whether either meets the
obligations of the Final Order, which were calculated based on each entity's
separate contribution to the repurposing process. (DX136 ¶¶ 171, 174, 232, 287,
295.) None of those accelerated relocation payments, if earned, has anything to do
with any promise that Intelsat made to SES. There was no promise by Intelsat to

40

share proceeds other than what may have been required under the Consortium Agreement. And, as the Court has determined, the Consortium Agreement does not require Intelsat to share its accelerated relocation payments with SES.

*Third*, the Court has found that SES has no "unjust enrichment" claim. Among other things, just as the existence of the Consortium Agreement precludes an unjust enrichment claim, it would bar any constructive trust claim. *See In re First Cent. Fin. Corp.*, 377 F.3d at 215 (noting the existence of an agreement precluded the equitable remedy of a constructive trust).

If Intelsat earns the accelerated relocation payments for which the FCC made it eligible in the Final Order, it will do so through its own efforts. The FCC allocated the accelerated relocation payments to each firm based on the "relative contribution, in terms of both effort and cost, that each eligible space station operator will make to meet the Accelerated Relocation Deadlines based on three objective factors related to each space station operator's relative contribution." (DX136 ¶ 238.) The FCC also noted the burdens of accelerated clearing "will fall more heavily on some space station operators than others" (*Id.* ¶ 227), and the evidence establishes that Intelsat is eligible for larger accelerated relocation payments because it has materially more market share in the C-Band than SES and more work to do to earn the money for which it is eligible. (*See, e.g.,* DX239 (SES admitting that "SES vs Intelsat share will not be 50/50 under any type of metric (revenue, supply etc.) that the FCC would mandate"); DX227 (SES admitting that Intelsat has 50% more coverage in the C-Band than SES does); 2/15/22 Tr.

85:24-86:11 (Bryan) (Intelsat must do "a lot more" work than SES under the terms of the FCC's Order).)  Intelsat is entitled to a larger acceleration payment than SES because Intelsat is making a significantly larger contribution to the repurposing than SES.  *See, e.g., Rapoca Energy*, 368 F. Supp. 2d at 54 (denying a constructive trust claim governed by New York law because the claimant failed to show unjust enrichment); *Sharp v. Kosmalski*, 351 N.E.2d 721, 724 (N.Y. 1976) ("The salutary purpose of the constructive trust remedy is to prevent unjust enrichment . . . .").  There being no fraud or unjust enrichment having been proven by SES, there is no basis for imposing a constructive trust on any of the accelerated relocation payments that Intelsat may be eligible to receive.

**_Claims against Intelsat License and Intelsat Jackson._**  Intelsat US LCC is the only entity that signed the Consortium Agreement. (DX1(Consortium Agreement); 2/15/22 Tr. at 13:19-21 (Bryan) at 109:21-24.)  Nevertheless, SES maintains that it may pursue its claims against other Intelsat entities despite the absence of language in the Consortium Agreement that would bind affiliates of Intelsat.

Because SES has not satisfied its burden to prove any of its claims, the Court need not determine which entities may be liable.  The U.S. District Court for the Southern District of New York recently cautioned against federal courts' offering advisory opinions:

> [I]t is unnecessary for the Court reach Plaintiffs' alternative argument for relief . . . *see Immigration & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts ... are not required to make findings on issues the decision of which is unnecessary

to the results they reach."); *In re Surface Mining Regulation Litig.*, 627
F.2d 1346, 1360 n.16 (D.C. Cir. 1980) ("We need not address this
procedural challenge because of our determination that the disputed
interim regulation itself is without support in the record and therefore
arbitrary and capricious."). Indeed, to do so would arguably be
inappropriate. See, e.g., United Pub. Workers of Am. (C.I.O.) v. Mitchell,
330 U.S. 75, 89 (1947) ("[T]he federal courts established pursuant to
Article III of the Constitution do not render advisory opinions.").

*New York v. Wolf*, 2021 WL 185190, *3 n.4 (S.D.N.Y. Jan. 19, 2021). Having

determined that the signatory to the Consortium Agreement has no liability to SES,

and there being no alternative theory of relief offered that would otherwise bind an

Intelsat affiliate in the absence of such liability, the Court will not address this

issue further.


## CONCLUSION

As set forth above, the Court finds that under the plain language of the

Consortium agreement and the evidence in the record, SES has failed to carry its

burden of establishing by a preponderance of the evidence that Intelsat is liable to

SES under any theory of recovery set forth by SES. Accordingly, Intelsat's objection

to SES proofs of claim nos. 84, 85, and 103 will be sustained, and the claims will be

disallowed.[16]

A separate order shall be issued.

Signed: September 30, 2022

_____/s/ Keith L. Phillips_____
United States Bankruptcy Judge

Copies to:                          Entered on Docket: September 30, 2022

---

[16] The Motion for summary judgment filed by Intelsat is moot in light of the Court's ruling.

43

Orin Snyder
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Michael A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Brian M. Lutz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Christopher D. Belelieu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193Justine M. Goeke

Brian M. Lutz.
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000

20 San Francisco, CA 94105
KAUFMAN & CANOLES, P.C.
Dennis T. Lewandowski
Clark J. Belote
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665

Peter J. Barrett
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Michael A. Condyles
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Jeremy S. Williams
Kutak Rock L.L.P.

901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Edward O. Sassower, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Steven N. Serajeddini, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Aparna Yenamandra
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Michael B. Slade
KIRKLAND & ELLIS LLP
300 North LaSalle
 Chicago, IL 60654

Michael A. Glick
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
15 Washington, DC 20004

B. Webb King
Office of the United States Trustee
210 First St, SW, Suite 505
Roanoke, VA 24011

John P. Fitzgerald, III
Office of the US Trustee - Region 4 -R
701 E. Broad Street, Ste. 4304
Richmond, VA 23219

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTELSAT S.A., *et al.*, | ) | Case No. 20-32299 (KLP) |
| | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |

## <u>AMENDED MEMORANDUM OPINION</u>

## <u>INTRODUCTION</u>

On May 13, 2020, the Debtors[1] filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.  (Docket No. 1)  On July 14, 2020, SES Americom, Inc. ("SES"), filed proofs of claim against each of the Debtors  (DX94), alleging that each Debtor had repudiated its obligations under a consortium agreement, including the obligation to split evenly any proceeds received by Intelsat and SES under that agreement.  (DX94 at 7.) SES sought "at least $1.8 billion" against each Debtor, claiming it was entitled to "approximately $450 million" in compensatory damages, plus punitive damages. (DX94 at 6, 7.)

---

[1] Due to the large number of debtors (the "Debtors" or "Intelsat"), the Court does not list them all herein.  The other related filing entities are listed at Docket No. 89, the Court's order granting joint administration.  The instant case, *In re Intelsat, S.A.*, was designated the lead case.

On October 19, 2020, the Debtors objected to SES's proofs of claim (the
"Objection").  (Docket No. 946.)  At the conclusion of discovery, the parties filed
competing motions for summary judgment.  (Docket Nos. 2342, 2345, 2845.)
Following oral argument, the Court denied SES's motion for summary judgment,
holding that there were genuine issues of material fact precluding such a ruling.
(Docket No. 2845, 8/19/21 Tr. at 121:5-10.)  The Court took Intelsat's motion for
summary judgment (the "Motion") under advisement "to consider whether or not it
should grant partial summary judgment, summary judgment in full, or to apply
relief under Rule 56(g)."  (*Id*. at 121:25-122:4.)  The Court deferred ruling on the
Motion until after the scheduled trial.  (Docket No. 4171, 2/2/22 Tr. at 4:5-25.)

The Court confirmed the Debtors' plan of reorganization (the "Plan")  on
December 17, 2021. (DX528 (Docket No. 3894.))  In resolving SES's objections to
confirmation of the Plan (Docket 3468), the parties narrowed some of the issues
raised by the Objection.  (Docket No. 3719.)  On the February 23, 2022, effective
date of the Plan (*see* Docket No. 4279), SES waived and released its Proofs of Claim
against all Intelsat entities except Intelsat US LLC (Proof of Claim 85), Intelsat
Jackson Holdings S.A. (Proof of Claim 103), and Intelsat License LLC (Proof of
Claim 84), and it released all its punitive damage claims.  (*See* Docket No. 3719
§ 1.2.2.)  In addition, in the order confirming the Plan, the Court found that Intelsat
License LLC was the Intelsat entity entitled to receive any earned accelerated
relocation payments provided by the FCC's Final Order (*see infra* p.6) (DX528
¶¶ 91-96.)

2

In ruling on the Objection and the Motion, the Court has considered the parties' Joint Stipulated Facts (Docket No. 4143) and the evidence presented during a lengthy trial.  At trial, SES called six witnesses, and the Court admitted nearly 900 exhibits, either by stipulation of the parties (Docket Nos. 4176, 4200, 4385) or during trial.  The Court also received and considered deposition designations from an additional 18 witnesses.

For the reasons stated herein, the Court will sustain the Debtors' objections to the proofs of claim at issue.

## BACKGROUND

The now-reorganized Debtors and SES (jointly "the Parties") are two of the world's largest and most sophisticated satellite operators.  The Debtors and SES combined provide more than 90% of incumbent satellite services in the C-Band spectrum in the United States.  (Docket No. 4143, ¶ 6.)  In 2018, they entered into an agreement to collaborate on a specific project (the "Project"), in which they, along with other smaller satellite operators, would collectively negotiate to sell access to C-Band spectrum to mobile carriers, share in the costs of clearing that spectrum, and then split any remaining proceeds.  (DX1; *see also* DX61-62, 78-79.)[2]  Under the Parties' proposal, the profits would depend on how the market valued their shared spectrum, as well as their ability to collectively minimize clearing costs.  (DX1 § 6.04.)  However, the Federal Communications Commission ("FCC") rejected their proposal (DX136 ¶ 37.) and instead ordered that Intelsat and SES each clear their

---

[2] This was part of an effort to transition their operations from a band of electromagnetic spectrum in what is called the "C-Band" to clear the spectrum for 5G wireless use.

own transmissions from 300 MHz of the spectrum (the "Final Order"). Neither would share in each other's risks or clearing costs, nor would they share in or otherwise receive market-based proceeds. Under the Final Order, each of them may individually receive fixed compensation, in an amount set by the FCC, if they successfully complete their own individual required clearing work. (*Id.* ¶¶ 227-34; *see also id.* ¶¶ 171, 174, 287, 295.)

Under the Final Order, if it completes its clearing tasks, SES should receive $4 billion and have certain of its own clearing costs reimbursed. (*Id.* ¶ 232.) However, SES asserts it is entitled to half of all "proceeds" from the venture the Parties had proposed to the FCC and had memorialized in the Agreement. SES alleges that this would leave it with a shortfall of $420,824,626.

The relationship between the Parties began in 2017, when Intelsat and SES began discussions. On September 27, 2018, they entered into a 120-page Consortium Agreement (the "Agreement" or the "Consortium Agreement"), memorializing those discussions. (DX1.) The Agreement and its exhibits define the "Project" that the Parties agreed to pursue, and it also identifies alternatives they sought to avoid through this collaboration. Through the Project, the Parties would cooperate and jointly negotiate agreements to voluntarily clear portions of the C-Band to give mobile carriers access. (DX101.) The actual consortium created by the Agreement is commonly referred to as the "C-Band Alliance" or "CBA" (the "CBA" or the "Consortium").

Because the Parties both had the right to use the C-Band spectrum the Project could only succeed if they collectively negotiated with new users and voluntarily and collectively cleared the use of the shared spectrum by all incumbent users. The Consortium would negotiate access and manage the clearing, with compensation determined by the market's valuation of that spectrum. The Parties agreed to share in the Project, both in their up-front costs (involving the replacement of billions of dollars of investment in satellites and equipment) and in potential profits from transfer of their spectrum rights.

The Agreement was negotiated as the Parties were simultaneously urging the FCC to adopt their market-based approach. (DX106-08; DX310; DX172.) That proposal advocated a privately-run, market-based solution in which incumbent satellite operators would collectively negotiate with new "secondary" users over what spectrum to offer, how and by when to effectuate the clearing, and what the price would be for vacating the spectrum. The Agreement, in turn, expressly incorporated key aspects from the FCC's July 13, 2018, Notice of Proposed Rulemaking ("NPRM")—released during the midst of the Parties' contract negotiations—including the specific concept of a satellite operator-controlled "transition facilitator" that would have specific powers and authority to act on behalf of all incumbent operators in the clearing process. (*See* DX114 ¶¶ 66-97; DX1 at SES0210335-36.)

The FCC did not adopt the Parties' proposal. (DX136 ¶¶ 213-14.) In the March 3, 2020, Final Order, it rejected the market-based approach and instead

mandated that the satellite operators clear certain spectrum by 2025.  (*Id.* ¶¶ 37,

155.)  The FCC did not appoint a private "transition facilitator" to control the

clearing process, determine the spectrum to be cleared, or negotiate compensation.

Instead, the FCC determined how much spectrum must be cleared, imposing the

threat of penalties on each operator individually if it did not clear as ordered.  (*Id.*

¶¶ 175-77.)  At the same time, the FCC provided that the new users must

reimburse each satellite operator individually for certain transition costs.  (*Id.*

¶¶ 178, 199.)  Unlike the Project, such costs—and the risks associated with

clearing—are not shared under the FCC's approach.  Instead, the FCC offered

"accelerated relocation payments" on an individualized basis for each satellite

operator—based on the operator's own relative market share and clearing

burdens—to encourage it individually to clear its own use earlier than mandated.

(*Id.* ¶¶ 232-33, 289, 295.)  Again, unlike the Project, the risks of another operator

failing to clear its own transmissions are also not shared among satellite operators:

Each satellite operator is paid if it succeeds in clearing early, regardless of whether

any other operator also succeeds.  (*Id.*)  The FCC's accelerated relocation payments

have no relationship to the value of the spectrum itself or to the public auction—

they were set by regulatory fiat.  (*Id.* ¶ 191.)  Nothing about what the satellite

operators are eligible to receive in either cost reimbursement or accelerated

relocation payments appears to be determined by the market.

Although the FCC rejected the Parties' proposal, SES asserts the $9.7 billion

in accelerated relocation payments that SES and Intelsat would secure if they

fulfilled their individual clearing obligations are subject to the Agreement's 50/50 split.  Under SES's theory, those payments are subsumed within the "Project" that the Parties defined in the Agreement.  SES's breach-of-contract theory turns on the meaning of "Project" under the Agreement.  Alternatively, they proffer theories of unjust enrichment and breach of fiduciary duty.

The Debtors urge that the testimony and evidence from the seven-day bench trial confirm what the plain text of the Agreement says and that the Consortium Agreement was not written to encompass any and every eventuality that the FCC might adopt.  They argue that the Agreement spells out a market-based solution in detail both in directly defining the "Project"—specifying that the Consortium is to "serve as the transition facilitator referred to in the NPRM"—and in exhibits such as a model "Secondary Market Agreement," which could only be altered with both Parties' consent.  (DX1 at SES0210335; *see also id.* §§ 2.01, 2.02, Ex. A.)  The Debtors point to the fact that, in contrast, the Consortium Agreement does not address how the Parties would operate under, or share costs or benefits from, any other approach to clearing the C-Band spectrum, including the FCC's eventual decision to order the clearing of the spectrum on its own terms.

Further, they argue that the negotiation history, the incorporation of the FCC's NPRM into the Agreement, the Parties' contemporaneous representations to the FCC, and their course of conduct all provide the relevant industry context and confirm the "Project" exclusively entailed the Parties' proposed market-based approach, in which the market—not the FCC—would determine how much

7

spectrum the Parties would offer in exchange for compensation based on the value of that spectrum. They argue that all presentations and documents confirm that the voluntary market-based approach depended on the Consortium's negotiating market-based transactions with entities interested in specific parts of the C-Band and defining the methodology for clearing the spectrum.

SES argues that its conduct over the period between (i) November 2019, when the FCC Chairman, via tweet, announced his intent to pursue a public auction and (2) the FCC's February 2020 issuance of a draft final order (the "Draft Order"), showed that the Consortium Agreement must have encompassed more than the market-based proposal. The Debtors argue that rather, that conduct shows the Parties were simultaneously doing two things: (i) working to salvage aspects of their Project, at least in part—and with it, market-based compensation—in the construct of a public auction, and (ii) considering whether to amend the Consortium Agreement to encompass whatever the FCC might ultimately adopt.

Even after the FCC Chairman's November 2019 tweet, the Parties continued to advocate for the transition facilitator role as defined in the NPRM and continued to seek a share of the proceeds from the FCC's eventual auction as compensation based on the market's valuation of the spectrum. That advocacy for market-based compensation continued even into the final two weeks prior to the FCC's issuing the Draft Order. The Parties continued to advocate for market-based compensation until the very end when they jointly sought to increase the FCC's fixed payments.

At the same time, SES sought to amend the Consortium Agreement. To that
end, SES proposed a complete re-write, redefining the key terms "Project" and
"Project Gross Proceeds" and deleting "Secondary Market Agreements" altogether.
(DX127.) When that proposal failed, SES sought to add language to a "short-form"
amendment that would have provided for a 50/50 split between the Parties
regardless of the FCC's approach. (DX42.) At the time, SES's chief strategist and
chief legal officer both described SES's need for amendment as "urgent" and
"critical." (DX167; DX170.)

Intelsat posits that the reason SES had an urgent need to amend was
because its executives were concerned that the approach the FCC appeared likely to
adopt—and ultimately did adopt—was not covered by the Consortium Agreement.
It cites SES contemporaneous internal communications that (i) an FCC-directed
distribution mechanism would "unravel the project" (DX411, DX470), (ii) an FCC-
created proceeds split would be "very bad" for SES (DX239), and (iii) the FCC's
approach would "void our 50/50 with Intelsat" (DX78) and the "50/50 with Intelsat
would be gone" (DX79.) Attempts by SES's executives to explain away those
contemporaneous statements at trial were not credible. At the same time, the
instructions from the highest levels within SES were to "find a way to preserve the
structure of the consortium agreement" (DX239), and to seek an "upfront agreement
with Intelsat" (DX411.) SES failed to obtain such an amendment, and Intelsat
argues that once the contours of the Final Order became clear, it would have made
no sense for Intelsat to give away hundreds of millions of dollars at the expense of

its creditors when, unlike the proposed Project, SES's cooperation was neither
necessary nor relevant to what the FCC had mandated.

SES did amend other agreements to account for the FCC's rejection of the
market-based approach. The Parties rewrote their agreement with one vendor[3] to
remove all references to "secondary market agreements" and "project-based
proceeds"—terms defined by the Consortium Agreement—because neither appeared
to be in the cards. (SES244.) Intelsat's CFO stated that the economics for a second
vendor[4] should change because the deal the Parties were working on was "clearly
outside the old docs." (DX477.) And with respect to a third vendor,[5] SES concluded
it neither needed to amend nor terminate its contract because, given the FCC's
change in approach, it simply "doesn't apply to the situation," as it "was not
covered." (DX460; DX461.)

The timetable of the Parties' negotiations with the FCC is as follows:

January 17, 2020 - The FCC informally proposes $5 billion in total payments
to the satellite operators, with $2.55 billion allocated to Intelsat and $1.3 billion
allocated to SES.

February 3, 2020 – The FCC revises its offer to change the distribution
between the Debtors and SES. The distribution proposed was $2.89 billion
allocated to Intelsat and $1.35 billion allocated to SES.

---

[3] Evercore.
[4] 5GEIA.
[5] Auctionomics.

10

February 4, 2020 – The FCC proposes $8.8 billion in total payments to the satellite operators, with $5.08 billion allocated to Intelsat and $2.4 billion allocated to SES.

February 5, 2020 – The FCC informally proposes $9.7 billion in total payments to the satellite operators, with $4.85 billion allocated to Intelsat and $3.99 billion allocated to SES.

February 7, 2020 – The FCC issues the Draft Order, reflecting the numbers proposed on February 5.

March 3, 2020 – The FCC issues the Final Order, reflecting the numbers set out in the Draft Order and officially abandoning the market-based approach for clearing the C-Band Spectrum.

Despite the Parties' collective efforts to try to salvage aspects of the Project, the FCC's decision to conduct a public auction was a significantly different from the Parties' Agreement. It was in this atmosphere that the Debtors filed their chapter 11 petitions on May 13, 2020.

## DISCUSSION

**Jurisdiction** The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. The Objection constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B).

11

**Burden of Proof**.  "The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim.  The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim.  The burden then shifts to the debtor to object to the claim.  The debtor must introduce evidence to rebut the claim's presumptive validity.  If the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence."  *Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 640 (4th Cir. 2004) (internal citations omitted).  The Court finds that the Debtors, in introducing substantial credible evidence, as referenced above, have successfully shifted the burden to SES to prove, by a preponderance of the evidence, the validity and amount of the claims it has asserted.

**Conclusions of Law**.[6]  At its essence, this is a case about a contract, the Consortium Agreement, and what effect the Final Order had on it.  The answer will determine whether Intelsat is obligated to share accelerated relocation payments equally with SES, as SES claims.

***Breach of Contract.***  The Consortium Agreement's plain language contemplates a private market-based approach fundamentally at odds with the FCC's Order.  The Agreement considers the "Project" to be a private, market-based approach.  Such an approach is fundamentally at odds with the FCC's Draft and Final Orders.

---

[6] 6 Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

12

SES initially took the position in responses to Intelsat's Requests for Admission that the terms "Project," "Project Purposes," "Project Gross Proceeds," "Project Structure," as well as §§ 10.02 (Termination Clause) and 11.04 (Amendment Clause) of the Consortium Agreement were all ambiguous. (2/9/22 Tr. 118:18-120:9 (Purvis) (discussing (DX249); *see also* DX249 at 8-11, 14-15, 18, 22, 25-26, 30.) But at trial, SES's counsel stated that "we think the contract language is clear." (2/7/22 Tr. 16:6-13 (SES Opening).) Regardless of this statement, the Court will address whether the Agreement is unambiguous as to the private, market-based approach contemplated as the "Project."

The Agreement is governed by New York law (*see* DX1 § 11.02), and New York courts apply a high bar respecting ambiguity. Ambiguity does not arise simply "because two interpretations are technically possible; both interpretations must also be reasonable." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 304 (S.D.N.Y. 2010). Likewise, where "the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation." *Rahl v. Bande*, 328 B.R. 387, 401 (Bankr. S.D.N.Y. 2005) (citation omitted). "A written agreement that is complete, clear, and unambiguous on its face must be enforced to give effect to the meaning of its terms and the reasonable expectations of the parties, and the court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities." *Hoeg Corp. v. Peebles Corp.*, 60 N.Y.S. 3d 259, 261

13

(N.Y. App. Div. 2017); *see also Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)

("[a]mbiguity is determined by looking within the four corners of the document, not

to outside sources").   Rather, a contract is ambiguous only where a relevant term

within the agreement is "reasonably subject to differing interpretations."

*Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001).

      The plain and unambiguous language of the Agreement makes clear that the

"Project," "Project Purposes," "Project Scope," "Project Structure," and "Project

Gross Proceeds" apply only to a private, market-based approach to clearing the C-

Band spectrum.   Thus, consideration of extrinsic evidence is unnecessary and

improper.

      "<u>Project</u>."   From the opening page of the Agreement, the Parties plainly

contemplated the Project to be the market-based solution they discussed among

themselves and repeatedly presented to the FCC, and which the FCC described in

detail in the July 2018 NPRM.   The Agreement states that the members "desire to

enter into … a consortium . . . to act as the transition facilitator referred to in the

NPRM, for the purpose of implementing the Project." (DX1 at SES0210335.)   The

Agreement then immediately states that the Project "will entail a market-based

solution . . . as described in more detail herein and in the NPRM."   (*Id.*)   The

Agreement is also clear that the term "will" has the same meaning as "shall," which

SES concedes is mandatory.   (DX1 § 1.03(d)(viii); 2/9/22 Tr. 103:17-21 (Purvis).)   The

"Project" is therefore the market-based solution described in the Consortium

Agreement and in the NPRM that the FCC explicitly rejected in its eventual Order.

"Project Purposes."  The Project Purposes confirm that the Project refers only to the "market-based approach" contemplated by the NPRM.  The first reason the Parties indicated they wished to "develop and implement the Project" was to "act as transition facilitator"—a role exclusively associated in the NPRM with the market-based approach—"and ensure expedited transition of the [C-Band] Spectrum." (DX1 at SES0210335.)  The Project lacks any mention of any other method for clearing the spectrum that may have been under consideration by the FCC, other than to state expressly—and as a further "Project Purpose"— that the Agreement was designed to "avoid certain complications associated with other potential options for clearing a portion or portions of the C-Band."  (*Id.*)  It would make little sense that an approach to clearing the C-Band that the Parties were expressly developing their Project to "avoid"—an FCC-run auction over which the Parties lacked control—would nonetheless fall *within* that Project, as SES insists.

"Project Scope."  The structure of the Project definition in the Agreement confirms it remained singularly focused on the private market-based approach.  The description of the Project Scope in § 2.01 provides a list of nine tasks that the Parties "shall undertake" "[i]n furtherance of the Project Purposes."  The list of tasks is conjunctive, with each undertaking separated by "and," rather than a disjunctive list from which the Parties could pick and choose.  The private market-based approach is the only method under which all nine undertakings would be applicable, and many of the undertakings could only be applicable to a privately-run, market-based auction where proceeds flowed directly to satellite operators (not

15

to the government).  As an example, the Project Scope required the Consortium to "negotiate and enter into" secondary market agreements that were unique to the private market-based approach.  (DX1 § 2.01(c).)  In negotiating such agreements with 5G providers, the Project also required the Parties to "determine amounts of C-band spectrum to be offered," (DX1 § 2.01(a)), petition the FCC to transfer the spectrum licenses to the mobile operators with whom the Consortium had entered into Secondary Market Agreements, (§ 2.01(b)), "create . . . a master plan setting forth the authorized Spectrum Clearing activities" for all Protected Incumbent Users (§ 2.01(d)), and establish procedures to compensate and reimburse members for Eligible Spectrum Clearing Costs from Project Gross Proceeds (§§ 2.01(e), (f))—all facets of a market-based solution and not a public auction approach, none of which are compatible with the FCC's Orders.  (DX1 §§ 2.01(a)-(h); *see also* 2/15/22 Tr. 31:11-16, 31:25-32:5 (Bryan).)

After identifying eight specific tasks that the Parties "shall undertake" as part of the private market-based approach, the ninth and final conjunctive charge is that the Parties would "otherwise serve as the transition facilitator referred to in the NPRM." (DX1 § 2.01(i).)  The use of the word "otherwise," an adverb meaning "in all *other* respects," demonstrates that the preceding eight undertakings listed in the Project Scope are simply some of the tasks the Parties understood would be associated with serving as the Transition Facilitator, a function only relevant under the private auction, market-based approach.  *See Otherwise*, Merriam-Webster (11th ed. 2003); *see also 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.*, 815

N.Y.S.2d 507, 510 (N.Y. App. Div. 2006) ("The meaning of a word in a series of words is determined by the company it keeps.").

The "Transition Facilitator" role is unique; the FCC defined that role in the NPRM, and it existed solely under the proposed market-based approach. The NPRM contemplated that the "Transition Facilitator" would serve several important functions that would be relevant only within a market-based private auction. These included "negotiat[ing] with any interested terrestrial operators and incumbent users, [and] clear[ing] the negotiated-for spectrum, making it available for flexible use while protecting incumbent earth stations through a variety of potential means." (DX114 ¶ 72.) SES's Chief Legal Officer suggested they "tie in" the Agreement with the NPRM. (DX110 at SES00091323.) That is reflected in the final Agreement: almost every time the term "Transition Facilitator" is used in the Agreement, the NPRM itself is explicitly referenced. (DX1.)

The Court finds that the Project undertakings were rejected in the FCC's Final Order. Under the FCC's Order, the Consortium does not pick blocks of spectrum to auction; the FCC does. Under the FCC's Order, neither the CBA nor any satellite firm has any role in the auction; the FCC runs it exclusively. Under the FCC's Order, the FCC, not a Transition Facilitator, manages the clearing; thus, there is no need for a master plan. Under the FCC's Order, the satellite companies play no role in processing reimbursements or allocating compensation (which the FCC itself determined).

17

SES's argument that the optional amendment provision in § 2.01 of the Agreement establishes the Parties' intent to include more than just the market-based approach fails under New York law. SES argues the fact that the Parties "acknowledged and understood that various details of the Project shall be subject to change" means that the Parties were required to amend the Agreement to encompass a public auction. But if that were the case, the Parties could have used mandatory language—"shall"—for amendments, as they did in other parts of the agreement, rather than note the Agreement "may be amended." (2/9/22 Tr. 100:9-15, 123:20-125:5 (Purvis); Campbell 4/26/21 Dep. Tr. 223:20-224:6;[7] *see* 2/15/22 Tr. 10:17-11:22 (Bryan).)

There is nothing in the four corners of the Agreement to suggest such an interpretation, and it is not a reasonable one. Rather, it is more a case of SES, in retrospect, trying to do exactly what the New York courts cautioned against in *Rahl* – that where "the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation." 328 B.R. at 401.

Further, SES's argument ignores "the common (and commonsensical) rule" that specific contractual language governs over more general language. *Cap.*

---

[7] SES objects to part of this testimony, claiming that the questions were leading. (*See* Docket No. 4112, SES Depo. Objs., Appx. p. 5.) The Court does not find either of these questions to be leading, but in any case, the Court is not swayed by this evidence in making its decision. The Court further notes that all other evidence subject to objections not specifically addressed herein was not considered by the Court in making its ruling.

*Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 272 (2d Cir. 2011); *see also*

*Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001); *John Hancock Mut. Life*

*Ins. Co. v. Carolina Power & Light Co.,* 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New

York law recognizes that definitive, particularized contract language takes

precedence over expressions of intent that are general.").  Here, SES cannot identify

any language in the Agreement explicitly referring to any of the alternative

approaches (other than the agreed-to, private market-based "Transition Facilitator"

role) outlined in the NPRM.  When read as a whole, the Agreement clearly

establishes that the Consortium members intended only to collaborate on and, if

successful, share the proceeds from, the Parties' proposed market-based approach.

*CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 874 N.Y.S.2d 174, 177 (N.Y. App.

Div. 2009) (a "contract should be read as a whole, with every part interpreted with

reference to the whole; if possible, the contract will be interpreted as to give effect to

its general purpose.")  Even if the language in the optional amendment paragraph

did somehow require the Parties to amend the Agreement "to reflect the final rules

promulgated by the FCC, SES identifies nothing in the Agreement to indicate that,

under a mandatory amendment that would require rewriting the majority of the

contract, the Parties would nevertheless be obligated to maintain the same proceed

splits to which they agreed for the market-based proposal.  (*See* 2/15/22 Tr. 69:5-12

(Bryan) ("[A]ll of the terms would have been contemplated [to be on the table in a

potential amendment], but most importantly is, if [the FCC Order] was the result,

and we were going to have to amend to have [the Agreement] apply, is how the

proceeds would be split.").)

"Project Structure."  The Consortium Agreement also provided that the
Project "shall" be implemented through other agreements that would be necessary
only under the CBA's proposed market-based approach.  (DX1 § 2.02.)  These
include secondary market agreements, an escrow agreement, and an operating
manager services agreement.  (DX1 § 2.02 and Exhibits A-C.)  The forms of these
agreements attached to the Consortium Agreement all reaffirm the nature and
intent of the Agreement, and they are not compatible with the Final Order.

"Project Gross Proceeds."  The Agreement also defines "Project Gross
Proceeds" as "all proceeds received by or for the benefit of the Consortium Members
in respect of the Project."  (DX1 at SES0210338.)  SES's Chief Legal Officer
admitted that the "[p]roject gross proceeds definition is tied to the definition of the
defined term capital P Project."  (2/9/22 Tr. 126:1-4 (Purvis).)  It is those Project
Gross Proceeds and no other monies, that are, after the deduction of various fees
and expenses, subject to the revenue sharing agreement in the Agreement.  For all
the reasons set forth above, the accelerated relocation payments for which Intelsat
is eligible under the FCC's Order are not "in respect of the Project": they are not "in
respect of" the market-based process described in detail in the NPRM and the
Consortium Agreement (inclusive of its Exhibits and Schedules).  Thus, under the
FCC's approach, there are no Project Gross Proceeds and, consequently, none
subject to the sharing agreement, even if were to apply."

SES's argument that the Parties intended revenues to be shared no matter
what approach the FCC adopted for clearing the C-Band is found nowhere in the

Agreement.  Given the sophistication of the Parties, if SES really wanted "Project
Gross Proceeds" to encompass any proceeds that could possibly be generated from
the NPRM's proposed provisions, SES should have included that in the Agreement.
It cannot now rely on the Court to read it into the Agreement through a convoluted
process that requires supposition and a tortured reading of the provisions of the
Agreement.  *See Kreiss v. McCown De Leeuw & Co.*, 37 F. Supp. 2d 294, 301
(S.D.N.Y. 1999) (noting that "New York law gives full effect to integration …
clauses.").  SES's proffered amendment in February 2020 included proposing such a
broad term as "C-Band Proceeds", demonstrates that such an agreement might have
been possible but was never adopted.  Instead, from beginning to end, the
Agreement's plain language reflects that it only applies under the CBA's private,
market-based approach, characterized by voluntary cooperation between private
parties and driven by market demand and private incentives.

     If a contract is unambiguous, the Court looks to the plain language of the
contract rather than to extrinsic evidence of the Parties' alleged wishes.  *See World
Ambulette Transp., Inc. v. Lee*, 78 N.Y.S.3d 137 (N.Y. App. Div. 2018) (reversing
district court ruling that relied on extrinsic evidence to override contract's plain
language ); *Modern Art Servs., LLC v. Fin. Guar. Ins. Co.*, 79 N.Y.S.3d 4 (N.Y. App.
Div. 2018).  In other words, "[w]here a contract is unambiguous, it is unnecessary
for the court to resort to extrinsic evidence such as business practice to interpret it."
*In re Aerovias Nacionales de Colombia, S.A. Avianca*, 323 B.R. 879, 890 (Bankr.

S.D.N.Y. 2005).  Since there is no relevant ambiguity here, the Court must not

consider extrinsic evidence.

Even if it were proper for the Court to consider extrinsic evidence, however,

the evidence here confirms Intelsat's contention that the Consortium Agreement

was intended to apply only in the context of the Parties' proposed market-based

approach to C-Band Spectrum clearing that the FCC rejected in its entirety.  In

reaching that conclusion, the Court considers "(1) the acts and circumstances

surrounding execution of the ambiguous term, (2) conversations, negotiations and

agreements made prior to or contemporaneous with the execution of a written

agreement, and (3) the parties' course of conduct throughout the life of the contract."

*Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*, 2021 WL 602989, at *1

(S.D.N.Y. Feb. 16, 2021).

During the period in which the Parties were negotiating the Consortium

Agreement, their goal was to persuade the FCC to allow them to clear the C-Band

through a market-based approach and to follow through on that approach once that

approval was granted.  For example, in June 2018, after months of term sheet

negotiations and as they were beginning to negotiate the Consortium Agreement

itself, the Parties' CEOs signed a letter agreement titled "Understanding reached

for C-Band Secondary Market Proposal."  (*See* DX69; DX70; *see also* DX61-62.)

That letter explained that the Parties would develop the Project through the

creation of a consortium to clear portions of the C-Band "in each case as

contemplated by the [C-Band Secondary Market] Proposal."  (DX69 at

SES0001488.)  And, while drafting the Consortium Agreement itself, SES suggested that the Parties tie the definition of "Project" in the Consortium Agreement to what the FCC had described as the market-based approach in the NPRM.  (2/9/22 Tr. 100:25-103:2 (Purvis) (discussing DX110 at INT00091323).)  Along similar lines, SES described the Consortium Agreement to its Board as the "Transition Facilitator (Consortium) Agreement," using the same term as the FCC had in the NPRM to describe the entity that would control the C-Band clearing process in the context of the market-based approach.  (2/11/22 Tr. 213:20-214:2 (De Hauwer); DX75 at SES0436866-67.)  Moreover, in the months preceding the Consortium Agreement's execution, Intelsat and SES told the FCC repeatedly they were working together to develop the "market-based proposal" that would "create a Consortium of C-Band satellite operators" to clear the spectrum through "secondary market agreements." (DX106 at SES0178670; DX107 at SES178666-67; DX108 at SES0006564.)

Second, after the Parties executed the Consortium Agreement and formed the CBA, they described its purpose to the FCC, the public at-large, and each other. For example, the CBA's October 1, 2018, press release, which it also filed with the FCC, confirms the Consortium Agreement reflected the transition facilitator in the NPRM and designed the CBA to be that transition facilitator.  (DX115 at SES0077303; 2/10/22 Tr. 55:17-55:5 (VanBeber).)  Related documents state that the CBA was formed to effectuate the satellite operators' "breakthrough market-based proposal to clear portions of this CBand spectrum."  (DX115 at SES0077306.)  Other filings the CBA submitted to the FCC throughout the course of the C-Band

proceedings also reflect that the CBA was formed and existed only to facilitate the market-based approach.  (*See, e.g.*, DX26; DX117 at INT0029315; DX 119 at SES0141104; DX198; DX342; DX415.)  The CBA's head of advocacy testified to Congress in 2019 that the CBA's proposal "depend[ed] on a private sale overseen by the FCC."  (DX15; DX16; Pitsch 3/23/21 Dep. Tr. at 129:5-18; Pitsch 3/24/21 Dep. Tr. at 331:15-332:10.)

SES recognized that the CBA's existence depended on the market-based approach outside of these public statements as well.  For example, the SES former Chief Legal Officer acknowledged "that the CBA would not continue in the face of an adverse FCC Order," meaning one other than the "Market Based Approach" (SES283 at SES0036043.), and he also observed to his colleagues at SES that if the FCC ordered a distribution different than what was in the Consortium Agreement, SES would need a new agreement with Intelsat.  (DX411 at SES0233403.)

Finally, the Parties' actions after the public-auction tweet show they understood that the Consortium Agreement did not apply once the FCC rejected the market-based approach.  In particular, the Court notes SES's repeated efforts to amend the Consortium Agreement to redefine the Project Scope and change how monies that might be earned would be distributed.  (DX127 at INT00322395-96, INT00322410-12; see also DX42; DX169.)  SES believed that it was "urgent" that before the FCC released its order, Intelsat agree to SES's proposed amendment that would provide for 50/50 sharing regardless of what the FCC decided.  (DX42; DX322; DX167.)  SES's conduct after the public auction tweet demonstrates SES's

recognition that the Consortium Agreement, as written and signed, did not align with the FCC's anticipated order.

The Court finds that the Agreement is not ambiguous in any reasonable way. The Project contemplated by the Agreement will not come to pass; any monies the Parties receive related to their individual clearing efforts are not "in respect of the Project" and therefore not subject to the Agreement's revenue-sharing provisions. SES's effort to "reinvent an obviously straightforward contract [] that was signed and executed by [] sophisticated parties" is without merit. *Am. Home Assurance Co. v. Merck & Co.*, 329 F. Supp. 2d 436, 444 (S.D.N.Y. 2004).

SES argues that § 10.02(e) of the Agreement prohibits Intelsat from terminating the Agreement without SES's consent. SES contends that the section requires a determination by the Operating Subcommittee that an FCC order "would prevent the Project from moving forward."[8] The Debtors disagree. The Court need not address this argument, as the Agreement had already terminated prior to the

---

[8] Section 10.02 of the Agreement provides as follows:
    Termination . This Agreement may be terminated by and upon any of the following:
    (a) the third (3rd) anniversary of the date of this Agreement, if by such time no Secondary Market Agreement has been entered into;
    (b) by a Supermajority of the Members, upon their written agreement;
    (c) by Intelsat, upon a material breach of this Agreement by SES that remains uncured by SES sixty (60) days after notice thereof by Intelsat to SES;
    (d) by SES, upon a material breach of this Agreement by Intelsat that remains uncured by Intelsat sixty (60) days after notice thereof by SES to Intelsat; or
    (e) by either Intelsat or SES, upon the determination by the Operating Subcommittee that any final, non-appealable FCC C-Band Orders or order of any other Governmental Authority would prevent the Project from moving forward.

receipt of any accelerated relocation payments by any party.  This is the case

because there were no secondary market agreements as of the third anniversary of

the Agreement.  (September 27, 2021). (2/8/22 Tr. 155:1-20, 240:22-24 (Collar);

2/9/22 Tr. 109:13-22 (Purvis); DX443 (citing DX1 § 10.02(a)); 2/15/22 Tr. 2:14-4:13

(Bryan); DX136 ¶ 232).)  Thus, even if accelerated relocation payments could

theoretically be proceeds "in respect of the Project," Intelsat US LLC

unquestionably had the right to terminate before any accelerated relocation

payments were received and in fact did so.[9]

SES argues the termination under § 10.02(a) should have no effect, since

Intelsat allegedly breached the Agreement before termination.  SES has asserted

two bases for this claim:  (i) Intelsat's independent contacts with the FCC in the

final days preceding the FCC's February 2020 Draft Order, and (ii) Intelsat's

rejection of the Consortium Agreement pursuant to 11 U.S.C. § 365 on December 7,

2020, during the course of these chapter 11 cases.  (See 2/7/22 Tr. 48:8-11, 50:10-15,

55:23-25 (SES Opening); 2/15/22 Tr. 101:5-16 (Bryan).)

The Court finds that these actions did not constitute material breaches of the

Agreement under the facts in this case, and neither alleged breach resulted in

damages to SES.  New York courts recognize that "inconsequential or de minimis

---

[9] After the third anniversary of the Agreement passed, Intelsat sent a termination letter to
all Consortium members, stating that "to the extent the Consortium Agreement had any
continuing effect following the FCC's February and March 2020 Orders (and Intelsat
believes it had none), it is formally terminated pursuant to Section 10.02(a)."  (DX443; see
2/15/22 Tr. 3:12-21 (Bryan) (Intelsat sent termination letter "out of an abundance of
caution" as "no secondary market agreement had occurred, so the agreement terminated on
its own terms.").)

breaches that are not so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract" will not give rise to damages. *See., e.g., Smolev v. Carole Hochman Design Grp., Inc.*, 913 N.Y.S.2d 79 (N. Y. App. Div. 2010).

Further, SES has not shown any damages as a result of either alleged breach, even if the breaches were material. *In re MS Angeln GmbH & Co. KG*, 10 F. Supp. 3d 424, 431 (S.D.N.Y. 2014) ("[I]n order to prove a breach of contract claim, a plaintiff must establish that his damages were caused by the defendant's wrongful conduct."). Because the FCC rejected the Parties' Project, there never were any Project Gross Proceeds—*i.e.*, monies earned "in respect of the Project." Further, there is no evidence that any of Intelsat's independent contacts with the FCC had the impact of reducing payments to SES. Quite the opposite. During the time SES complains about, Intelsat's individual payments were reduced while SES's payments were increased by $1.5 billion.

As to SES's second basis for its claim that Intelsat breached the Agreement by rejecting the Agreement during the progression of its case in this Court, the Court finds that the rejection of the Agreement is consistent with the Debtors' position that the Agreement had no application following the FCC's order, rendering it effectively irrelevant. The Court does not read into the rejection any admission that the Agreement was still in effect. To do so would be to infer an intent that is not supported by the evidence presented to the Court. The Debtors urge, in their Proposed Findings of Fact and Conclusions of Law, that the

Agreement was rejected in the bankruptcy case in an abundance of caution, to the extent it was still in force and construed to somehow impose obligations on them despite the FCC's rejection of the market-based approach, Intelsat US LLC rejected the Agreement because it provided no benefit to the Debtors' estates following the FCC's Final Order. *See* 11 U.S.C. § 365; *COR Rte. 5 Co. v. The Penn Traffic Co. (In re The Penn Traffic Co.)*, 524 F.3d 373, 378 (2d Cir. 2008) (Section 365 of allows a trustee or chapter 11 debtor-in-possession to assume or reject any executory contract or unexpired lease of the debtor.)[10]

Intelsat's independent contacts with the FCC in the final days preceding the FCC's February 2020 Draft Order did not damage SES. The Debtors' rejection of the Agreement in the bankruptcy case did not harm SES. Because the two alleged breaches claimed by SES did not cause damages, there can be no recovery for them.

***Unjust Enrichment.*** SES asserts a claim for unjust enrichment as an alternative to its breach of contract claims. The Court finds that SES's unjust enrichment claim fails for two reasons. *First*, the unjust enrichment claim arises out of the same subject matter as the Consortium Agreement and is thus barred as a matter of law. *Second*, even putting aside this contractual bar, SES cannot establish the elements of an unjust enrichment claim.

New York courts are clear that "where a valid and enforceable contract governs the relevant subject matter of the parties' dispute, the contract—rather than principles of restitution—should determine the measure of a party's recovery

---

[10] The rejection of a contract may give rise to damages for the contract's breach, but, as has been established here, there were no damages incurred by SES because of the rejection.

for events *arising from that subject matter.*" *Chesapeake Energy Corp. v. Bank of
N.Y. Mellon Tr. Co., N.A.*, 837 F.3d 146, 159 (2d Cir. 2016) (per curiam) (emphasis
added).[11] By contrast, "unjust enrichment . . . is an obligation the law creates in the
absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746
(N.Y. 2005); *Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916). Thus, "a party may
not recover in . . . unjust enrichment where the parties have entered into a contract
that governs the subject matter" at issue in the dispute. *Catlyn & Derzee, Inc. v.
Amedore Land Devs., LLC*, 87 N.Y.S.3d 661, 664 (N.Y. App. Div. 2018); *see Poplar
Lane Farm LLC v. Fathers of Our Lady of Mercy,* 449 F. App'x. 57, 59 (2d Cir. 2011)
("[W]hen a valid agreement governs the subject matter of a dispute between parties,
claims arising from that dispute are contractual; attempts to repackage them as
sounding in … unjust enrichment … are generally precluded."). For this reason,
New York courts routinely dismiss unjust enrichment claims when they arise out of
alleged breaches of contract. *E.g., Sell It Soc., LLC v. Strauss,* 2018 WL 2357261, at
*8 (S.D.N.Y. Mar. 8, 2018); *DRL Software Sols., LLC v. JourneyPure, LLC,* 2018 WL
1276856, at *2 (S.D.N.Y. Mar. 8, 2018) (dismissing unjust enrichment claim where
"the case will center on parties' obligations under [a written] contract"); *ISS Action,*

---

[11] *See also MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998)
(observing that, under "well–settled principles of New York law…. the existence of a valid
and enforceable written contract governing a particular subject matter ordinarily precludes
recovery in quasi contract ... for events arising out of the same subject matter" (internal
quotation marks omitted)); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382,
389 (1987) ("It is impermissible ... to seek damages in an action sounding in quasi contract
where the suing party has fully performed on a valid written agreement, the existence of
which is undisputed, and the scope of which clearly covers the dispute between the
parties.")

*Inc. v. Tutor Perini Corp.*, 95 N.Y.S.3d 298, 303 (N.Y. App. Div. 2019) (dismissing unjust enrichment claim because the disputed issue was addressed, one way or another, in the parties' agreements").

SES seeks to avoid this adverse case law by arguing that the unjust enrichment claim acts as a gap-filler to the extent that the Consortium Agreement does not apply to the FCC's decision. However, this is precisely the type of end-run around a contract that the above cases prohibit. Under New York law, an unjust enrichment claim does not arise merely because a contract does not specifically address a given situation. Such a rule would effectively always allow unjust enrichment claims if a contract were found not to govern a specific action between parties. Instead, the inquiry must focus on whether the events giving rise to the unjust enrichment claim are "events arising out of the same subject matter" as a "written contract governing a particular subject matter." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (emphasis added). If the events arise out of the same subject matter, an unjust enrichment claim may not lie—even if the contract is held not to apply to that matter. *Id.* ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")

The nature of SES's primary claim—that Intelsat has breached the Consortium Agreement—demonstrates why there can be no unjust enrichment claim here as a matter of law. The thrust of SES's unjust enrichment claim appears

to be that Intelsat improperly led SES to believe the Agreement's revenue-sharing

obligation was still in force even after Intelsat had determined that it was not.

Putting aside whether that is correct as a factual matter, it demonstrates that

SES's unjust enrichment claim arises out of precisely the same events and subject

matter as its contract claims.  The fact that SES's unjust enrichment claim seeks to

enforce a 50/50 split—a figure found nowhere else other than the Agreement—

confirms as much.  In such a situation, New York law is clear that an unjust

enrichment claim cannot succeed. *Catlyn & Derzee, Inc.*, 87 N.Y.S.3d at 664.

SES cites no case to the contrary.  In its opening statement, SES argued that

unjust enrichment is a "long-recognized stand-alone theory of liability" and cited a

series of cases in which  plaintiffs successfully asserted such claims. (*See* 2/7/22 Tr.

84:22-23 (SES Opening Statement).)  But none of those cases involved a valid,

enforceable contract governing the same subject matter as the unjust enrichment

claim.  For example, in *Thayer v. Dial Indus. Sales, Inc.*, the court noted that a

party cannot proceed in quasi contract "when there is an express contract covering

the subject matter involved."  189 F. Supp. 2d 81, 92 (S.D.N.Y. 2002) (quotations

omitted).  The court held that because the plaintiff performed services for a period

before there was a contract governing his performance, he could bring an unjust

enrichment claim to recover for those precontract services.  *Id.*  Other cases on

which SES relies did not concern a contractual relationship or breach of contract

claim.[12]  SES thus has provided no authority to show why New York's rule

disallowing unjust enrichment claims on a subject matter covered by a contract does

not bar its claim here.

In addition, SES has not established the elements of unjust enrichment.

Even if SES could assert a claim for unjust enrichment in the face of the

Consortium Agreement, the Court finds the claim would still fail because SES

cannot establish any of the elements necessary to establish such a claim.

To establish unjust enrichment, a plaintiff must show that "(1) the defendant

was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good

conscience to permit the defendant to retain what is sought to be recovered." *Deerin*

*v. Ocean Rich Foods, LLC*, 71 N.Y.S.3d 123, 126-27 (N.Y. App. Div. 2018) (citation

omitted).  SES cannot establish any of these elements.

SES cannot show Intelsat was enriched at all, much less at SES's expense.

The undisputed evidence at trial was that the work to cause the FCC to increase its

accelerated relocation payment offer to a total of $9.7 billion was either joint work

or, with respect to the last $900 million (from $8.8 billion to $9.7 billion), work that

Intelsat drove individually.  As that work increased the "size of the pie" for both

Parties, SES cannot explain how Intelsat was enriched or SES was harmed.

Rather, as the amount of accelerated relocation payments grew to $9.7 billion,

SES's portion of those funds grew by $1.5 billion, while Intelsat's share decreased

---

[12] In particular*,* SES cites *State Farm Mut. Auto. Ins. Co. v. A to Z Med. Care P.C.*, 2019 WL
2489901 (E.D.N.Y. June 7, 2019); *Gov't Emps. Ins. Co. v. Infinity Health Prod., Ltd.*, 2012
WL 1427796 (E.D.N.Y. Apr. 6, 2012).

by more than $200 million. (DX524.) Because its payments were decreased when the total relocation payments were increased to $9.7 billion, Intelsat was not unjustly enriched, and in fact was not enriched at all. On the other hand, SES received a large increase in its award thanks to Intelsat's continued negotiation efforts with the FCC.

Various SES witnesses testified that if they had known that Intelsat believed the 50/50 split would no longer apply under the anticipated Final Order mandating individualized acceleration payments, SES may have ceased working cooperatively with Intelsat earlier. But SES's witnesses also admitted that, in that scenario, the outcome was so uncertain that SES may itself have received less compensation—or even no compensation—in the market-driven clearing process set forth in the Agreement.[13] At best, what SES may have done in recognition that a 50/50 split was no longer obtainable, and what may have been the effect of its actions, is speculative. There is no proof that SES's walking away from the joint advocacy prior to the release of the Draft Order would have made SES better off. There is thus no evidence that SES was harmed by what it alleges to be the wrongful conduct.

Finally, SES cannot establish that it would be "against equity and good conscience to permit [Intelsat] to retain what is sought to be recovered." *Deerin*, 71 N.Y.S.3d at 127. The ultimate split of the accelerated relocation payments was set by the FCC. The FCC allocated those amounts based on its views of "the relative

---

[13] *See* 2/14/22 Tr. 41:25-42:7 (De Hauwer).

contribution that each eligible space station operator is likely to make towards accelerating the transition of the [C-band spectrum]," along with each license holder's satellite coverage and transponder usage.  (DX136 ¶ 227.)

SES has not presented any evidence that the FCC was "duped" into establishing those splits or that the splits are fundamentally unfair using the metrics the FCC itself independently selected.  To the contrary, SES's own data (and own internal communications) are clear that, based on the objective metrics that the FCC used in allocating the accelerated relocation payments amongst the operators, Intelsat and SES's share of the proceeds would *not* be equal "under any type of metric (revenue, supply etc.) that the FCC would mandate," such that SES received more than it deserved from the FCC.  (DX239; DX227.)[14]  Moreover, while SES criticizes "back-channeling" by Intelsat CFO David Tolley in the two-day period between the FCC's "best and final offer" on February 4 and issuance of the Draft Order on February 7, there is no evidence that anything Intelsat did resulted in it receiving a larger allocation at SES's expense.  In fact, during that same time, Intelsat's offer decreased while SES's increased by $1.5 billion.  (*E.g.,* DX160.)

To the extent SES thought the FCC's splits were unfair, it could have objected to the Draft Order or refused to participate in the accelerated clearing; it did neither.  In short, the Court does not see anything "unjust" about allowing the split of accelerated relocation payments set by the FCC based on objective criteria to determine the amounts available to SES and Intelsat.  For this reason and the

---

[14] SES does not dispute that Intelsat has more capacity in the C-Band (*see* DX227; 239).

reasons set forth above, the Court finds that even independent of any contractual

bar to SES's unjust enrichment claim, SES could not and did not establish the

elements of an unjust enrichment claim.

*Breach of Fiduciary Duty*.  SES has asserted Intelsat breached a fiduciary

duty to SES when it took the position that the Consortium Agreement did not apply

to the FCC's Draft and Final Orders.  Despite presenting evidence and argument for

seven days at trial, SES made little to no mention of this claim.  In any event, the

Court finds that SES's breach of fiduciary duty claim fails.

To establish a breach of fiduciary relationship under New York law, "a

plaintiff must prove the existence of a fiduciary relationship, misconduct by the

defendant, and damages that were directly caused by the defendant's conduct."

*Stein v. N. Assurance Co. of Am.*, 2012 WL 1605365, *10 (E.D.N.Y. May 7, 2012).

SES cannot establish these elements.

The first element of a fiduciary duty claim is the existence of a fiduciary

relationship between the Parties.  *Id*.  To the extent SES claims a fiduciary duty is

established by the Consortium Agreement, that claim is precluded by its plain

terms.  Section 8.04 of the Consortium Agreement states:

> <u>Section 8.04 Fiduciary Duties</u>. No Member or any of its past present, or
> future Representatives shall have any fiduciary duty to any Member,
> nor shall have any obligation, or be liable or accountable in damages or
> otherwise, to any Member for exercising any of the rights of such
> Member or such Representative under this Agreement or any Related
> Agreement to which it is or will be a party, or for losses sustained,
> liabilities incurred or benefits not derived as a result of errors in
> judgment or mistake of fact or law or any act or omissions, so long as
> such Member (or its Representatives) was not grossly negligent, did
> not engage in willful misconduct and did not act with bad faith or

35

> deliberate dishonesty. No Member shall in any event be liable for any
> consequential, incidental or indirect damages, including loss of profit
> or goodwill. This provision shall not affect specific limitations of
> liability in any of the Related Agreements. (DX1 § 8.04.)

As sophisticated parties, Intelsat and SES had the option to contractually "waive

legal claims based on the fiduciary duties that arise from their relationships."

*Union Carbide Corp. v. Montell N.V.*, 1998 WL 293991, at *7 (S.D.N.Y. June 5,

1998); *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 523-24

(S.D.N.Y. 2014). That is precisely what they did. Section 8.04 of the Agreement

precludes any claim that may be based on the existence of a fiduciary duty.

SES seeks to avoid this result by pointing to language in § 8.04 that it claims

creates a carve-out to the fiduciary duty disclaimer for willful misconduct, bad faith,

or deliberate dishonesty by a Consortium member. Its attempt fails for two

reasons.

First, SES's reading of the disclaimer is incorrect. Under the "last antecedent

doctrine," a modifier placed at the end of the series—like the one here pertaining to

willful misconduct, bad faith, or deliberate dishonesty—modifies only the last item

in the series. *See Duane Reade, Inc. v. Cardtronics, LP*, 863 N.Y.S.2d 14, 17 (N.Y.

App. Div. 2008) (applying canon). The carve-out language that SES points to does

not relate to the fiduciary duty disclaimer, but instead to the portion of § 8.04 that

creates a limitation on damages recoverable for breaches of the Agreement.

This interpretation is also consistent with any reasonable understanding of

the language of the provision. It is typical for a contractual term that limits a

party's liability to have a carve-out for willful misconduct or bad faith; if a party has

engaged in such misconduct, the law generally does not permit that party to insulate itself from the harm it caused. *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC (In re Part 60 Put-Back Litig.)*, 36 N.Y.3d 342, 352 (N.Y. 2020). In contrast, it makes little sense to have the existence of a relationship (like a fiduciary duty) depend on the nature of a party's future actions. Under SES's reading, the Parties could have maintained their relationship for years without having any fiduciary duties to one another, only to have such a duty spring to life at the moment Intelsat engaged in supposedly willful or dishonest conduct. That makes no sense.[15]

*Second*, even if SES were correct that a willful misconduct carve-out applies to the fiduciary duty disclaimer, SES failed to establish that a fiduciary duty exists between the Parties. Section 8.04 merely disclaims fiduciary duties; it does not create such duties. New York law is clear that "an arms-length contract between two parties "does not by itself give rise to fiduciary duties between them, something more is required." *Hamister v. Liberty Mut. Ins. Co.*, 2008 WL 4365893, at \*9 (W.D.N.Y. Sept. 22, 2008). Here, there are simply no affirmative statements in the Consortium Agreement that *establish* such a fiduciary duty.

SES cites no persuasive evidence that would establish a fiduciary relationship. It presented no evidence that "one party's superior position or superior access to confidential information is so great as virtually to require the

---

[15] Even if the disclaimer could have potentially applied to the "no fiduciary duty" clause, the facts here belie the notion that Intelsat's actions constitute "willful misconduct," "bad faith," or "deliberate dishonesty."

other party to repose trust and confidence in the first party," which may have created a fiduciary duty. *Pension Comm. v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 624 (S.D.N.Y. 2009); *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 293 (N.Y. App. Div. 1988). Nor did SES establish the type of "special circumstances" required to convert a contractual relationship into a fiduciary one, "such as control by one party of the other … or creation of an agency relationship." *L. Magarian & Co. v. Timberland Co.*, 665 N.Y.S.2d 413, 414 (N.Y. App. Div. 1997). Intelsat and SES are competitors (Docket No. 4143, Joint Stipulated Facts, ¶ 1.); Intelsat and SES are not fiduciaries.

Even if SES could establish that Intelsat owed a fiduciary duty to SES and that Intelsat breached that duty by seeking a greater portion of the accelerated relocation payments from the FCC, SES would not be able to establish damages. As with SES's unjust enrichment claim, there is no evidence that Intelsat's alleged breach caused any actual harm to SES.

As discussed above, during the period in which SES alleges Intelsat was engaged in misconduct, Intelsat's share of the relocation payments was reduced from $5.08 billion to $4.85 billion, and SES's share increased from $2.4 billion to $4 billion. As a result, even if Intelsat's engaging in advocacy before the FCC during this time could be construed as breaching some duty owed to SES, that advocacy in fact benefited SES by more than a billion dollars. And to the extent SES's fiduciary duty claim is based on alleged back-channeling undertaken by Intelsat or its agents, SES failed to prove that such advocacy improved Intelsat's own position vis-à-vis

SES.  Instead, the record establishes that Intelsat's potential recovery decreased during the final days of the negotiations, whereas SES's increased.  Because Intelsat's advocacy did not damage SES, its claim for breach of fiduciary duty (even if one even existed) must fail.  *Parametric Capital Mgt., LLC v. Lacher*, 791 N.Y.S.2d 10, 11 (N.Y. App. Div. 2005) (breach of fiduciary duty claim dismissed because "such breach would ripen only when plaintiffs are able to allege damages").

***Constructive Trust***.  In its Proofs of Claim, SES did not seek the imposition of a constructive trust.  (DX94.)  However, in its opening statement at trial, SES nonetheless asked the Court to impose a constructive trust on some of the accelerated relocation payments that Intelsat License will receive if it satisfies the requirements of the Final Order.  The Court declines to do so.

As a threshold matter, even if SES were able to establish some elements of a constructive trust, its claim would nevertheless fail because SES disclaimed any allegation of fraud; neither did it prove fraud.  (*See* DX249 at p. 45-46, Responses to Req. for Admission 56 & 57 ("SES admits that it does not allege that Intelsat committed fraud.").)  It is settled law that there can be no constructive trust in the absence of fraud: "New York law is clear that a constructive trust is an equitable remedy intended to be fraud-rectifying rather than intent-enforcing." *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 216 (2d Cir. 2004) (internal quotations and citations omitted); *see also Bankers Sec. Life Ins. Soc'y v. Shakerdge*, 406 N.E.2d 440, 441 (N.Y. 1980)  (noting "the constructive trust doctrine serves as a fraud-rectifying remedy rather than an intent-enforcing one")

(citation omitted).  Consistent with Second Circuit and New York case law, a

district court in the Fourth Circuit denied a constructive trust claim governed by

New York law where (as here) there was "no allegation or evidence that the

transaction was false or fraudulent." *Rapoca Energy Co. v. J.L. Mining Co.*, 368 F.

Supp. 2d 541, 545 (W.D. Va. 2005).  SES's constructive trust theory fails for that

reason alone.

The Court also finds that SES did not establish by a preponderance of the

evidence any of the elements necessary to a constructive trust claim.  "[T]o establish

a constructive trust there must be provided: (1) a confidential or fiduciary relation,

(2) a promise, express or implied, (3) a transfer made in reliance on that promise,

and (4) unjust enrichment." *Bankers Sec. Life Ins. Soc.*, 406 N.E.2d at 440.

*First*, there was no "confidential or fiduciary relation" between the Parties.

As the Court has previously found, there was a waiver of any fiduciary duties in the

Consortium Agreement.  (DX1 § 8.04 ("No Member or any of its past, present, or

future Representatives shall have any fiduciary duty to any Member …").

*Second*, there was no "transfer made" to Intelsat "in reliance on" any promise

to SES.  The FCC's Order provides for acceleration payments directly and

separately to each of Intelsat and SES, depending on whether either meets the

obligations of the Final Order, which were calculated based on each entity's

separate contribution to the repurposing process.  (DX136 ¶¶ 171, 174, 232, 287,

295.)  None of those accelerated relocation payments, if earned, has anything to do

with any promise that Intelsat made to SES.  There was no promise by Intelsat to

40

share proceeds other than what may have been required under the Consortium
Agreement. And, as the Court has determined, the Consortium Agreement does not
require Intelsat to share its accelerated relocation payments with SES.

*Third*, the Court has found that SES has no "unjust enrichment" claim.
Among other things, just as the existence of the Consortium Agreement precludes
an unjust enrichment claim, it would bar any constructive trust claim. *See In re
First Cent. Fin. Corp.*, 377 F.3d at 215 (noting the existence of an agreement
precluded the equitable remedy of a constructive trust).

If Intelsat earns the accelerated relocation payments for which the FCC made
it eligible in the Final Order, it will do so through its own efforts. The FCC
allocated the accelerated relocation payments to each firm based on the "relative
contribution, in terms of both effort and cost, that each eligible space station
operator will make to meet the Accelerated Relocation Deadlines based on three
objective factors related to each space station operator's relative contribution."
(DX136 ¶ 238.) The FCC also noted the burdens of accelerated clearing "will fall
more heavily on some space station operators than others" (*Id.* ¶ 227), and the
evidence establishes that Intelsat is eligible for larger accelerated relocation
payments because it has materially more market share in the C-Band than SES
and more work to do to earn the money for which it is eligible. (*See, e.g.,* DX239
(SES admitting that "SES vs Intelsat share will not be 50/50 under any type of
metric (revenue, supply etc.) that the FCC would mandate"); DX227 (SES admitting
that Intelsat has 50% more coverage in the C-Band than SES does); 2/15/22 Tr.

85:24-86:11 (Bryan) (Intelsat must do "a lot more" work than SES under the terms of the FCC's Order).)  Intelsat is entitled to a larger acceleration payment than SES because Intelsat is making a significantly larger contribution to the repurposing than SES.  *See, e.g., Rapoca Energy*, 368 F. Supp. 2d at 54 (denying a constructive trust claim governed by New York law because the claimant failed to show unjust enrichment); *Sharp v. Kosmalski*, 351 N.E.2d 721, 724 (N.Y. 1976) ("The salutary purpose of the constructive trust remedy is to prevent unjust enrichment . . . .").  There being no fraud or unjust enrichment having been proven by SES, there is no basis for imposing a constructive trust on any of the accelerated relocation payments that Intelsat may be eligible to receive.

**Claims against Intelsat License and Intelsat Jackson.**  Intelsat US LCC is the only entity that signed the Consortium Agreement.  (DX1(Consortium Agreement); 2/15/22 Tr. at 13:19-21 (Bryan) at 109:21-24.)  Nevertheless, SES maintains that it may pursue its claims against other Intelsat entities despite the absence of language in the Consortium Agreement that would bind affiliates of Intelsat.

Because SES has not satisfied its burden to prove any of its claims, the Court need not determine which entities may be liable.  The U.S. District Court for the Southern District of New York recently cautioned against federal courts' offering advisory opinions:

> [I]t is unnecessary for the Court reach Plaintiffs' alternative argument for relief . . . *see Immigration & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts ... are not required to make findings on issues the decision of which is unnecessary

42

to the results they reach."); *In re Surface Mining Regulation Litig.*, 627 F.2d 1346, 1360 n.16 (D.C. Cir. 1980) ("We need not address this procedural challenge because of our determination that the disputed interim regulation itself is without support in the record and therefore arbitrary and capricious."). Indeed, to do so would arguably be inappropriate. See, e.g., United Pub. Workers of Am. (C.I.O.) v. Mitchell, 330 U.S. 75, 89 (1947) ("[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions.").

*New York v. Wolf*, 2021 WL 185190, *3 n.4 (S.D.N.Y. Jan. 19, 2021). Having determined that the signatory to the Consortium Agreement has no liability to SES, and there being no alternative theory of relief offered that would otherwise bind an Intelsat affiliate in the absence of such liability, the Court will not address this issue further.

## CONCLUSION

As set forth above, the Court finds that under the plain language of the Consortium agreement and the evidence in the record, SES has failed to carry its burden of establishing by a preponderance of the evidence that Intelsat is liable to SES under any theory of recovery set forth by SES. Accordingly, Intelsat's objection to SES proofs of claim nos. 84, 85, and 103 will be sustained, and the claims will be disallowed.[16]

A separate order shall be issued.

Signed: October 5, 2022

_____/s/ Keith L. Phillips_____
United States Bankruptcy Judge

Entered on Docket: October 5, 2022

Copies to:

---

[16] The Motion for summary judgment filed by Intelsat is moot in light of the Court's ruling.

43

Orin Snyder
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Michael A. Rosenthal
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Brian M. Lutz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Christopher D. Belelieu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193Justine M. Goeke

Brian M. Lutz.
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000

20 San Francisco, CA 94105
KAUFMAN & CANOLES, P.C.
Dennis T. Lewandowski
Clark J. Belote
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665

Peter J. Barrett
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Michael A. Condyles
901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Jeremy S. Williams
Kutak Rock L.L.P.

901 East Byrd Street
Suite 1000
Richmond, VA 23219-4071

Edward O. Sassower, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Steven N. Serajeddini, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Aparna Yenamandra
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

Michael B. Slade
KIRKLAND & ELLIS LLP
300 North LaSalle
 Chicago, IL 60654

Michael A. Glick
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
15 Washington, DC 20004

B. Webb King
Office of the United States Trustee
210 First St, SW, Suite 505
Roanoke, VA 24011

John P. Fitzgerald, III
Office of the US Trustee - Region 4 -R
701 E. Broad Street, Ste. 4304
Richmond, VA 23219

## EXHIBIT D

aantypas@akingump.com
aburgess@sandsanderson.com
adam.jachimowski@troutman.com
adela.troconis@davispolk.com
aentwistle@entwistle-law.com
aepps@williamsmullen.com
agoldman@cahill.com
ahochheiser@mauricewutscher.com
aleblanc@milbank.com
amy.eldridge@klgates.com
andrew.buxbaum@troutman.com
andrew.silfen@arentfox.com
aqureshi@akingump.com
aravi@cahill.com
ashley.boizelle@fcc.gov
ashmead@sewkis.com
atlanta@sec.gov
attorney.general@po.state.ct.us
attorney.general@state.de.us
bankruptcy@coag.gov
barry.ihrke@usbank.com
bbennett@jonesday.com
beasthatn@williamsmullen.com
beth.brownstein@arentfox.com
rstark@brownrudnick.com
bkahn@akingump.com
blennon@willkie.com
blutz@gibsondunn.com
bmccallen@willkie.com
bpisella@winston.com
branchd@ballardspahr.com
brandon.horak@usbank.com
brian.lohan@arnoldporter.com
cajones@wtplaw.com
cbooker@wtplaw.com
ccarr@law.ga.gov
citizenservices@myfloridalegal.com
civil.rights@ag.ny.gov
constituentservices@ag.louisiana.gov
consumerinterest@alabamaag.gov
cora.request@coag.gov
cschreiber@winston.com

cwedoff@jenner.com
ddavenport@hooverpenrod.com
ddunne@milbank.com
dfoley@mcguirewoods.com
dloft@bsfllp.com
dmintz@orrick.com
dtlewand@kaufcan.com
dylan.trache@nelsonmullins.com
efile@pbgc.gov
ehowlett@sandsanderson.com
eli.vonnegut@davispolk.com
emily.mather@klgates.com
gbressler@mdmc-law.com
hawaiiag@hawaii.gov
heather.anderson@law.njoag.gov
hfield@wilmingtontrust.com
hhutman@hooverpenrod.com
iblumberg@paulweiss.com
idizengoff@akingump.com
jackson.toof@arentfox.com
james.grudus@att.com
jamestecee@quinnemanuel.com
jason.binford@oag.texas.gov
jason.gold@nelsonmullins.com
jason.kyrwood@davispolk.com
jbrody@jonesday.com
jburke@orrick.com
jcampbell@wilmingtontrust.com
jed.donaldson@hrnnexus.com
jeffrey.rothleder@squirepb.com
jfigueiredo@hahnhessen.com
jhollis@woodsrogers.com
jlevitin@cahill.com
jmclemore@williamsmullen.com
jordanharap@quinnemanuel.com
jpaget@huntonak.com
jporter@entwistle-law.com
jwilson@kelleydrye.com
jwuebker@huntonak.com
jzeizel@cahill.com
karol.denniston@squirepb.com
kathryn.bonorchis@lewisbrisbois.com
kcrowley@clrbfirm.com

kdoorley@akingump.com
kdwbankruptcydepartment@kelleydrye.com
kelliott@kelleydrye.com
kelly.patricia@pbgc.gov
kenneth.n.whitehurst@usdoj.gov
kkatsionis@kelleydrye.com
kkimpler@paulweiss.com
kmartorana@gibsondunn.com
kpavlova@sandsanderson.com
kvogel@vogelandcromwell.com
lclayton@paulweiss.com
lloyd.randolph@usdoj.gov
lotempio@sewkis.com
margaret.westbrook@klgates.com
mbouslog@gibsondunn.com
mbrod@milban1c.com
mdtcbkc@tniamidade.gov
melanie.brichant@bofa.com
rnfreimuth@willkie.com
mhankin@jenner.com
mhastings@woodsrogers.com
michael.carlson@fcc.gov
michael.scott@loyensloeff.com
michele.ellison@fcc.gov
mmccauley@wilmingtontrust.com
mmorano@modmc-law.com
mmueller@williamsmullen.com
mrosenthal@gibsondumi.com
muneera.carr@yahoo.com
nmccullagh@spottsfain.com
nmorin@jonesday.com
nyrobankruptcy@sec.gov oag@dc.gov
oag@oag.state.md.us
osnyder@gibsondunn.com
paley.chen@bofa.com
pbasta@paulweiss.com
bfalabella@hirschlerlaw.com

phealy@wsfsbank.com
priscilla.windley@miamidade.gov
psibley@pryorcashman.com
qdepompolo@wilmingtontrust.com ra-li-ucts-bankrupt@state.pa.us
rcappucci@entwistle-law.com
rchappell@spottsfain.com
rgordon@jenner.com
rick.prokosch@usbank.com
rkeach@bernsteinshur.com
rottinger@vanblacklaw.com
rpage@rpagelaw.com rsims@jonesday.com
rstieglitz@cahill.com
rvieth@hirschlerlaw.com
salberino@akingump.com
sanders.witkow@davispolk.com
sarah.walton@davispolk.com
sboehm@mcguirewoods.com
schristianson@buchalter.com
service@oag.state.va.us
sleach@hirschlerlaw.com
slieberman@pryorcashman.com
sshah@milbank.com
ssouthard@klestadt.com
stephanie.massman@davispolk.com
steve.jackson@loudoun.gov
steven.gazzillo@bofa.com
support@naag.org
tebel@sandsanderson.com
thomas.johnson@fcc.gov
tpbrown@huntonak.com
upalsson@winston.com
uricchio.hannah@pbgc.gov
usavae.webmaster@usdoj.gov
ustpregion04.rh.ecf@usdoj.gov
walker.andrew@pbgc.gov
webb.king@usdoj.gov
rwestermann@hirschlerlaw.com
robert.mcintosh@usdoj.gov