No. 3:22-cv-668

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# HON. ROBERT E. PAYNE

SES AMERICOM, INC.,

*Appellant,*

v.

INTELSAT US LLC, et al.,

*Appellees.*

On Appeal from the United States Bankruptcy Court
for the Eastern District of Virginia
No. 20-32299 | Hon. Keith L. Phillips

## APPELLANT'S SUPPLEMENTAL REPLY BRIEF

Dennis T. Lewandowski
Clark J. Belote
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Phone: (757) 624-3252
Email: dtlewand@kaufcan.com
      cjbelote@kaufcan.com

Helgi C. Walker
Russell B. Balikian (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Phone: (202) 955-8500
Email: HWalker@gibsondunn.com
      RBalikian@gibsondunn.com

Orin Snyder (*pro hac vice*)
Michael A. Rosenthal (*pro hac vice*)
Justine M. Goeke (*pro hac vice*)
Grace Hart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Phone: (212) 351-4000
Email: OSnyder@gibsondunn.com
      MRosenthal@gibsondunn.com
      JGoeke@gibsondunn.com
      GHart@gibsondunn.com

*Counsel for Appellant SES Americom, Inc.*

# TABLE OF CONTENTS

1. Whether, on the facts of the record, "a valuable performance has been rendered," assuming that the performance was "under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations" under the Restatement. ...........................................1

2. If the response to paragraph (1) is "Yes," identify the valuable performance and state the value thereof (explaining the value in detail)....................................................................................................................1

3. What, if any, work was done by SES to assist Intelsat in clearing the C-Band assigned to Intelsat? ........................................................................5

4. If the Consortium Agreement does not apply to the activities and conduct of SES and Intelsat after the FCC's November 18, 2019 public-auction announcement, what, if any, instrument or agreement supplied the manner and terms of how SES and Intelsat would proceed thereafter? .................................................................................................6

5. After the public-auction announcement, how were expenses of the C-Band Alliance paid, and where did the funds come from? ............................7

6. After the public-auction announcement, what action did the C-Band Alliance take to attempt to influence in any way the forthcoming FCC Final Order?............................................................................................7

7. How, if at all, does the term "Project Gross Proceeds" operate to define the Project itself, the scope of the Project, or the purpose of the Project?.................................................................................................9

CONCLUSION................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bright v. Westmoreland Cnty.*,
    380 F.3d 729 (3d Cir. 2004) ...................................................................................4

*Burr v. Jackson*,
    19 F.4th 395 (4th Cir. 2021) ...................................................................................4

*Sing Fuels Pte Ltd. v. M/V Lila Shanghai*,
    39 F.4th 263 (4th Cir. 2022) ...................................................................................4

**Regulations**

Final Order, 35 FCC Rcd. 2343 (Mar. 3, 2020) .................................1, 2, 5, 6, 9, 10

**Other Authorities**

Press Release, CBA, *C-Band Alliance Responds to Remarks of FCC
    Chairman Ajit Pai in C-Band Proceeding* (Feb. 6, 2020) ...................................2

Restatement (Third) of Restitution and Unjust Enrichment
    § 5 ..........................................................................................................................3
    § 13 ........................................................................................................................3

Intelsat concedes the Agreement "continued to apply" after the November 18, 2019 public-auction announcement. Int. Supp. 12.[1] That concession confirms the Agreement was not limited to a market-based approach. Reversal is warranted.

**Questions 1–2:** The record refutes Intelsat's claim that SES "provided no value to Intelsat" and "did not render a valuable performance." Int. Supp. 2–3. Intelsat understood SES's partnership was "critical to maximize [Intelsat's] expected value." App. 660, 662. SES was indeed an indispensable partner. It fronted 50% of the CBA's costs, seconded employees to the CBA, and, together with Intelsat, jointly advocated to the FCC and White House, developed technical and operational clearing plans, managed outside counsel and consultants, and communicated with customers. SES Supp. 9–18. SES also joined Intelsat in risking billions to counter the FCC's "best and final" offer. *Id.* at 3–4. Together, the parties secured $9.7 billion in ARPs, plus transition costs ($1.28–$2.5 billion) and operational control. Final Order ¶¶ 178, 210, 232, 287. And SES elected to clear on an accelerated basis, without which neither party would be entitled to any ARPs. SES Supp. 3.

Given all this, the notion that SES's contributions "ultimately produced no

---

[1] Unless otherwise noted, "SES Supp." and "Int. Supp." refer to SES's and Intelsat's supplemental briefs, Dkts. 50, 51; "SES Br." and "SES Reply" refer to SES's opening brief and reply, Dkts. 37, 41; "Dkt." refers to this Court's docket; "Bankr. Dkt." refers to the bankruptcy court's "megadocket," https://www-a.vaeb.uscourts.gov/servecal/files/megadkt/723198.html; capitalized terms are defined in SES's opening brief and reply; all emphases are added and citations omitted; citations to "§" refer to sections of the Agreement; and "OA Tr." refers to the oral argument transcript.

value" is absurd, even insulting. Int. Supp. 2. After the parties secured $9.7 billion in ARPs, top executives from both companies toasted in celebration. App. 120:10–14 (Collar), 261:18–25 (Spengler). SES's CEO said this moment marked "the culmination of two years of hard work"—it was "an amazing thing that we'd just achieved." App. 120:8–9, 121:8–13 (Collar). Intelsat's CEO agreed it had been a "long journey" together, App. 263:7–13 (Spengler), and the CBA *publicly* said the draft order "reflect[ed] the tireless efforts of many" personnel, Press Release, CBA, C-Band Alliance Responds to Remarks of FCC Chairman Ajit Pai in C-Band Proceeding (Feb. 6, 2020).

While the Final Order did not accept all CBA proposals, that does not negate the parties' joint work or its value. Besides, the Order reflects many CBA proposals, most notably ARPs, App. 456–59, 488, a "Relocation Coordinator," App. 459–60, 487–89, and a $9.7 billion payout to satellite operators—nearly twice the original $5 billion offer, App. 462–72. The Final Order references the "C-Band Alliance" **338 times**, often relying on the CBA's views.[2] In the words of Intelsat's CEO, "you can see a lot of the activity [of] the CBA incorporated in the [FCC's] draft order." Bankr.

---

[2] *E.g.*, Final Order ¶¶ 30–31, 130 & n.368 (300 MHz of spectrum); ¶ 32 (avoiding disruptions); ¶¶ 41–53 (rejecting other proposals); ¶ 56 (geographic scope); ¶¶ 78–79 (licensing units); ¶¶ 157–159, 170 n.464 (clearing deadlines); ¶ 162 (delay costs); ¶ 185 n.491 (rapid-transition benefits); ¶ 194 & n.519 (technology upgrades); ¶ 199 & nn.534, 536–37 (new satellites); ¶ 201 & nn.538–39 (system changes); ¶¶ 205–10 (estimated relocation costs); ¶ 304 & n.695 (submitting "combined" plans); ¶ 330 & nn.733–34 (rejecting other uses of C-Band); ¶¶ 336, 339 (power limits).

Dkt. 4389-61 at PDF p.92.

As to the value of SES's performance, Intelsat does not dispute SES's calculations. SES Supp. 4–9. It claims only that SES's *cooperation* during negotiations actually "harmed Intelsat to the benefit of SES," Int. Supp. 2, because even though the final joint push increased total ARPs from $8.8 billion to $9.7 billion, Intelsat's individual share "decreas[ed] from $5.08b to $4.85b, while SES's increased from $2.4b to $3.99b," *id.* at 2 n.3. But as SES explained, the parties agreed to a 50/50 split of their *combined* proceeds, and the share allocated to *both* of them increased by *$1.36 billion*. SES Supp. 3–4, 6 n.3.[3]

Intelsat also says SES has not asserted a "fraud" claim. Int. Supp. 4. SES does not need to. The Restatement makes clear that where, as here, the unjustly enriched party "induced the claimant's mistake" through misrepresentations, the principles applicable to fraud or misrepresentation in Restatement § 13 are relevant—regardless of whether the misrepresentation would separately amount to actionable fraud. Restatement § 5 cmt. d; SES Supp. 5.

The remainder of Intelsat's arguments go beyond the Court's questions regarding whether SES rendered a valuable performance. For example, Intelsat

---

[3] Intelsat's flawed focus on its individual allocation is unpersuasive even on its own terms because the $4.87 billion it received under the Final Order (¶ 232) as a result of the parties' joint negotiations (and Intelsat's clandestine back-channeling) is still much higher than the $2.55 billion the FCC initially offered to Intelsat, App. 694.

3

questions whether SES would have been "'better off'" if it "walk[ed] away" in February 2020, whether Intelsat's refusal to execute the short-form amendment forecloses reliance on its 50/50 promises, and whether SES had "non-contractual, legally protected right[s]" in those promises. Int. Supp. 2 n.2, 4, 6–7. Most of those questions are addressed elsewhere, SES Br. 38–40; SES Reply 19–20, and the reliance question—raised for the first time here—is meritless.[4]

Intelsat also mischaracterizes SES's arguments and the bankruptcy court's holding. SES has never claimed the bankruptcy court needed to "addres[s] and rejec[t], line-by-line, every assertion SES made" in its post-trial submission, Int. Supp. 6—only that the court improperly ignored core parts of SES's evidentiary and legal case and copied the Intelsat Submission as its opinion, SES Br. 5–6, 23–29, 33–37 (citing *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263, 270 (4th Cir. 2022); *Burr v. Jackson*, 19 F.4th 395, 404–05 & n.6 (4th Cir. 2021); *Bright v. Westmoreland Cnty.*, 380 F.3d 729, 731 (3d Cir. 2004)). Nor did the bankruptcy court categorically deem SES's "witnesses . . . 'not credible,'" "discredi[t]" them, or reject unjust-enrichment testimony as "not credible." Int. Supp. 1, 3, 6, 10. The bankruptcy court

---

[4] Intelsat argues that SES could not have relied on Intelsat's 50/50 promises because its General Counsel declined to sign the short-form amendment "prior to the final call with the FCC." Int. Supp. 6–7 (emphasis omitted). But the General Counsel cited only the "late date" in declining the short-form amendment—and simultaneously *reassured* SES that "the [CEOs] have discussed this." App. 780. She did not say the 50/50 was off, and Intelsat's CEO repeatedly communicated to SES's CEO that the parties *would* split ARPs 50/50. SES Reply 15.

4

made a single statement about credibility—that SES witnesses could not "explain away" statements about their reasons for reaffirming the 50/50 split in a short-form amendment proposed by a third party. App. 583. That unexplained statement was copied directly from the Intelsat Submission, Add. 10; *see* OA Tr. 138:8 (court "didn't explain why"), and focused on a single issue (subjective reasons for an unexecuted amendment) that does not control, SES Br. 29 n.9; SES Reply 11 n.10.

**Question 3:** Intelsat wrongly says SES "has done no work to assist Intelsat" in clearing C-Band spectrum. Int. Supp. 7. In reality, Intelsat's post-repudiation transition plans leverage SES's work with Intelsat. SES Supp. 9–12. For example, the customer coordination and analysis that Intelsat cites in its plan continued to be coordinated between the parties after the Final Order. Bankr. Dkt. 4389-60 at PDF pp.73, 85; *see* SES Supp. 11. The parties also undertook the earth-station outreach Intelsat's transition plan cites. Bankr. Dkt. 4389-60 at PDF p.86; *see* SES Supp. 11; App. 882. The upgrades and technologies being used in Intelsat's transition likewise were developed with SES. Bankr. Dkt. 4389-60 at PDF p.73; *see* SES Supp. 11. Intelsat has acknowledged SES's role in transition plans it has filed with the FCC, noting it would work with SES on "common tasks, such as the supply and installation of earth station filters," Bankr. Dkt. 4389-60 at PDF p.63, and that coordination is particularly important where "antennas . . . access multiple satellite operators," Bankr. Dkt. 4389-60 at PDF pp.91, 150, 209; Bankr. Dkt. 4389-64 at PDF p.36.

Intelsat wrongly denies any "link" between the parties' advocacy and clearing under the Final Order. Int. Supp. 11. As noted, the Final Order adopted many CBA proposals, including its proposal to clear 300 MHz, its clearing deadlines, and the estimated costs of transition. *Supra*, at 2 & n.2; *see* SES Supp. 10; App. 882. Intelsat asserts that "the FCC required individual clearing," Int. Supp. 8–10, but the Final Order actually authorized satellite operators to "***file either individual or joint Transition Plans***," Final Order ¶ 304. It also allowed a satellite "consortium"—*i.e.*, the CBA—to serve as Relocation Coordinator. *Id.* ¶ 308 n.698. Intelsat's repudiation, not the FCC, was the obstacle to greater collaboration. SES Supp. 9–12.

**Question 4:** Intelsat concedes that the "Agreement continued to apply . . . following the November [20]19" public-auction announcement, that it remained in force "[u]ntil the FCC's order," and that no other instrument "governed." Int. Supp. 12. This concession gives away the game for Intelsat. If the Agreement undisputedly remained operative "[u]ntil the FCC's order," *id.*, then Intelsat indisputably breached when it repudiated early on February 7, 2020, before the FCC had released even a *draft* of its order (much less the Final Order), SES Br. 13–15.

Intelsat's description of the parties' work after the public-auction announcement does not detract from the significance of its concession and, in any event, misrepresents the record. *Infra*, at 7–9. Intelsat also strays from the Court's question in repeating arguments about proposed amendments to the Agreement, Int. Supp.

6

13, which SES has addressed elsewhere, SES Br. 10–11, 27–28; SES Reply 11 n.10.

**Question 5:** Intelsat concedes the parties "jointly fronted the expenses . . . under the Consortium Agreement both before and after the" public-auction announcement. Int. Supp. 13. That the parties' "relocation costs are separately and individually reimbursed" under the Final Order, *id.* at 14, does not suggest the Agreement was inapplicable. It means only that there are no eligible expenses to deduct under § 6.04. SES Supp. 8.

**Question 6:** It is undisputed that after the public-auction announcement, the CBA (a creature of the Agreement) continued working to influence the FCC's forthcoming Order. Int. Supp. 15. Those efforts confirm the parties' intent to continue their partnership despite the FCC's decision to transition the C-Band through a public auction, rather than the parties' preferred private-sale approach. During this period, the parties (through the CBA) submitted more than ***two dozen*** joint filings to the FCC pertaining to the public auction. SES Supp. 16. And as noted, the CBA's work was evident in the draft order and Final Order. *Supra*, at 2 & n.2.

Trying to explain this evidence away, Intelsat maintains the parties' advocacy was directed only toward a "market-based approach within the context of a publicly-overseen auction." Int. Supp. 15. That sleight of hand reflects Intelsat's inconsistency about what the "market-based approach" entailed. According to its General Counsel at trial, the Agreement's "market-based approach" was a purely private sale

7

process and "***never included***" an "FCC auction." App. 1293:7–10 (Bryan).

But Intelsat says something different now (as it periodically did throughout trial), in an apparent effort to justify why Intelsat continued working with SES after the FCC's public-auction announcement. Working backwards from the FCC's order, Intelsat plucks examples of what the FCC did *not* incorporate and claims the approach is no longer "market-based" in their absence. That *post hoc* position is both arbitrary and at odds with the evidence.

Intelsat says, for example, that a "market-based approach" required compensation to be set based on a *percentage* of auction revenues. Int. Supp. 16. But that requirement is not in the Agreement, and it makes little sense. What the parties cared about was maximizing their payout, not the math behind the final number. *See* App. 71:16–21 (Collar), 222:15–18 (Spengler); App. 440, 443; OA Tr. 118:24–119:6 (parties were "trying to get the most money [they] could"). In any event, the FCC based its calculation on the market value of an accelerated clearing, SES Reply 4 n.4, and both parties as free-market actors accepted the $9.7 billion in ARPs during negotiations and elected an accelerated clearing, App. 489; App. 105:1–23 (Collar).

The substance of the parties' advocacy after the public-auction announcement also forecloses Intelsat's argument. While the parties initially advocated to receive a percentage of auction proceeds—even calling it a "must have" early on—that was not their only position. OA Tr. 121:12–18 ("they were also doing something else").

After learning on January 17 that the FCC "would provide for a flat dollar amount," "not a percentage as proposed," App. 227:1–19 (Spengler), they told the FCC they were "***open to a pre-calculated target number***," App. 676, and extensively negotiated that number, increasing the FCC's offer from $5 billion to $9.7 billion.

Intelsat also says for the first time that the CBA sought "to control how and what *all* parties must do to effectuate the clearing, not merely their own, individual actions." Int. Supp. 17. But it was always true that each satellite operator would "individually" clear its own operations. App. 794. And Intelsat ignores that (i) it proposed rebranding the "Transition Facilitator" as the "Clearing Coordinator" and ceding the financial role, App. 1980; and (ii) the CBA could have served as the "Relocation Coordinator" and thus "coordinat[ed] the schedule for clearing the band," "assign[ed] obligations" for "earth station migrations and filtering," and "assess[ed] the completion of the transition," among other responsibilities, Final Order ¶¶ 308–309 & n.698. Thus, loss of involvement in *others*' clearing flowed from Intelsat's repudiation—not the FCC. Ultimately, though, the parties achieved their goal of operational control over their own clearings. App. 303:8–12 (Spengler).

**Question 7:** The definition of "Project Gross Proceeds" in § 1.01 "includ[es] *without limitation*" SMA payments, thus confirming that *other* payments are covered because New York law requires reading a contract as a harmonious whole without conflict or superfluity. SES Supp. 18–20. Intelsat does not dispute these principles;

9

indeed, it cites no New York contract cases. Int. Supp. 17–20. But it embraces a view in conflict with these principles by arguing that the second half of the Project Gross Proceeds definition is just "belt-and-suspenders"—*i.e.*, surplusage. *Id.* at 19 n.11. It fails to cite, much less explain, § 2.01's language defining the Project Scope "***in accordance with***" the "FCC C-Band Orders," *i.e.*, the FCC's "***final rules***." SES Supp. 19. And it misconstrues snippets of the prefatory recitals, Int. Supp. 18, failing to recognize that the parties' advocacy *did* "avoid certain complications" of a public-auction approach and that the Project *did* "entail a market-based solution" (but was not *limited* to it), App. 6–7. Nothing in these recitals overrides § 1.01's clear, operative language. And Intelsat's assertion (at 19) that "none of" § 2.01's undertakings "work" in an auction is both beyond the scope of the Court's question and untrue.[5]

## CONCLUSION

The Court should reverse the judgment of the bankruptcy court disallowing SES's claims against Appellees and remand for calculation of damages.

---

[5] The parties "determine[d] amounts of C-Band spectrum" they could clear in their transition plans, § 2.01(a); *supra*, at 2 & n.2; "ma[de] oral presentations and written submissions and filings with the FCC," § 2.01(b); SES Supp. 16 n.11; had authority to "negotiate and enter into [SMAs]" under the public auction, § 2.01(c); Final Order ¶ 186 n.497; "create[d] and regularly update[d] a master plan" for the transition, § 2.01(d); SES Supp. 9–12; established processes for reimbursing and compensating members, § 2.01(e)–(f); *see* § 6.04; and otherwise "serve[d] as the transition facilitator" and "engage[d] in any and all other [related] activities," § 2.01(i)—or at least could have, *supra*, at 6, 9; SES Br. 15. There was no "C-Band Uplink" proceeding, § 2.01(g), and the parties chose not to litigate, § 2.01(h); SES Reply 5–6.

Respectfully submitted,

Dated: May 9, 2023                                /s/ Helgi C. Walker

| | |
|---|---|
| Dennis T. Lewandowski<br>Clark J. Belote<br>KAUFMAN & CANOLES, P.C.<br>150 W. Main Street, Suite 2100<br>Norfolk, VA 23510-1665<br>Phone: (757) 624-3252<br>Email: dtlewand@kaufcan.com<br>         cjbelote@kaufcan.com | Helgi C. Walker<br>   *Counsel of Record*<br>Russell B. Balikian (*pro hac vice*)<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036-5306<br>Phone: (202) 955-8500<br>Email: HWalker@gibsondunn.com<br>         RBalikian@gibsondunn.com<br><br>Orin Snyder (*pro hac vice*)<br>Michael A. Rosenthal (*pro hac vice*)<br>Justine M. Goeke (*pro hac vice*)<br>Grace Hart (*pro hac vice*)<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Phone: (212) 351-4000<br>Email: OSnyder@gibsondunn.com<br>         MRosenthal@gibsondunn.com<br>         JGoeke@gibsondunn.com<br>         GHart@gibsondunn.com |

*Counsel for Appellant SES Americom, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Helgi C. Walker, hereby certify that this brief complies with the page limits set by this Court's Order of April 4, 2023, Dkt. 49, because it does not exceed ten pages, excluding the parts of the brief exempted by Bankruptcy Rule 8015(g).

Dated:     May 9, 2023                    */s/ Helgi C. Walker*

                                                                Helgi C. Walker
                                                                *Counsel of Record*

## CERTIFICATE OF SERVICE

I, Helgi C. Walker, hereby certify that on May 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 9, 2023               */s/ Helgi C. Walker*

                                 Helgi C. Walker
                                   *Counsel of Record*