IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SES AMERICOM INC.,

    Appellant,

v.                           Civil Action No. 3:22-cv-668

INTELSAT US,

    Appellee.

## MEMORANDUM OPINION

This matter is before the Court on SES Americom, Inc.'s ("SES") appeal of the Bankruptcy Court's denial of SES's claim for $421 million in Intelsat U.S. LLC's ("Intelsat") bankruptcy proceeding. For the reasons set forth below, the judgment of the Bankruptcy Court will be reversed and this matter will be remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A. Factual Background

This dispute arises out of a September 27, 2018 Consortium Agreement between SES and Intelsat, among others.[1] Consortium Agreement (App. 2). SES and Intelsat are two "fixed-satellite

---

[1] The other companies to join the Consortium were Eutelsat and Telesat. Consortium Agreement (App. 2).

service. . . operators," Consortium Agreement (App. 6), and "fierce competitors," VanBeber Tr. Testimony (App. 182). In 2018, Intelsat and SES each possessed significant and very valuable Federal Communication Commission ("FCC") licenses to provide services in the so-called C-Band of cellular broadband frequencies ("C-Band rights").[2] Consortium Agreement (App. 6).

In July 2018, the FCC announced that it was considering options to reallocate the use of the C-Band in a Notice of Proposed Rulemaking ("NPRM"). NPRM (App. 733). The NPRM laid out three possible approaches to reallocation: (1) "a market-based approach"; (2) "auction-based approaches"; and (3) "approaches that combine elements of the various options." Id. at App. 735.

The reallocation proposed by the FCC put at risk the C-Band rights of Intelsat and SES, as well as those of other, small players in the industry. There was apprehension in the industry that the reallocation could result in loss of the C-Band rights without compensation or that the FCC's approach to compensation would not yield the full monetary value of the rights.

---

[2] The C-Band refers to "the 3.7 to 4.2 GHz spectrum band" of the electromagnetic spectrum. Consortium Agreement (App. 6). The C-Band historically was used primarily by satellite operators, like SES and Intelsat, but, in 2018, the FCC announced its intention to transition use of the C-Band to 5G wireless service providers. Notice of Proposed Rulemaking (App. 732).

At the time of the FCC announcement, Intelsat was in a precarious financial situation. It had significant debt and was experiencing declining revenues. Spengler Tr. Trans. (App. 195). Intelsat saw potential proceeds from the sale of its C-Band rights as a "one-time opportunity to address capital structure to our expected business trajectory." Id. at App. 198. As a result, from 2017 to 2020, according to Intelsat CEO Stephen Spengler ("Spengler"), "[t]he C-Band initiative was the most important initiative we had at the company." Id. at App. 200.

It was against that background that Intelsat reached out to its main competitor, SES, suggesting that the companies work together to monetize their C-Band rights. Spengler Tr. Testimony (App. 203). Fully mindful of the three proposals made by the FCC, the two companies decided to work together to achieve the most compensation (monetization) for their licensed C-Band space to 5G providers while satisfying the FCC's stated desire to reallocate use of the C-Band to 5G providers. From the start, SES demanded a 50/50 split of all proceeds from any joint effort to monetize the C-Band rights. Id. at App. 203-204 (an unconditional 50/50 split of proceeds "was a requirement from the very beginning"); De Hauwer Tr. Tran. (App. 306) ("SES would only engage in this if there was to be a fifty-fifty split of

3

the proceeds"); Collar Tr. Trans. (App. 69-70) ("It was fifty-fifty, unconditional").

On June 13, 2018, the CEOs of the two companies—Stephen Spengler for Intelsat and Steven Collar ("Collar") for SES-signed a non-binding letter of understanding. Spengler & Collar Letter (June 13, 2018) (App. 1433). In addition to memorializing the 50/50 split, the letter refers to the Project as the "C-Band Secondary Market Proposal." Id. An exhibit to the letter goes on to explain that the Proposal "is designed to provide incentives to ensure expedited transition of the lower C-Band segment from satellite operations to terrestrial mobile operations." Id. at App. 1444. It is without doubt that Intelsat and SES considered the "market-based approach," one of the three options mentioned by the FCC, as the way to receive the most compensation from the reallocation of their C-Band rights.

On September 27, 2018, SES, Intelsat, and other satellite service providers signed the Consortium Agreement. They agreed to engage in a concentrated and combined lobbying effort before the federal government (primarily, but not exclusively, the FCC) "for the purpose of implementing the Project, which will entail a market-based solution to enable the provision of flexible-use service on a market-by-market basis in the C-Band." Consortium Agreement (App. 6). At the same time, the parties "acknowledged

4

and understood that various details of the Project <u>shall be subject to change</u>. . . <u>to reflect the final rules promulgated by the FCC</u>." <u>Id.</u> at 14 (emphasis added).

The Consortium Agreement also created the C-Band Alliance ("CBA") whose role was "to implement the safe and efficient clearing and repurposing of C-band spectrum." CBA Press Release "C-Band Alliance Responds to Announcement by Federal Communications Commission Chairman Regarding the C-Band Spectrum Proceeding" (Nov. 18, 2022) (App. 628).

With the Consortium Agreement, Intelsat and SES entered uncharted waters. As Collar said, "I can't emphasize enough how unprecedented this was and how -- we -- we had no idea ultimately whether it would be allowed to happen, whether we would be successful. . . . It was an unprecedented process with no obvious parallel." Collar Tr. Trans. (App. 71); <u>see also</u> Purvis Tr. Trans. (App. 157). Spengler agreed. He testified at trial: "I would say this, in the satellite business, it was unprecedented that two major operators would get together and do something like this." Spengler Tr. Trans. (App. 263). Others, including the CBA itself, contemporaneously appreciated the unprecedented nature of the Consortium Agreement and the CBA's proposals. <u>See also</u> CBA FCC Filing "Expanding Flexible Use of the 3.7 to 4.2 GHz Band" (Feb. 6, 2019) (App. 1755) ("T-Mobile

responds that no precedent is perfectly analogous—a banal observation, given the unique challenges raised in this proceeding").

As SES had insisted, Intelsat and SES, the two leading global satellite-service providers, agreed to a 50/50 split of all "Project Gross Proceeds," after subtracting certain percentages for the other, smaller Consortium Member companies and for costs. Consortium Agreement § 3.02 (App. 15). In particular, ARTICLE 3 (THE MEMBERS) provides that each Consortium Member will be "assigned a percentage interest in the Consortium." Consortium Agreement § 33.02. That section then specifies that:

> [a]s between Intelsat and SES, the aggregate amount of the Intelsat/SES Percentage Interests (after deduction of the Percentage Interests of all other consortium members) shall be divided equally between Intelsat and SES.

§ 3.02. The Consortium Agreement also provided that "Project Gross Proceeds" included

> <u>any and all proceeds received by or for the benefit of the Consortium Members in respect to the Project</u>, including without limitation any proceeds payable to or for the benefit of the Consortium Members pursuant to any Secondary Market Agreement.

Consortium Agreement, § 1.01 at App 9 (emphasis added).[3] Working together after entering into the Consortium Agreement, Intelsat and SES, through the CBA, did in fact achieve significant compensation for their C-Band rights, even though the FCC did not use the market-based approach that Intelsat and SES preferred. The compensation provided under the auction-based system used by the FCC to monetize the C-Band rights being reallocated was $9.7 billion to the incumbent C-Band license holders as a whole. Of that, Intelsat received $4,865,366,000.00 and SES received $3,968,113,000.00. The balance, $866,502,000, went to the other incumbent license holders. Adjustments were made for the expenses occurred. SES demanded that the 50/50 split be implemented (after costs), asserting that it was entitled to an additional $421 million from Intelsat's share. Intelsat refused.

Later, Intelsat filed a petition in the Bankruptcy Court where SES made a claim based on the claimed 50% provision in the Consortium Agreement and a claim for unjust enrichment. The Bankruptcy Court's opinion and this appeal focus on the meaning and reach of certain provisions of the Consortium Agreement, and

---

[3] That text contains no limitation except that the proceeds must be "received by or for the benefit of the Consortium Members in respect to the Project." The "including without limitation" text does not confine applicability to whatever Secondary Market Agreements yielded.

whether those provisions are or are not ambiguous. A complete discussion of the facts related to the issue of ambiguity appear in the substantive analysis of the ambiguity issue. See infra at 13-27.

Likewise, the record is replete with evidence extrinsic to the Consortium Agreement. That evidence is outlined below at pp. 27-47 because it is best assessed after the ambiguity issue is resolved.

**B. Procedural Background**

After, Intelsat filed a petition for relief under Chapter 11 of the United States Bankruptcy Code, Amend. Op. at 1 (ECF No. 38-9), SES filed proofs of claim against Intelsat and its subsidiaries, alleging that Intelsat had violated the Consortium Agreement. Id. SES sought at least $1.8 billion ($450 million in compensatory damages and $1.350 billion in punitive damages). Id. At trial, the Bankruptcy Court heard the testimony of six witnesses, received and considered deposition testimony from another eighteen witnesses, and admitted nearly 900 exhibits. Id. at 3. The Bankruptcy Court then issued a 45-page opinion, detailing its factual and legal findings. On September 30, 2022, the Bankruptcy Court entered an Order sustaining Intelsat's objection to the claims filed by SES (ECF No. 38-8) and an accompanying Memorandum Opinion (ECF No. 38-7). On October 5,

8

2022, the Bankruptcy Court filed an Amended Memorandum Opinion (ECF No. 38-9).

On October 17, 2022, SES filed a notice of appeal and appealed the September 30 Order, the Memorandum Opinion, and the Amended Memorandum Opinion, "together with all rulings, findings, determinations, and other decisions adverse to SES embodied in these prior pleadings or relating to Claims 84, 85, and 103 filed by SES, including specifically the order denying SES's Motion for Summary Judgment." Notice of Appeal at 2 (ECF No. 1-1). On appeal, SES says that it is entitled to $421 million in fulfillment of the 50/50 split provision in the Consortium Agreement.

## II. DISCUSSION

The parties present four issues for appeal. Each will be evaluated separately below.

### A. *Whether the Bankruptcy Court exercised independent judgment*

At the conclusion of the evidentiary portion of trial, the Bankruptcy Court ordered both parties to submit proposed findings of fact, which they did. Intelsat's Proposed Findings of Fact & Conclusions of Law (App. 1071-1228); SES's Proposed Findings of Fact & Conclusions of Law (App. 428-569). The Bankruptcy Court then heard closing argument. Intelsat Response at 30 (ECF No. 40). The Bankruptcy Court issued its Memorandum

Opinion, Original Op. (ECF No. 38-7), followed by the Amended Opinion in which it modified a footnote. See Amend. Op. 18 n.7 (ECF No. 38-9).

SES argues that the Bankruptcy Court failed to exercise independent judgment because it adopted Intelsat's proposed findings of facts and conclusion of laws, including particularly when it adopted "wholesale Intelsat's one-sided presentation of extrinsic evidence, ignoring material and substantial evidence supporting SES." SES Br. at 5-6 (ECF No. 37). Intelsat refutes this characterization, calling SES's accusation "nonsense." Intelsat Response at 30. Intelsat points out that the Bankruptcy Court dropped a hundred pages from the Intelsat proposed findings of facts and that, even in the parts that the Bankruptcy Court adopted, "the court moved, modified, and added to them to reflect what it wished to say." Id. at 30.

As a matter of law, this question is considered de novo. See Aiken County v. BSP Div. of Envirotech Corp., 866 F.2d 661, 676 (4th Cir. 1989). Although it is "strongly critize[d,] the practice of verbatim (or close to verbatim) adoption of proposed opinions" is tolerated and, as long as the record reflects that the trial court sufficiently exercised independent judgment, these opinions receive the same level of deference as any other. Burr v. Jackson, 19 F.4th 395, 407 (4th Cir. 2021); Anderson v.

10

City of Bessemer, 470 U.S. 564, 572 (1985) ("even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous").

When determining whether a trial court that has adopted findings submitted by a party "exercised judicial discretion," Burr, 19 F.4th at 407, courts consider various factors including: (1) if both parties had an "opportunity to respond at length to the proposed findings"; (2) to what degree the final order varies "in organization and content" from the findings submitted by counsel; and (3) if the findings are supported by citations to the record, Anderson, 470 U.S. at 572-574. As explained by the United States Court of Appeals for the Third Circuit, "[t]he central issue is whether the [trial] court had made an independent judgment." Bright v. Westmoreland County, 380 F.3d 729, 732 (3rd Cir. 2004) (citation omitted). To those guiding factors, we now turn.

First, the Bankruptcy Court invited both parties to submit proposed findings of fact and conclusions of law, which they did.[4] Those findings were filed in the record, allowing the parties to review the other's submission. SES had ample opportunity to lay out its case - both during the multi-day

---

[4] Intelsat's Proposed Findings of Fact & Conclusions of Law (App. 1071-1228); SES's Proposed Findings of Fact & Conclusion of Law (App. 428-569); see also Aiken County, 866 F.2d at 677.

trial and in its own extensive proposed findings. SES then "was provided and availed itself of the opportunity to respond at length to [Intelsat's] proposed findings" during closing argument. Anderson, 470 U.S. at 572; Burr, 19 F.4th at 406. Thus, "[t]he procedure employed by the [bankruptcy] court, while less than ideal, meets the standard announced in Anderson." Aiken County, 866 F.2d at 677.

Second, the Bankruptcy Court did not "simply rubber-stamp" all of Intelsat's proposed findings. Burr, 19 F.4th at 406. It is clear that the Bankruptcy Court used Intelsat's Proposed Findings of Fact and Conclusions of Law as the predicate for its Amended Opinion and that the Bankruptcy Court drew heavily from what Intelsat filed. But, a comparison of the proposed findings and the final opinion "reveals that the [Bankruptcy] Court considered the issues and made modifications." Id.

For example, the Bankruptcy Court trimmed Intelsat's proposed findings from 147 to 45 pages.[5] This is evidence that the Bankruptcy Court engaged in some independent consideration of the issues. And, in the parts of Intelsat's findings that it preserved, the Bankruptcy Court made some modifications and re-

---

[5] Intelsat's Proposed Findings of Fact & Conclusions of Law (App. 1071-1228); Original Op. (ECF No. 38-7); Amend. Op. (ECF No. 38-9).

organized some sections of what Intelsat had proposed.[6] Although many of those changes are stylistic or tonal, the Bankruptcy Court, in some parts of it Amended Opinion, did add some of its own legal analysis and conclusions. Order Comparison at 21, 23, & 29. The Final Order also reveals that the Bankruptcy Court conducted some independent legal research and a review of Intelsat's cited legal authority. This is reflected in the Bankruptcy Court's correction of Intelsat's citation errors as well as the addition and deletion of cited authority. Id. at 16, 21, 22, 24, 29, 30, 32 n.11, 33, & 40.

Third, the Final Order is "replete with references to the record." Aiken County, 866 F.2d at 677. The Bankruptcy Court's changes reflect familiarity with the record, including adding relevant dates and details where appropriate. Order Comparison at 5, 8, & 11.

Taken together, these factors support a conclusion that the Bankruptcy Court weighed the parties' arguments and evidence before coming to its decision, and thus the Amended Opinion satisfies the requirements of Anderson.[7] Although Anderson

---

[6] See Comparison of Proposed Findings & Final Order ("Order Comparison") (ECF No. 37-1).

[7] The Court is mindful that so-called "mega cases" such as this one present great challenge to the Bankruptcy Court which has a large docket and a limited staff. That circumstance makes it

13

necessitates the result that the Bankruptcy Court's Amended Opinion is neither to be rejected <u>in toto</u> nor subjected to a more rigorous standard of review, <u>Anderson</u> does not foreclose the conclusion (explained below at pp. 27 to 47) that the extensive record of significant, perhaps outcome-determinative, extrinsic evidence was given short shrift by the Bankruptcy Court when, for the most part, the Bankruptcy Court adopted wholesale the truncated treatment of the extrinsic evidence set out in the Intelsat findings.

## B. Whether the Bankruptcy Court erred in the holding that the Agreement was unambiguous

This issue actually encompasses two questions: (1) whether the contract terms are ambiguous; and (2) the assessment of the extrinsic evidence. Each will be addressed in turn.

### 1. The Ambiguity Issue

The Bankruptcy Court held that the "plain and unambiguous language of the Agreement makes clear that the 'Project,' 'Project Purposes,' 'Project Scope,' 'Project Structure,' and 'Project Gross Proceeds' apply only to a private, market-based

---

tempting to review the filings made by the parties and to adopt the one that seems to do the best job. But, to do that, invites the very criticism levied here by SES. For that reason, and to promote confidence in the end product of the decisional process, it is, as the authorities teach, preferable to avoid even the appearance that a court's decision comes from the pen of a party.

approach to clearing the C-Band spectrum." Amend. Op. at 14. In the view of the Bankruptcy Court "[w]hen read as a whole, the Agreement clearly establishes that the Consortium members intended <u>only to collaborate on and, if successful, share the proceeds from, the Parties' proposed market-based approach</u>." <u>Id.</u> at 19 (emphasis added). Thus, the Project contemplates "a private, market-based approach" which is "fundamentally at odds with the FCC's Draft and Final Orders." <u>Id.</u> at 12.

The District Court reviews <u>de novo</u> whether a contract is ambiguous. <u>JA Apparel Corp. v. Abboud</u>, 568 F.3d 390, 397 (2nd Cir. 2009). If the contract is unambiguous, "its meaning is likewise a question of law for the court to decide" <u>de novo</u>. <u>Id.</u>; <u>see also</u> <u>In re Jenkins</u>, 784 F.3d 230, 234 (4th Cir. 2015).

Under New York law, which both parties agree applies, "a contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." <u>Donohue v. Cuomo</u>, 184 N.E.3d 860, 867 (N.Y. 2022) (cleaned up). A contract is ambiguous only when, "read as a whole, [it] fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations." <u>Id.</u> (citation omitted). "Language whose meaning is otherwise plain does not

15

become ambiguous merely because the parties urge different interpretations in the litigation." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2nd Cir. 2009) (citation and quotation marks omitted). "'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" Id. (quoting Kass v. Kass, 696 N.E.2d 174 (1998)). Finally, as in this case, "'[w]here a contract was negotiated between sophisticated, counseled businesspeople negotiating at arm's length, courts should be especially reluctant to interpret an agreement as impliedly stating something which the parties' specifically did not include." Donohue, 184 N.E.3d at 866 (quoting 2138747 Ontario, Inc. v. Samsung C & T Corp., 103 N.E.3d 774 (2018)).

The Consortium Agreement is certainly not a model of clarity. The definitions it provides are often circular and confusing. Some of the important textual provisions are contradictory. And, as explained below, whatever else may be said about it, the Consortium Agreement cannot be described as unambiguous, respecting the terms "Project" and "Project Gross Proceeds" and whether the Consortium Agreement involved only "collaboration, and, if successful, shar[ing] the proceeds from, the parties' proposed market-based approach." Amend. Op. at 19.

Analysis of the ambiguity issue begins with a section entitled "Interpretation and Construction of the Agreement,"

16

Consortium Agreement § 1.03. Unfortunately, that section does nothing but instruct on what comprises the Consortium Agreement.[8] So, it is of no help in today's task.

Next, the analysis turns to ARTICLE I, DEFINITIONS AND CONSTRUCTION and, in particular, § 1.01 ("Certain Definitions"). Although § 1.01 does not define the term "Project," it does define "Project Gross Proceeds," and, on that point, says:

> <u>any and all proceeds received by or for the benefit</u> of the Consortium Members <u>in respect of the Project</u>, including without limitation any proceeds payable to or for the benefit of Consortium Members pursuant to any Secondary Market Agreement.

Consortium Agreement § 1.01 (App. 9) (emphasis added).

So, the effect of that important provision hinges on the textual meaning of the term "the Project." Unfortunately, the definitions section provides no definition for that crucial term. Consortium Agreement § 1.01 (App. 7-10). Instead, in § 1.02 ("Additional Definitions"), the Consortium Agreement directs the reader to § 2.01 which is in ARTICLE 2 entitled "THE PROJECT." However, § 2.01 does not actually define the term "the Project." Instead, it provides that, "[i]n furtherance of the Project Purposes," the members agree "that the Consortium shall <u>undertake the following in accordance</u> with the terms of <u>this Agreement and the FCC C-Band Orders</u>." <u>Id.</u> at App. 13 (emphasis

_____

[8] And, even that is broad, vague, and confusing.

added).  The  term  "FCC  C-Band  Orders"  appears  in  the  final
paragraph  of  § 2.01  as  a  parenthetical  short  form  following  the
phrase  "to  <u>reflect  the  final  rules  promulgated  by  the  FCC  for</u>
<u>the  future  utilization  of  the  C-Band  in  furtherance  of  the  NPRM</u>
(the  '<u>FCC  C-Band  Orders</u>')."  Consortium  Agreement  (App.  14)
(emphasis  added).

Section  1.02  ("<u>Additional  Definitions</u>")  also  tells  that  the
definition  of  "NPRM"  is  to  be  found  in  the  "Recitals."
Consortium  Agreement  (App.  11).  The  Recitals  say  that,  on  July
13,  2018,  the  FCC  released  an  "Order  and  Notice  of  Proposed
Rulemaking  (title  omitted),"  the  parenthetical  short-formed  of
which  is  "NPRM."  The  Recitals  go  on  to  explain  that  the  NPRM
seeks  <u>comments  on  the  "promulgation  of  rules  to  provide</u>  for  the
reallocation  or  shared  use  . . .  of  [the]  C-Band."  <u>Id.</u>  at  App.  6
(emphasis  added).

So,  under  § 2.01,  the  Consortium  is  "to  undertake  the
following,"  thereby  referring  to  something  that  follows,  and  to
pursue  that  undertaking  (whatever  it  might  be)  "in  accordance
with  the  terms  of  the  Agreement  and  the  [yet  to  be  announced]
FCC  C-Band  Orders"  (whatever  they  may  provide).  And,  although  §
2.01  is  captioned  "Project  Scope"  (App.  13),  it  does  not  define
the  term  "Project."

However, § 2.01 does identify nine separate items to be undertaken to further the "Project Purposes." Consortium Agreement § 2.01(a)-(i) (App. 13-14). But, "Project Purposes" is not given a meaning. To get to those purposes, the reader is told in the Additional Definitions section (§ 1.02) to consult the Recitals. Id. at App. 11. The Recitals contain six separate clauses of which two seem to pertain to the "Project Purposes." They read:

> WHEREAS, the Initial Members [SES, Intelsat, Eutelsat, and Telsat Canada] desire to enter into, and each Other Member desires to join, a consortium (the "Consortium") to act as the transition facilitator referred to in the [Notice of Proposed Rulemaking ("NPRM")], for the purpose of implementing the Project, which will entail a market-based solution to enable the provision of flexible-use service on a market-by-market basis in the C-Band across [the contiguous United States], as described in more detail herein and in the NPRM;

> WHEREAS, the Members will develop and implement the Project in order to (i) act as the transition facilitator and ensure expedited transition of the Target Spectrum within the C-Band from satellite operations to flexible-use operations in furtherance of the FCC's stated objectives in the NPRM of allocating spectrum as efficiently as possible, keeping the United States at the forefront of fifth-generation wireless broadband technology rollout, incentivizing secondary market transactions that promote the public interest, maintaining sufficient spectrum for critical satellite services and users and harmonizing international spectrum allocations, (ii) avoid certain complications associated with other potential options for clearing a portion or portions of the C-Band and (iii) accomplish an orderly Spectrum Clearing and fairly compensate Members and other

> Protected Incumbent Users participating in the Project
> or the Spectrum Clearing (the "<u>Project Purposes</u>")

Consortium Agreement Recitals (App. 6-7) (emphasis added). These "whereas" clauses are quite broad, but they bespeak the purpose of working with the FCC for several purposes one of which is to assure that whatever reallocation method is chosen by the FCC the Consortium Members are "fairly" compensated.

The nine undertakings laid out in the section entitled "Project Scope"[9] do not confine the scope to a market-based approach. Those nine undertakings include to:

- "make oral presentations and written submissions and filings with the FCC";
- "negotiate and enter into agreements. . . between the Consortium Members. . . and Flexible-use Providers";
- "create and regularly update a master plan setting forth the authorized Spectrum Clearing activities";
- "establish processes and procedures" to compensate Members and to engage in spectrum clearing;
- "represent the Consortium in any FCC proceedings";
- "engage in any litigation or other regulatory, court or Governmental Authority actions"; and
- "serve as the transition facilitator."

Consortium Agreement § 2.01 (App. 13-14).[10]

Following the articulation of the nine undertakings is the text that:

---

[9] A subsection of ARTICLE 2 which is entitled "THE PROJECT."

[10] The nine undertakings are summarized here because of their length. The summary is taken from the opening text of §§ 2.01(a)-(i).

it being acknowledged and understood that various details of the Project <u>shall be subject to change</u>, and this Agreement may be amended from time to time with the approval of the Consortium Board. . . <u>to reflect the final rules promulgated by the FCC for the future utilization of the C-Band in furtherance of the NPRM.</u>

Consortium Agreement § 2.01 (App. 14) (emphasis added).[11]

An examination of the several contractual terms which the Bankruptcy Court recited, but did not discuss, when it found that the Consortium Agreement's purpose and reach was unambiguous teaches that, at least in defining the key term "Project," the Consortium Agreement is actually a model of ambiguity. And, without doubt it is likewise ambiguous as to whether the undertakings within the Consortium Agreement are limited to the private market-based approach to clearing the C-Band (as Intelsat argues and as the Bankruptcy Court held). Several reasons lead to that conclusion.

First, notwithstanding several, rather confusing and quite awkward attempts to do so, the Consortium Agreement does not provide a clear definition of the term "Project," which, of course, lies at the heart of: (a) the parties' dispute over the terms "Project Gross Proceeds" (§ 1.01) and "Percentage

---

[11] Although this text contemplates the need for amendment of the Consortium Agreement, it does not impose amendment as a condition.

Interest" (§ 3.02); and (b) the Bankruptcy Court's resolution of those disputes.

Second, the Consortium Agreement refers to the "Project Purposes" in broad and vague terms. Those terms are not confined to a private market-based approach.

Third, the term "Project Scope" is likewise broad and vague, and it is not confined to a private market-based approach. And, significantly, the Project Scope section (after identifying nine undertakings) actually concludes with text that foretells the need for flexibility and, more importantly, that teach that whatever is done under whatever "the Project" is or whatever is within its scope, must reflect the FCC's final rules. And, on the that score, there is no dispute that a public auction approach to reallocation of the C-Band was a very real possibility.[12]

Fourth, the "Project Structure" actually contemplates the development and use of "related agreements." Consortium Agreement § 2.02 (App. 14). And, although the "Project Scope" mentions several examples of "related agreements," the scope is not confined to those examples.

---

[12] Section 2.01 provides, inter alia, that the Consortium "shall undertake" the nine tasks "in accordance with the terms of the Agreement and the FCC C-Band Orders" which are later defined to be "the final rules promulgated by the FCC . . . in furtherance of the NPRM." Consortium Agreement (App. 13-14).

Finally, to further muddy the definitional waters, § 2.01 provides:

> The <u>foregoing undertakings</u> [§ 2.01(a)-(i)], <u>together with all of the transactions and agreements contemplated</u> in this Agreement and the Related Agreements [not yet in existence] and all of the rights, interests and obligations of the Members herein and therein shall be <u>collectively referred to as the "Project."</u>

Consortium Agreement (App. 14) (emphasis added). That textual definition of the "Project" is itself very expansive (so much so as to include within the term "Project" provisions of yet-to-be-prepared documents), and it is, without doubt, ambiguous in its own right.

But the text of the Consortium Agreement does make clear that "the various details of the Project shall be subject to change." Consortium Agreement § 2.01 (App. 14). What those "changes" may be, even those needed "to reflect the final rules promulgated [whatever those rules may be] by the FCC for the future utilization of the C-Band in furtherance of the NPRM (the 'FCC C-Band Orders')," is unclear. Consortium Agreement § 2.01 (App. 14). That, of course, serves to compound the ambiguity, but it does teach that the parties well-knew that their joint effort to achieve maximum monetization of their C-Band rights would have to occur within whatever approach to reallocation the FCC ultimately selected in the rulemaking process in which the

the Consortium Members were to participate and whose outcome they wanted to influence so as to maximize the compensation of their C-Band rights.

Indeed, all of the foregoing contractual text must be assessed in perspective of the undisputed fact that the NPRM issued by the FCC informs the public (including SES and Intelsat) that, in addition to a market-based approach, the FCC was also considering auction-based approaches and a combined market and auction approach. NPRM (App. 371, 735-750). And, the Consortium Agreement acknowledges the need to comply with whatever final rule the FCC should promulgate whether borne of a market-based approach, a public auction based approach, or some combination approach.

In other words, reflective of the published possibility that the Consortium's preferred market-based approach might not be (and there was a good chance it would not be) the approach adopted by the FCC, the Consortium Agreement provides that the "various details of the Project shall be subject to change" to reflect whatever approach taken by the FCC. § 2.01 (App. 14). That, of course, included the public auction approach that was eventually selected by the FCC.

The foregoing reasons preclude the Bankruptcy Court's finding that:

24

> plain and unambiguous language of the Agreement makes clear that the 'Project,' 'Project Purposes,' 'Project Scope,' 'Project Structure,' and 'Project Gross Proceeds' apply only to a private, market-based approach to clearing the C-Band Spectrum.

Amend Op. at 14. And, for the same reason, the Bankruptcy Court clearly erred when it made the kindred holding that: "[w]hen read as a whole, the Agreement clearly establishes that the Consortium members intended only to collaborate on and, if successful, share the proceeds from the Parties' proposed market-based approach." Id. at 19.[13]

Moreover, the record tells that it is reasonable to read the Consortium Agreement to provide for collaboration to maximize the monetary yield of whatever rules the FCC ultimately adopted for clearing the C-Band and reallocating the C-Band rights held by Intelsat and SES.[14] And, that would include the public auction approach.

_____

[13] Notably, this sentence is taken nearly verbatim from Intelsat's proposed findings. Intelsat Proposed Findings (App. 1197) ("Therefore, when read as a whole, as New York law dictates, the Agreement clearly establishes that the Consortium members only intended to collaborate on and, if successful, share the proceeds from, the parties' proposed market-based approach").

[14] It is true that, in § 2.01, the Consortium Agreement provides that it "may" be amended to address the FCC's Final Rules, but amendment is not required to make the changes needed to meet the final rules. Consortium Agreement (App. 14).

25

Likewise, and for the same reasons, the Consortium Agreement is ambiguous whether the Accelerated Reallocation Payments ("ARPs"), as defined in the Final FCC Order, are "Project Gross Proceeds." As SES rightly points out, "Project Gross Proceeds" are broadly defined and include, "without limitation," "any and all proceeds received by or for the benefit of the Consortium Members in respect of the Project." Consortium Agreement § 1.01 (App. 9). Although it is unclear *if* the ARPs came about "in respect of the Project," it is a reasonable view of the record that they did.

The "language [of the Consortium Agreement] is susceptible of two reasonable interpretations," depending on what was happening at the FCC. Donohue, 184 N.E.3d at 867. In particular, the Project and its scope and purpose reasonably can be read to include Intelsat and SES working together to do whatever is needed to achieve maximum monetization under what the FCC rules require, even if those rules do not include the private market-based approach preferred by the Consortium Members.

SES argues that the Consortium Agreement is unambiguous in so providing. But, for the foregoing reasons, SES cannot prevail on that assertion because the Consortium Agreement is ambiguous.

The ambiguity is baked into the uncertain, indeed confusing, use of the term "the Project," upon which the

26

definition of "Project Gross Proceeds" depends. And, the same is true for the terms "Project Purposes," "Project Scope," and "Project Structure." Thus, to understand the full extent of "the Project" and what it did, or did not, include, it is necessary to look beyond the four corners of the contract and to examine the extrinsic evidence.

When a contract's language creates ambiguity and the court looks to extrinsic evidence, "the meaning of the ambiguous contract is a question of fact for the factfinder." JA Apparel Corp., 568 F.3d at 397; see also Hopeman Bros., Inc. v. Continental Cas. Co., 307 F.Supp.3d 433, 443-44 (E.D. Va. 2018). The Bankruptcy Court's factual findings therefore are reviewed for "clear error." In re Jenkins, 784 F.3d at 234.

"A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (cleaned up). This standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Id.

27

### 2. *The Extrinsic Evidence*

The Bankruptcy Court's Amended Opinion took the view that, because the contract contained "no relevant ambiguity, the Court must not consider extrinsic evidence." Amend. Op. at 22. Nonetheless, in the alternative, the Amended Opinion undertakes to consider some of the extrinsic evidence. And, as to that endeavor, the Amended Opinion states:

> The Court considers "(1) the acts and circumstances surrounding execution of the ambiguous term, (2) conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written agreement, and (3) the parties' course of conduct throughout the life of the contract."

Id. (quoting Nuance Commc'ns, Inv. v. Int'l Bus. Machines Corp., 2021 WL 602989, at *1 (S.D.N.Y. Feb. 16, 2021)). Based on the extrinsic evidence that it did review, the Bankruptcy Court concluded that:

> the [extrinsic] evidence here confirms Intelsat's contention that the consortium Agreement was intended to apply only in the context of the Parties' proposed market-based approach to C-Band Spectrum clearing that the FCC rejected in its entirety.

Amended Op. 22 (App. 596).

In the view of SES, that finding, however, was made by only looking at the evidence Intelsat presented in its proposed findings and without addressing a great volume of highly significant extrinsic evidence presented by SES.

When one party presents significant extrinsic evidence, the finder of the fact is obligated to confront that evidence head-on and in its entirety. SES says that was not done here and that the extrinsic evidence supporting its position was not accorded any consideration by the Bankruptcy Court. If that is so, there is clear error. It is thus necessary to examine the extrinsic evidence that SES says was not considered.

(a)  *The Extrinsic Evidence*

To begin, there is considerable extrinsic evidence that, at the time the parties entered into the Consortium Agreement, they were acutely aware that the FCC might not adopt the market-based approach that the parties preferred. Indeed, there was undisputed testimony that they understood that the FCC could adopt a public, rather than private, auction. Spengler Tr. Trans. (App. 209-210). There also was evidence that the parties understood that there was even a possibility that the FCC could require the satellite-service companies to forfeit their licenses without any form of compensation. Id. at 210.[15] And, the undisputed evidence shows that the parties also understood that the best possible way to monetize the C-Band was to work together. Collar Tr. Testimony (App. 64). In sum, the record

---

[15]  If that occurred, the Consortium Agreement contemplated litigation to challenge the FCC's order. Spengler Tr. Trans. (App. 210); see also Consortium Agreement § 2.01(h) (App. 14).

establishes that Intelsat and SES understood and agreed that a joint effort was the best, perhaps the only effective, way to achieve maximum monetization for the coming reallocation of their C-Band rights.

The record also shows quite clearly that, fully mindful of the risks that the FCC might adopt alternatives other than the preferred market-based approach, the Consortium Members, under the lead of SES and Intelsat diligently prosecuted the private market-based approach that they preferred and that, in their view, would maximize both the monetization of the anticipated C-Band relocation and the Consortium's control over the forthcoming relocation. Notwithstanding those extensive efforts to convince the FCC to adopt the Consortium's preferred private-market based approach, the FCC announced, on November 18, 2019, in a letter to the Senate and in a tweet that it intended to pursue a public auction to clear and reallocate the C-Band rights.[16] In a press release issued that day, the CBA acknowledged that the "FCC Chairman's indication that he intends

---

[16] Letter from Ajit Pai to Senator Roger Wicker (Nov. 18, 2019) (App. 649); Ajit Pai Twitter Thread (Nov. 18, 2019) (App. 700).

to pursue a public auction of C-band spectrum is a significant departure from the CBA's market-based proposal."[17]

Nevertheless, the CBA vowed to "continue to work cooperatively with the FCC to develop an effective alternative plan and achieve the best outcome for the American public while protecting the interests of our users and the rights of our companies." Id. (emphasis added). In other words, the CBA vowed to continue the joint effort to work toward, inter alia, maximizing what the Consortium Members were to be paid for their C-Band rights under the public action approach chosen by the FCC.

The record likewise is full of evidence that, after the FCC's November 2019 announcement, the CBA and its members fulfilled that vow. In fact, there is clear, unrebutted evidence that Intelsat and SES did continue to work together and to advocate for ways to maximize proceeds of the reallocation of their C-Band rights within the public auction approach chosen by the FCC, even though the private market-based auction approach was off the table. Intelsat's Spengler said, after the November tweet, "we agreed that there was still a need and – and that we should still work together." Spengler Tr. Transcript (App. 218)

---

[17] CBA Press Release "C-Band Alliance Responds to Announcement by Federal Communications Commission Chairman Regarding the C-Band Spectrum Proceeding" (Nov. 18, 2022).

(emphasis added). The evidence discloses that the companies "concluded that there was <u>an opportunity still for us to</u>, let's say, <u>salvage what our intentions were</u> in our – in our project together." <u>Id.</u> at App. 1269 (emphasis added).

To those ends, between November 18, 2019 and February 7, 2020, Spengler, Collar, and Telesat's CEO Dan Goldberg had weekly phone calls discussing their joint advocacy work. <u>Id.</u> at App. 217. At no point during this time-period did Intelsat tell SES that the deal reflected in the Consortium Agreement, including the 50/50 agreement, was off. De Hauwer Tr. Trans. (App. 311-312).

According to the record, after the FCC chose the public auction approach over the private market-based approach, the parties even made public representations that the Consortium Agreement, including the 50/50 split provision, was still viable and that the CBA was active in pursuit of salvaging a way to protect the rights of the Consortium Members. Reflecting that view of things, the CBA continued to pay outside consultants, including attorneys and lobbyists, with funds split between Intelsat and SES.[18] Throughout that time, the CBA continued to

---

[18] Appellant's Supplemental Brief ("SES Supp. Br.") at 2 (ECF No. 50); Appellees' Supplemental Brief ("Intelsat Supp. Br.") at 13; <u>see also</u> De Hauwer Tr. Trans. (App. 323-324); Bryan Tr. Trans. (App. 355 & 358).

maintain its own staff, CEO, email addresses, and counsel, all to the end of maximizing the members' compensation under the FCC's rule (the public auction approach).[19]

In addition, and of great significance, the undisputed evidence is that, throughout this period, Intelsat's Vice-President for Investor Relations, Dianne VanBeber, continued to advise the investing public that a 50/50 split between Intelsat and SES should be used for financial modeling purposes.[20] That, of course, must be viewed as an accurate statement of the Intelsat's position until it was formally stated otherwise to its investors. Otherwise, Intelsat would have been making false statements to its investors.

And, together, representatives of Intelsat and SES met policy makers at the FCC and the White House and submitted numerous official written comments. SES Supp. Br. at 2-3; see also Intelsat Supp. Br. at 2 ("To be sure, prior to February 2020, the parties engaged in extensive joint efforts"). Those

---

[19] CBA FCC Filing (Jan. 15, 2020) (App. 812) (Henry Gola of Wiley Rein identifying as CBA's counsel in a filing before the FCC); Letter from Purvis to Bryan (Feb. 11, 2020) (App. 784) (referring to CBA's CEO and Intelsat's order for CBA "to cancel the scheduled staff meetings"); Email "RE: Draft Response to AT&T Technical Proposal" (Jan. 15, 2020) (App. 796) (address line including multiple emails with @c-bandalliance.com addresses).
[20] Spengler Tr. Transcript (App. 221-222); VanBeber Tr. Trans. (App. 181-182).

joint efforts were for the purpose of securing the most compensation from the C-Band rights under the public auction approach to reallocation.

It was at one such meeting, in January 2020, that the FCC informed the CBA that it would provide Accelerated Relocation Payments ("ARPs") to the satellite operators to compensate them for their C-Band rights. Spengler Tr. Trans. (App. 225-226). These payments would be divided individually among the companies. Bryan Tr. Trans. (App. 350); Spengler Tr. Trans. (App. 227). In an email the day after the meeting, Christopher de Hauwer ("de Hauwer"), SES's Chief Strategy & Development Officer, wrote "I asked in the meeting that FCC aggregate the 3 CBA members, they are happy to do that if we file a legal rep[resentation] doc that we are preparing." De Hauwer to Bausch Email "Re: FCC Offer" (Jan. 18, 2020) (App. 1464). Unknown to SES, after that meeting, Intelsat began to pursue separate negotiations with the FCC to increase its percentage of the total ARPs. Bryan Tr. Trans. (App. 351-352).

During the period from late January to early February 2020, SES pressed Intelsat to sign two documents. De Hauwer led SES's efforts on both documents. First, SES wanted Intelsat to sign the above-mentioned representation letter to the FCC asking the FCC to allocate one single amount to the CBA, rather than

34

dividing the ARPs between the companies. De Hauwer Tr. Trans. (App. 316). Second, SES sought an amendment to the Consortium Agreement that would reaffirm the 50/50 split. Id. at App. 327-328.

The record reflects that, from January 25 to 27, 2020, SES's de Hauwer repeatedly requested that Michelle Bryan ("Bryan"), Intelsat's General Counsel, look at the proposed agreement and that Intelsat sign it. Email Chain "RE: Revised ex parte" (Jan. 25-27, 2020) (App. 713-714). The evidence also shows that, although Intelsat told SES it was "fine" with the letter, Intelsat repeatedly stalled signing it. De Hauwer Tr. Trans. (App. 322). An email from Bryan to David Tolley ("Tolley"), Intelsat's Chief Financial Officer, candidly informed that: "I can't stall on this much longer." Email Chain "RE: Revised ex parte" (Jan. 25-27, 2020) (App. 713-714) (emphasis added). Tolley's reply: "Push it as far as you can. And then I can take over and plead ignorance and need for a fresh look." Id.

Another CBA company, Telesat, then expressed some concerns about the document asking the FCC to make a single payment to the CBA. De Hauwer Tr. Tran. (App. 321-322). By the evening of February 3, SES and the Telesat had agreed upon a draft version

35

of the proposed letter to the FCC,[21] which De Hauwer sent to Bruno Fromont ("Fromont"), Intelsat's Senior Vice-President for Strategy & Planning, and Bryan.[22] On February 4, De Hauwer wrote to his colleague John Purvis ("Purvis"), SES's Chief Legal Officer, advising that, if Intelsat refused to sign the documents, SES should immediately cease working with Intelsat. De Hauwer Tr. Trans. (App. 332). According to later trial testimony, SES did not think the amendment was necessary to enforce the 50/50 split. Collar Tr. Trans. (App. 84-85).

Negotiations with the FCC over the payment amount for the C-Band rights reached a fever pitch in the first week of February 2020. That week, Collar and de Hauwer (for SES) came to Washington, DC to again jointly advocate with Intelsat before the FCC. Spengler Tr. Transcript (App. 229). The two CEOs, Spengler and Collar, worked closely together for three days of that week, sharing meals, attending meetings, and being in constant communication as their negotiations with the FCC reached their conclusion. Spengler Tr. Transcript (App. 229); Collar Tr. Trans. (App. 101). Their undisputed purpose was to achieve maximum monetization for the forthcoming reallocation of

---

[21] Email Chain "RE: [External] Letter" (Feb. 3-4, 2020) (App. 1723-1728).

[22] Email Chain "Fwd: [EXTERNAL] Letter" (Feb. 3) (App. 1730).

their C-Band rights. And, as from the onset, both Intelsat and SES remained of the view that they could best do that by acting jointly. By the end of the negotiation on February 3, 2020, the joint efforts has procured a $5 billion offer from the FCC (representing the total ARPs to be paid to all incumbent C-band license holders for their C-Band rights).

During that same week, Intelsat also had four board meetings to discuss the FCC negotiations and Intelsat's increasingly dire financial situation. Spengler Tr. Trans. (App. 231). The first of these board meetings occurred on February 3, 2020. Id.; see also Intelsat Board Meeting Minutes (Feb. 3, 2020) (App. 942). At that meeting, Spengler updated the Board "on the status of discussions" with the FCC. Intelsat Board Meeting Minutes (Feb. 3, 2020) (App. 942). The Intelsat Board then discussed whether to accept or reject the then-pending $5 billion offer to the incumbent providers from the FCC and evaluated "the possible impact of various levels of proceeds [FCC ARPs] accruing to Intelsat." Id. at App. 942-943.

In the early morning on February 4, 2020, an email chain between several high-level Intelsat executives, including Spengler, began. That exchange offers proof pertaining to why Intelsat had a change of mind about the 50/50 split provision of the Consortium Agreement.

37

To start, Bryan (Intelsat's General Counsel) advised Spengler to tell SES's Collar the 50/50 split was off because, in light of Intelsat's financial difficulties, the Board has "defined our need in a flat dollar number and we <u>can not [sic] achieve that with the 50/50 split</u>." Email "Re: c-band consortium amendment 1 v3 PLEASE READ BEFORE YOUR BREAKFAST WITH COLLAR" (Feb. 4, 2020) (App. 716) (emphasis added). In the same email chain, Intelsat's Tolley relayed that SES's de Hauwer had told him that, if the 50/50 split was not respected, SES was "out" of the agreement, echoing de Hauwer's advice to Purvis the same day. <u>Id.</u>

Fromont (Intelsat's Senior Vice-President for Strategy & Planning) then suggested delaying this conversation with Collar. He wrote "I am wondering if this conversation should happen AFTER the [FCC Commissioner Ajit] Pai meeting" scheduled for later that day. Email "Re: c-band consortium amendment 1 v3 PLEASE READ BEFORE YOUR BREAKFAST WITH COLLAR" (Feb. 4, 2020) (App. 718). In particular, Fromont recommended that, after Spengler and Collar met with Pai, Spengler should have "the come to Jesus moment with Collar." Email "Re: c-band consortium amendment 1 v3 PLEASE READ BEFORE YOUR BREAKFAST WITH COLLAR" (Feb. 4, 2020) (App. 718). The record shows that Spengler followed Fromont's advice and did not tell Collar, or anyone

38

else at SES, that Intelsat would not honor the 50/50 split that day.

Instead, Collar and Spengler worked closely together preparing for and executing the final push of their lobbying efforts with the FCC. Spengler Tr. Trans. (App. 242). In fact, according to Spengler, for the rest of the week, Intelsat and SES "were a united front" before the FCC. Id. at App. 244; see also Collar Tr. Trans. (App. 104-105). And, there is proof that, even though Spengler discussed the 50/50 split with Collar on numerous occasions during that "united front" period, Spengler never told Collar that the 50/50 split was off. Spengler Tr. Trans. (App. 244 & 248).

That evidence is important, inter alia, because, from the outset, Intelsat was of the view that a joint effort with SES was the only way to maximize what it would receive for the reallocation of its C-Band rights. It is also probative of the fact that Intelsat's current view of the reach of the 50/50 provision is based on its dire financial circumstances, not on a long-held interpretation of the contract.

Then, according to the undisputed record, on February 4, after the flurry of emails between the Intelsat executives, Intelsat's Spengler and SES's Collar meet with FCC Chairman Ajit Pai ("Pai"), Pai's legal advisor Nick Degani ("Degani"), and

several other government officials. CBA Notice of Ex Parte Meeting (Feb. 6, 2020) (App. 940). In that meeting, Pai told the "united" allies that the FCC's best and final offer was a total $8.8 billion to the companies, up from $5 billion. Spengler Tr. Trans. (App. 251). Pai also informed them that, if the parties did not accept the offer by the next morning, the offer would revert to $5 billion. Id.[23]

Overnight, Spengler and Collar had to decide whether to accede to, or to reject, the FCC's demand, which would mean making a potentially $3.8 billion bet. Spengler Tr. Trans. (App. 253). Ultimately, the following day, February 5, SES and Intelsat, in the most important joint effort in which they had engaged in their joint effort to maximize what they would be paid for their C-Band rights, jointly proposed an $11.5 billion counteroffer. Id. at App. 254.

In a call with Collar, Spengler, and Degani, the FCC and the companies came to an understanding of a final number of $9.7 billion. It is reasonable to believe that the $9.7 billion number was the result of the joint effort suggested by Intelsat,

---

[23] At 8:00pm on February 4, Intelsat's General Counsel Bryan informed SES's Purvis that Intelsat would not sign the FCC representation letter or the amendment to the Consortium Agreement "at this late date." Email "RE: [EXTERNAL] Letter" (Feb. 4, 2020) (App. 1930). All times are given in Eastern Standard Time (EST).

agreed to by SES, and reflected in the Consortium Agreement and in the parties' course of dealing under the Consortium Agreement from the date the parties signed it until they struck the deal maximizing the parties C-Band rights with the FCC. Spengler Tr. Trans. (App. 256-257).

Collar testified that, during the Degani call, he explained to the FCC about the 50/50 deal with Intelsat and SES. Collar Tr. Trans. (App. 111). Spengler stated that, during the call, he "agreed with narrowing the gap [between Intelsat and SES], but I thought it was being done in a different way." Spengler Tr. Trans. (App. 269-270). However, in an Intelsat board meeting on the night of February 5, "Spengler noted that the FCC had retained the Intelsat share previously communicated [to the FCC] as 58% of the total incentive package." Intelsat Board Meeting Minutes (Feb. 5, 2020) (App. 946).

That night, after the call with Degani and Intelsat's board meeting, Collar, Spengler, and other senior executives from the companies went out for a celebratory drink and toasted to their joint success before Collar flew home to Europe. Spengler Tr. Trans. (App. 261-262). The next day, Collar sent Spengler a text: "Really glad you came for a drink. . . we are partners in this to the end." Spengler Tr. Trans. (App. 262). Reflecting SES's confidence in the continued relationship, on February 6

41

Collar agreed with de Hauwer that it was unnecessary to "chase Intelsat today for the filing of the rep agreement and execution of the consortium agreement amendment." De Hauwer and Collar Text Chain (Feb. 6, 2020) (App. 1713).

On February 6, 2020, Chairman Pai held a press conference at which he publicly announced the $9.7 billion agreement the FCC had made with Spengler and Collar on behalf of the CBA the day before. Collar Tr. Tran. (App. 122). While watching the livestream, Collar texted with de Hauwer. De Hauwer did some quick math and estimated Intelsat's rough allocation. De Hauwer and Collar Text Chain (Feb. 6, 2020) (App. 1714). Collar texted de Hauwer "Let's hold the line on 50/50 [with Intelsat] and see where we go in the next days and weeks. No [sic] ready to give up on the 400M just yet!" Id.

Unbeknownst to SES, Intelsat was not yet finished negotiating with the FCC to get a higher percentage. On February 6, Peter Pitsch ("Pitsch"), CBA's Executive Vice-President for Advocacy & Government Relations, emailed Intelsat's Tolley and Bryan informing them that the FCC's leaked draft order had Intelsat down to 50% of the payments. Email "amounts" (Feb. 6-7, 2022) (App. 722). Intelsat senior executives quickly switched into gear, attempting to persuade the FCC to change the split back to 58% for Intelsat, 42% for SES, rather than 50/50. Pitsch

assured Bryan and Tolley that he was reaching out to the FCC to
increase Intelsat's (and decrease SES's) portion of the
proceeds. Email "amounts" (Feb. 6-7, 2022) (App. 721). Late in
the evening of February 6, Tolley texted Matt Rhoades
("Rhoades"), the campaign manager for the CBA about the splits.
Tolley wrote:

> Time critical. Need to know what split to Intelsat is
> in the order. Nick [Degani] told us 58[%]. Then we
> back-channeled 60[%] as you know. Have reason to
> believe it is only 49[% for Intelsat], in which case
> this whole thing is going to explode. Tell me if you
> can find out. Would prefer not to call Nick direct but
> will if needed.

Tolley to Rhoades Text Chain (Feb. 6-7, 2020) (App. 693). The
two discussed next steps and Rhoades assured Tolley that "My
guys will be chasing all night." Id. at App. 694.[24]

　　As reported in Intelsat's Board Meeting Minutes mid-day on
February 7, "A phone call was placed to Nick Degani, the [FCC]
Chairman's legal advisor, to ask him to fix the mistake before
publishing the order today." Intelsat Board Meeting Minutes
(Feb. 7, 2020) (App. 708). Tolley reportedly told the FCC "that
absent returning Intelsat's portion to 58%, Intelsat would not
support the order and we would be forced to litigate." Id.

---

[24] It is important to note that Pitsch and Rhoades worked for the
CBA, not Intelsat, and were therefore jointly paid by Intelsat
and SES. It is particularly perplexing that Intelsat used a
jointly paid CBA lobbyist to lower SES's portion of the
proceeds.

On February 7, 2020 at 3:00 am, Spengler called Collar, who was in Europe. It was, in this call, that, for the first time, Spengler told Collar that Intelsat would no longer respect the 50/50 split and needed the split to return to 58% to save Intelsat's financial situation. Spengler Tr. Tran. (App. 271-272). At the time of the call, the FCC draft order still had a 50/50 split between Intelsat and SES. Id. at 271.

Spengler said at trial that this was "a very difficult call" to make. Spengler Tr. Trans. (App. 272). On February 7, Spengler texted Collar, "I feel very badly about all of this, sick actually." Spengler & Collar Text Chain (Feb. 7, 2020) (App. 711).

And, it was only after February 7, 2020, that Intelsat stopped telling investors to expect a 50/50 split between Intelsat and SES. VanBeber Tr. Trans. (App. 185-186). In other words, at all times until February 7, 2020, Intelsat's public position was that the 50/50 split was in effect.

Early in the morning on February 7, after Spengler's (Intelsat) call to Collar (SES), Bryan (Intelsat's General Counsel) wrote out proposed Intelsat's talking points:

> My view is that we should let [Degani] know that either through misunderstanding or purposeful intent to reneg, Intelsat's number changed overnight — declining from 58% of the total to 50% of the total.... At 58% we are in and good to our word: at 50% we are out.

Email Chain "amounts" (Feb. 6-7, 2022) (App. 720-721) (emphasis added). After Tolley's (Intelsat) call with Degani on the night of February 6, Intelsat "received a call from the FCC staff indicating that they had misunderstood the request for Intelsat and SES [during the February 5 call] and had believed we wanted to decrease the gap between incentive amount for Intelsat and SES." Intelsat Board Meeting Minutes (Feb. 7, 2020) (App. 708). As a result of Intelsat's advocacy, on the afternoon of February 7, Rhoades (the CBA lobbyist) texted Tolley informing him that the FCC was back to the 58% number. Tolley to Rhoades Text Chain (Feb. 6-7, 2020) (App. 695). At the February 7 board meeting, Spengler informed the Intelsat Board that "SES is adamant that the original agreement should still stand and asked Intelsat to reconsider its position to oppose the order." Intelsat Board Meeting Minutes (Feb. 7, 2020) (App. 708).

On February 7, 2020, the FCC issued a draft order on the C-Band proceedings. FCC Proposed Order (Feb. 7, 2020) (App. 1469). In the Proposed Order, the FCC wrote "[w]e decline to adopt the C-Band Alliance proposal for a private sale approach led by incumbent C-band satellite operators." Id. at App. 1469. Instead, as it had indicated in November 2019, the FCC adopted a public auction model that provided for no role for the CBA but

45

did provide for compensation for the Consortium Members' C-Band rights. Id. at App. 1470.

On February 12, 2020, Intelsat's General Counsel Bryan wrote to her SES counterpart, Purvis, informing him that Intelsat "disagree[s] that the [Consortium] Agreement applies to Intelsat's action in connection with the FCC's stated change in position." Bryan to Purvis Email (Feb. 12, 2020) (App. 632) (emphasis added). Intelsat took the position that the FCC's draft order "is not consistent with the Project as defined in section 2 of the [Consortium] Agreement." Id. at App. 633. That letter expressed the view that "the Project is specifically defined by reference to a cooperative formed with the goal of acting as a transition facilitator in connection with a private market-based transaction." Id.

On March 3, 2020, the FCC issued its final order. Final Order (App. 1684). In the Final Order, the FCC announced it "adopt[ed] a traditional Commission-administered public auction of overlay licenses" and reaffirmed that it "decline[d] to adopt the C-Band Alliance proposal for a private sale approach." FCC Final Order (App. 1686-1687). The FCC determined that "a mix of carrots and sticks best accommodates the need to clear [the C-band]." Id. at App. 1689. The FCC established a "Relocation Deadline of December 5, 2025. . . as well as two Accelerated

46

Relocation Deadlines—a Phase I deadline of December 5, 2021 and a Phase II deadline of December 5, 2023." _Id._ It then "set forth consequences for meeting or failing to meet these deadlines." _Id._ The much debated $9.7 billion number represents the total ARPs for all operators if they meet the FCC's two Accelerated Relocation Deadlines. _Id._ at App. 1696. The FCC broke down the number by operator and phase. In the Final Order, the FCC allocated a total of $4,865,366,000 to Intelsat ($1,197,842,000 for Phase I and $3,667,524,000 for Phase II) and $3,968,133,000 for SES ($976,945,000 for Phase I and $2,991,188,000 for Phase II). _Id._ The Final Order makes all operators "individually responsible for all space station clearing obligations." _Id._ at App. 1700. ARPs then are made.

   (b)   _Clear Error_

   This extensive and significant extrinsic evidence presented by SES was for the most part not considered by the Bankruptcy Court. The effect of that failure can be seen in an examination of the Bankruptcy Court's findings respecting the extrinsic evidence that was considered.

   Assessment of the consideration accorded the extrinsic evidence by the Bankruptcy Court begins with the observation that almost all of the text on that subject comes from Intelsat's Proposed Findings of Fact and Conclusions of Law.

47

Orders Comparison at 24-27 (ECF No. 37). Taking that into account and, considering that the Bankruptcy Court clearly erred in ignoring the fact that the Notice of Proposed Rulemaking ("NPRM") explicitly presented both a private, market-based approach and a public auction approach, the adoption of almost all of Intelsat's limited characterization of the extrinsic evidence led the Amended Opinion into clear error on that issue.

The adopted text starts with a discussion of the Consortium's goal of sponsoring the market-based alternative. No doubt, that was a goal, but the analysis entirely omits the significance of the undisputed fact that Intelsat and SES well-knew that a public auction approach was, as the FCC announced in the NPRM, a realistic possibility and that the Consortium needed to address that likelihood as the regulating process proceeded. Furthermore, the analysis also does not mention all of the joint work performed after the parties knew that their preferred approach had been rejected by the FCC. Therefore, that one-third of the adopted text is of no real analytical value in assessing whether the Consortium Agreement continued to govern after the FCC rejected the Consortium's preferred market-based approach and decided to pursue the public-auction approach.

Next, the adopted text outlines instances when Intelsat, SES, or both, publicly commented on the Consortium's proposal.

48

An examination of the cited comments show that they are efforts to lobby for adoption of the Consortium's preferred alternative (the private market-based approach). Although those comments are extrinsic evidence that were entitled to consideration, they do not bear the outcome-determining weight they are accorded in the Bankruptcy Court's Amended Opinion, because the Amended Opinion does not assess and weigh those comments against the extensive undisputed evidence about the course of conduct in which the parties engaged *after* the FCC rejected the private market-based approach in November 2019. And, the same is true to the extent that the adopted text relies on remarks attributed to SES's Chief Legal Officer Purvis. Amend. Op. at 24.

The final aspect of the adopted text in the Amended Opinion discussing extrinsic evidence purports to rely on "the Parties actions after the pubic-auction tweet" (the FCC's rejection of the private market-based approach). Amend. Op. at 25. However, that analysis actually consists only of comments about SES's efforts to amend the Consortium Agreement. In limiting itself to that topic, the Amended Opinion failed to consider all of the other extensive extrinsic evidence presented by SES about the course of conduct that followed the FCC's tweet. That extrinsic evidence is so specific and forceful that ignoring it simply

49

foreclosed making a reasoned, balanced assessment of the course of conduct or the extrinsic evidence as a whole.[25]

The foregoing errors helped to produce a clearly erroneous view of the record of the extrinsic evidence that was skewed in Intelsat's favor and that was made without independent analysis of the extensive extrinsic evidence of the course of conduct in which the parties engaged both from the outset of the joint effort and after the FCC rejected the Consortium's preferred approach. There was substantial extrinsic evidence that the need for a joint effort permeated every aspect of what the parties did from beginning to end. The beginning was the Consortium Agreement and the end was the ARPs produced by the public auction approach adopted in the final FCC rule. That extrinsic evidence was very important. But it was not considered.

On appeal, Intelsat suggests that some of the unconsidered evidence may have fallen under the Bankruptcy Court's sweeping pronouncement that "SES's executives" attempts to "explain away those contemporaneous statements [regarding attempts to amend the Consortium Agreement] at trial were not credible." Amend.

---

[25] Moreover, in its focus on SES's desire for an amendment, the adopted text of the Amended Opinion erroneously fails to appreciate the fact that the Consortium Agreement merely permits an amendment to affect a "change [in] the details of the Project" to "reflect the final rules promulgated by the FCC." The Consortium Agreement does not require an amendment to reflect the FCC's Final Rule (or rules).

Op. at 9. But, that statement is a conclusory one bereft of any discussion of what was not credible or why it was thought not to be credible. And, much of the extrinsic evidence that was not considered actually cut straight against the notion that the SES witnesses lacked credibility. The conclusory credibility finding in the Amended Opinion is really impossible to square with the record considered as a whole.[26]

The simple fact is that there is very strong extrinsic evidence favoring SES's position, and the Amended Opinion does not reflect that it was considered. Although the Bankruptcy Court, as a finder of fact, was not required to accept that evidence, it was required meaningfully to salute it and to explain its reason for disregarding it. By not addressing this evidence, the Bankruptcy Court committed clear error.

When that is taken into account along with the clear error respecting whether the Consortium Agreement was ambiguous, the Court is "left with the definite and firm conviction that a

---

[26] The Amended Opinion's language on the credibility question is drawn, almost verbatim, from Intelsat's Proposed Findings of Fact and Conclusion of Law. Amend. Op. at 9 ("Attempts by SES's executives to explain away those contemporaneous statements at trial were not credible") compare to Intelsat Proposed Findings of Facts & Conclusions of Law (App. 1087) ("The self-serving attempts by SES's executives to explain away those contemporaneous statements at trial were not credible"). And, Intelsat's findings do not address the evidence from its files and witnesses that support the evidence offered at trial by SES.

mistake has been committed." <u>Anderson</u>, 470 U.S. at 573 (cleaned up).

Considering the highly factual nature of the extrinsic evidence (even that which is not disputed), it is necessary to remand the case for reassessment in perspective of the decision that the contract is ambiguous and that the extrinsic evidence must be thoroughly and independently considered.

**C. _Whether the Bankruptcy Court erred in holding that SES's claim for unjust enrichment was foreclosed by New York law_**

In its Amended Opinion, the Bankruptcy Court found "that SES's unjust enrichment claim fails [because it] . . . arises out of the same subject matter as the Consortium Agreement and is thus barred as a matter of law." Amend. Op. at 28 (ECF No. 38-9). SES challenges this finding arguing that the Bankruptcy Court's

> view that the Agreement does not apply should have
> meant SES could bring an unjust enrichment claim based
> on Intelsat's false statements and omissions leading
> SES to believe Intelsat would split 50/50 any ARPs the
> parties obtained in connection with the public
> auction, so that it could reap the benefits of SES's
> cooperation.

SES Br. at 31 (ECF No. 37). Indeed, this is so, says SES, because "Intelsat repeatedly promised [the 50/50 split] to SES to induce its performance." SES Supp. Br. at 5 (ECF No. 50).

Intelsat, on the other hand, defends the Bankruptcy Court's finding, reiterating that SES's unjust enrichment claim arises

out of the same conduct underlying its breach of contract claim. Intelsat Response at 34-35 (ECF No. 40). Thus, Intelsat says, SES's unjust enrichment claim is foreclosed by its breach of contract claim. Id.

This issue rests on a legal conclusion, so the Bankruptcy Court's findings are reviewed de novo. In re Jenkins, 784 F.3d at 234. For the reasons set forth below, the Bankruptcy Court's conclusions of law on this question will be affirmed.

Under New York law, "[t]he basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." Corsello v. Verizon N.Y., Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). To make out such a claim, the plaintiff must allege

> (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or [benefit] to the plaintiff.

Bazak Inter. Corp. v. Tarrant Apparel Group, 347 F.Supp.2d 1, 3-4 (S.D.N.Y. 2004) (quoting Golden Pacific Bancorp v. Federal Deposit Ins. Corp., 273 F.3d 509, 519 (2d Cir. 2001)) (alteration in original); see also Shak v. Adelphi Uni., 549 F.Supp.3d 267, 274 (E.D.N.Y. 2021).

However, under New York law, a claim for unjust enrichment can only lie when an obligation is created by law and "*where*

53

*there has been no agreement or expression of assent, by word or act, on the part of either party involved.*" Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) (emphasis in original). "It is well settled that a claim for unjust enrichment will not lie if the parties have a contract." Perks v. TD Bank, N.A., 444 F.Supp.3d 635, 642 (S.D.N.Y. 2020); see also Clark-Fitzpatrick, Inc., 516 N.E.2d at 193 ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery. . . [under a theory of unjust enrichment] for events arising out of the same subject matter"). The only exception to this rule is "when there is a question whether the contract is valid." Perks, 444 F.Supp.3d at 642.

The New York Court of Appeals has further cautioned that "unjust enrichment is not a catchall cause of action to be used when others fail." Corsello, 967 N.E.2d at 1185. "It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Id. It cannot be used to "simply duplicate[], or replace[], a conventional contract or tort claim." Id. Claims are considered "duplicative of one another if they arise from the same facts and do not allege distinct

54

damages." Watson v. Suffolk Fed. Credit Union, No. 20-cv-1531 (LDH)(CLP), 2022 WL 523543, at *4 (E.D.N.Y. Feb. 22, 2022) (quoting NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008)). In light of this, "[w]here an unjust enrichment claim duplicates a claim for breach of a valid, enforceable contractual obligation, the unjust enrichment claim must be dismissed." Beck v. Manhattan College, 537 F.Supp.3d 584, 589 (S.D.N.Y. 2021).

These principles apply even when there is dispute over the extent or meaning of the contract. If the parties dispute "the meaning of certain terms" of the contract but "do not deny its existence" or dispute its validity, the Clark-Fitzpatrick rule applies and the unjust enrichment claim must be dismissed. Mindspirit, LLC et al. v. Evalueserve Ltd., 346 F.Supp.3d 552, 594-95 (S.D.N.Y. 2018); see also Payne v. Ellison, 914 N.Y.S.2d 123, 125 (N.Y. First App. Div. 2010).

In this case, there is an undisputed valid, enforceable contract. Neither party questions this fact nor that they had a "contractual relationship." Beth Israel Med. V. Hori. Blue Cross & Blue Shield, 448 F.3d 573, 586 (2nd Cir. 2006). Nor do they dispute that this relationship continued up to and including February 2020. SES Supp. Br. at 12 (ECF No. 50); Intelsat Supp. Br. at 12 (ECF No. 51) ("The Consortium Agreement continued to

apply to the parties' advocacy following the November 19 tweet announcing that the Chairman intended to pursue a public auction"). Thus, there is a valid and enforceable contract between the parties.

Furthermore, the contract covers the "subject matter" of this dispute (i.e. clearing the C-Band). This is simply not a case where the unjust enrichment claim "arises from facts wholly independent of any contract upon which plaintiffs sues." Sebastian Holdings, Inc. v. Deutsche Bank AG, 912 N.Y.S.2d 13, 15 (N.Y. First App. Div. 2010). Instead, SES's unjust enrichment claim relies on the same subject matter as its breach of contract claim and is "indistinguishable from [the] contract claims pleaded in the alternative." Shak, 549 F.Supp.3d at 274.

Finally, even if the contract did not govern the subject matter of the unjust enrichment claim, SES's claim still fails. SES argues that it remains entitled to the 50/50 split but the only grounds for the entitlement come from the contract itself. SES Br. at 30-31. Thus, SES "finds itself in a 'catch 22' with this claim. If a valid enforceable contract existed between the parties, then [SES] cannot recover under a theory of unjust enrichment." Bazak Intern. Corp., 347 F.Supp.2d at 4. But, "if no valid contract was in place. . . [SES] has failed to state a claim for relief under the theory of unjust enrichment because,

56

absent a contract," it had no right to a 50/50 split. Id. As SES has no viable claim to any of Intelsat's proceeds without a contract, its unjust enrichment claim is a mere duplicate of its breach of contract claim and thus must, and will, be dismissed.

**D. Whether the Bankruptcy Court erred in holding that SES did not establish a claim for unjust enrichment**

As a matter of law, SES's unjust enrichment claim must be dismissed. Thus, it is not necessary to determine if SES proved such a claim.

CONCLUSION

This matter will be remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

It is so ORDERED.

/s/     REP
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June 22, 2023

57